Case No. 26-689

**United States Court of Appeals**
**for the Ninth Circuit**

United States of America,

Plaintiff/Appellee,

v.

Cory Spurlock,

Defendant/Appellant.

D.C. No. 3:23-cr-00022-MMD-CLB

Appeal from the United States District Court
for the District of Nevada

**Appellant Cory Spurlock's**
**Opening Brief**

*Michael W. Price
*Sidney W. Thaxter
National Association of Criminal Defense Lawyers
Fourth Amendment Center
1660 L St. NW, 12th Floor
Washington, DC 20036

Rene L. Valladares
Federal Public Defender
*Jeremy C. Baron
Assistant Federal Public Defender
*Aarin E. Kevorkian
Assistant Federal Public Defender
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577

*Counsel for Appellant Cory Spurlock

## Table of Contents

Table of Contents ........ i

Table of Authorities ........ iv

Introduction and Summary of the Argument ........ 1

Jurisdictional Statement ........ 2

Detention Status ........ 3

Issues Presented ........ 3

Statement of the Case ........ 4

I. Cory Spurlock serves in the military and meets B.K. and O.O. ........ 4

II. Spurlock and O.O. allegedly join Will Larsen's business; coworker Jered Stefansky goes missing. ........ 5

III. Will and his wife Yesenia are killed. ........ 7

IV. The police investigate through a tower dump warrant. ........ 9

V. Spurlock was arrested and sat in pretrial custody for over four years. ........ 11

VI. Spurlock proceeded to jury trial, was convicted, and was sentenced to life imprisonment ........ 13

Argument ........ 14

I. The government obtained an unconstitutional tower dump warrant. ........ 14

A. Standard of review. ........ 15

B. The affidavit was utterly lacking in probable cause. ........ 15

C. General warrants aren't subject to the good faith exception. .......... 21

D. A surveillance technique's novelty doesn't suggest good faith. .......... 24

II. The government caused over four years of undue pre-indictment and pre-trial delay. .......... 28

A. Standards of review. .......... 28

B. Undue preindictment delay occurred. .......... 29

C. Spurlock's constitutional speedy trial rights were violated. .......... 32

III. Spurlock lacked adequate access to discovery and exhibits. .......... 36

A. Standard of review. .......... 36

B. The defense memorialized access issues. .......... 37

C. The inadequate access violated Spurlock's rights. .......... 38

IV. Multiple trial errors occurred. .......... 40

A. Standards of review. .......... 40

B. Counts One and Two (drug weight). .......... 42

1. Drug distributions before May 2020 don't count. .......... 42

a) Weight depends on drugs distributed after a defendant joins the conspiracy. .......... 43

b) Spurlock didn't join before May 2020. .......... 45

2. The government failed to prove the weight exceeded 1000 kilograms. .......... 47

3. The district court erroneously allowed the agent's testimony as lay, not expert, opinion. .......... 49

C. Count Two (conspiracy-motivated murder). .......... 50

D. Count Three (murder-for-hire). .......... 52

E. Count Four (witness tampering). .......... 56

1. Instructional error occurred, and the evidence was insufficient. .......... 57

2. The error requires two severed retrials. .......... 59

F. Counts Five and Six (transitory fear). .......... 61

G. Counts Seven and Eight (robbery and firearm use). .......... 64

V. The evidence militated heavily against the verdict. .......... 68

A. Standard of review. .......... 68

B. The government's case relied overwhelmingly on unreliable cooperating co-defendants. .......... 69

VI. The leader of the prosecuting office was invalidly serving. .......... 72

A. Standard of review. .......... 72

B. The improper service requires retrial. .......... 73

VII. The Court should remand for Counts Seven and Eight sentencing errors. .......... 75

A. Standard of review. .......... 75

B. The Court plainly erred by sentencing Spurlock on both counts. .......... 76

Conclusion .......... 79

## Table of Authorities

**Federal Cases** **Page(s)**

*Abouammo v. United States*,
608 U.S. 597 (2026) .................................................. 66

*Barker v. Wingo*,
407 U.S. 514 (1972) .................................................. 32, 35, 36

*Barrett v. United States*,
607 U.S. 128 (2026) .................................................. 65, 76

*Betterman v. Montana*,
578 U.S. 437 (2016) .................................................. 32

*Bond v. United States*,
572 U.S. 844 (2014) .................................................. 62

*Carpenter v. United States*,
585 U.S. 296 (2018) .................................................. 16, 24, 26

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) .................................................. 57

*Chatrie v. United States*,
609 U.S. 605 (2026) .................................................. 14, 16

*Chatwin v. United States*,
326 U.S. 455 (1946) .................................................. 62

*Cody v. Kijakazi*,
48 F.4th 956 (9th Cir. 2022) .................................................. 72, 74

*Covino v. Vermont Dept. of Corr.*,
933 F.2d 128 (2d Cir. 1991) .................................................. 39

*Drope v. Missouri*,
420 U.S. 162 (1975) .................................................. 39

*Erikson v. Pawnee Cnty. Bd. Of Cnty. Com'rs*,
263 F.3d 1151 (10th Cir. 2001) .......... 74

*Faretta v. California*,
422 U.S. 806 (1975) .......... 39

*Fowler v. United States*,
563 U.S. 668, (2011) .......... 56, 58

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*,
107 F.4th 1064 (9th Cir. 2024) .......... 73

*Groh v. Ramirez*,
540 U.S. 551 (2004) .......... 22, 23

*Herring v. United States*,
555 U.S. 135 (2009) .......... 27

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
816 F.3d 550 (9th Cir. 2016) .......... 72

*In re Four Applications for Search Warrants Seeking Information Associated With Particular Cellular Towers A/K/A Tower-Dump Warrants*,
2025 WL 603000 (S.D.M.S. 2025) .......... 21-22, 24

*In re Four Applications for Search Warrants Seeking Information Associated With Particular Cellular Towers A/K/A Tower-Dump Warrants*,
2026 WL 2260371 (S.D.M.S. 2026) .......... 18, 24

*Lee v. United States*,
343 U.S. 747 (1952) .......... 71

*Lora v. United States*,
599 U.S. 453 (2023) .......... 76

*Lucia v. SEC*,
585 U.S. 237 (2018) .................................................................. 73

*Marks v. Clarke*,
102 F.3d 1012 (9th Cir. 1996) ............................ 16, 19, 20, 21, 26, 28

*Marron v. United States*,
275 U.S. 192 (1927) .................................................................. 22

*Martinez v. Ryan*,
926 F.3d 1215 (9th Cir. 2019) ..................................................... 57

*McCoy v. Louisiana*,
584 U.S. 414 (2018) ............................................................ 39, 40

*Nathanson v. United States*,
290 U.S. 41 (1933) .................................................................... 17

*Owens ex rel. Owens v. Lott*,
372 F.3d 267 (4th Cir. 2004) ....................................................... 20

*Riley v. California*,
573 U.S. 373 (2014) ............................................................ 22, 26

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) .................................................................. 76

*Smith v. United States*,
599 U.S. 236 (2023) .................................................................. 68

*United States v. Smith*,
110 F.4th 817 (5th Cir. 2024) ........................................... 18, 23, 27

*State v. Bryant*,
2025 WL 3481348 (App. Div. N.J. 2025) ...................................... 18-19

*State v. De Simone*,
60 N.J. 319 (N.J. 1978) .............................................................. 19

*State v. Sims*,
75 N.J. 337 (N.J. 1978) ............................................................ 19, 20

*Steagald v. United States*,
451 U.S. 204 (1981) .................................................................... 22

*SW General, Inc. v. N.L.R.B.*,
796 F.3d 67 (D.C. Cir. 2015) ....................................................... 75

*Taylor v. United States*,
579 U.S. 301 (2016) .................................................................... 65

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ...................................................................... 63

*United States v. Aguilar*,
585 F.3d 652 (2d Cir. 2009) .................................................. 50, 51

*United States v. Alexander*,
817 F.3d 1178 (9th Cir. 2016) ....................................... 29, 32-33

*United States v. Alston*,
974 F.2d 1206 (9th Cir. 1992) ............................................... 68, 69

*United States v. Anderson*,
188 F.4th 571 (2d Cir. 2026) ....................................................... 54

*United States v. Barnes*,
895 F.3d 1194 (9th Cir. 2018) ...................................................... 15

*United States v. Beamon*,
992 F.2d 1009 (9th Cir. 1993) ...................................................... 32

*United States v. Bernal-Obeso*,
989 F.2d 331 (9th Cir. 1993) ........................................................ 71

*United States v. Bertini,*
2023 WL 8258334 (S.D.N.Y. Nov. 29, 2023) ................................ 17

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020) .................................... 31-32, 73, 74, 75

*United States v. Campbell*,
603 F.3d 1218 (10th Cir. 2010) ........................................................ 27

*United States v. Chong*,
419 F.3d 1076 (9th Cir. 2005) ................................................... 52, 55

*United States v. Collazo*,
984 F.3d 1308 (9th Cir. 2021) ................................................... 43, 44

*United States v. Comey*,
810 F. Supp. 3d 768 (E.D. Va. 2025) ................................................ 74

*United States v. Corona-Verbera*,
509 F.3d 1105 (9th Cir. 2007) ............................................ 28, 29, 30

*United States v. Crozier*,
777 F.2d 1376 (9th Cir. 1985) ................................................... 22, 28

*United States v. Cuozzo*,
962 F.2d 945 (9th Cir. 1992) ............................................................ 60

*United States v. Dominguez*,
48 F.4th 1040 (9th Cir. 2022) ........................................................... 65

*United States v. Emmett*,
749 F.3d 817 (9th Cir. 2014) ............................................................ 60

*United States v. Erskine*,
355 F.3d 1161 (9th Cir. 2004) ........................................................... 36

*United States v. Evans-Martinez*,
611 F.3d 635 (9th Cir. 2010) ............................................................ 77

*United States v. Fortenberry*,
89 F.4th 702 (9th Cir. 2023) ............................................................. 67

*United States v. Fuentes*,
2024 WL 5494054 (E.D. Okla. Sept. 3, 2024) ............................... 23-24

*United States v. Garcia*,
413 F.3d 201 (2d Cir. 2005) ............................................................ 49

*United States v. Garcia*,
497 F.3d 964 (9th Cir. 2007) ...................................................... 44, 45

*United States v. Gatlin*,
90 F.4th 1050 (11th Cir. 2024) ....................................................... 58

*United States v. George*,
960 F.2d 97 (9th Cir. 1992) ............................................................ 72

*United States v. Gessen*,
190 F.4th 795 (9th Cir. 2026) ............................................. 42, 54, 67

*United States v. Gonzalez*,
528 F.3d 1207 (9th Cir. 2008) ......................................................... 41

*United States v. Graf*,
610 F.3d 1148 (9th Cir. 2010) ......................................................... 41

*United States v. Griffin*,
188 F.4th 297 (4th Cir. 2026) .......................................................... 18

*United States v. Holmes*,
163 F.4th 547 (9th Cir. 2025) ...................................................... 41, 49

*United States v. Irons*,
31 F.4th 702 (9th Cir. 2022) ........................................................ 43, 44

*United States v. Jackson*,
24 F.4th 1308 (9th Cir. 2022) ...................................................... 61, 62

*United States v. Jackson*,
187 F.4th 1198 (9th Cir. 2026) ........................................................ 72

*United States v. Johnson*,
874 F.3d 1078 (9th Cir. 2017) ........................................ 56, 58

*United States v. Joseph*,
716 F.3d 1273 (9th Cir. 2013) ........................................ 78

*United States v. Lauria*,
70 F.4th 106 (2d Cir. 2023) ........................................ 17

*United States v. Lazarenko*,
564 F.3d 1026 (9th Cir. 2009) ........................................ 42, 59, 60

*United States v. Liu*,
731 F.3d 982 (9th Cir. 2013) ........................................ 41

*United States v. Lovasco*,
431 U.S. 783 (1977) ........................................ 31

*United States v. Loveland*,
825 F.3d 555 (9th Cir. 2016) ........................................ 55

*United States v. Lukashov*,
694 F.3d 1107 (9th Cir. 2012) ........................................ 42

*United States v. Master*,
491 F. App'x 593 (6th Cir. 2012) ........................................ 27

*United States v. McCullah*,
76 F.3d 1087 (10th Cir. 1996) ........................................ 51

*United States v. Medina*,
125 F.4th 310 (1st Cir. 2025) ........................................ 27

*United States v. Melchor-Lopez*,
627 F.2d 886 (9th Cir. 1980) ........................................ 45

*United States v. Morrison*,
529 U.S. 598 (2000) ........................................ 58

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010) .......................................................... 41

*United States v. Phillips*,
929 F.3d 1120 (9th Cir. 2019) .................................................. 53, 54

*United States v. Pontz*,
132 F.4th 10 (1st Cir. 2025) .............................................................. 49

*United States v. Ressam*,
679 F.3d 1069 (9th Cir. 2012) .......................................................... 29

*United States v. Ritter*,
989 F.2d 318 (9th Cir. 1993) ............................................................ 53

*United States v. Rodriguez-Moreno*,
526 U.S. 275 (1999) ........................................................................... 67

*United States v. Sherlock*,
962 F.2d 1349 (9th Cir. 1989) .................................................. 29, 34

*United States v. Stackhouse*,
105 F.4th 1193 (9th Cir. 2024) ......................................................... 55

*United States v. Strickler*,
490 F.2d 378 (9th Cir. 1974) ............................................................ 18

*United States v. Trump*,
740 F. Supp. 3d 1245 (S.D. Fla. 2024) ............................................. 74

*United States v. Vandergroen*,
964 F.3d 876 (9th Cir. 2020) ............................................................ 15

*United States v. Vasquez*,
899 F.3d 363 (5th Cir. 2018) ............................................................ 51

*United States v. Wicklund*,
114 F.3d 151 (10th Cir. 1997) .......................................................... 53

*United States v. Wills*,
346 F.3d 476 (4th Cir. 2003) .................................................... 63

*Villarreal v. Texas*,
607 U.S. 465 (2026) ............................................................ 39

*Wilkins v. Macomber,*
2024 WL 4036568 (9th Cir. Sept. 4, 2024) .................................. 35

*Ybarra v. Illinois*,
444 U.S. 85 (1979) .............................................. 17, 18, 19, 26

*Yokoyama v. Midland Nat. Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) .................................................. 72

*Young v. United States ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987) ............................................................ 74

**Federal Rules**

9th Cir. Model Crim. J. Instr. § 9.8 ........................................ 64
9th Cir. Model Crim. J. Instr. § 16.7 ...................................... 52
9th Cir. Model Crim. J. Instr. § 14.22 .................................... 65
Fed. R. App. P. 4 ................................................................... 2
Fed. R. Crim. P. 8 ................................................................. 59
Fed. R. Crim. P. 29 ............................................................... 13
Fed. R. Crim. P. 33 .................................................... 68, 70, 72
Fed. R. Crim. P. 52 ............................................................... 75
Fed. R. Evid. 701 .................................................................. 49
Fed. R. Evid. 702 .................................................................. 49

**Federal Statutes**

5 U.S.C. § 3345 .......... 72
8 U.S.C. § 1512 .......... 56
18 U.S.C. § 924 .......... 64-65, 76, 77, 78
18 U.S.C. § 1111 .......... 65
18 U.S.C. § 1201 .......... 62
18 U.S.C. § 1512 .......... 56
18 U.S.C. § 1951 .......... 64
18 U.S.C. § 1958 .......... 52, 55
18 U.S.C. § 2261 .......... 63
18 U.S.C. § 2261A .......... 61
18 U.S.C. § 3173 .......... 32
18 U.S.C. § 3231 .......... 2
18 U.S.C. § 3237 .......... 67
18 U.S.C. § 3592 .......... 53
21 U.S.C. § 846 .......... 43
21 U.S.C. § 848 .......... 50
28 U.S.C. § 547 .......... 73
28 U.S.C. § 1291 .......... 2

**Other**

Brian L. Owsley, *The Fourth Amendment Implications of the Government's Use of Cell Tower Dumps in its Electronic Surveillance,* 16 U. Pa. J. Const. L. 1 (2013) .......... 25

Katie Haas, *Cell Tower Dumps: Another Surveillance Technique, Another Set of Unanswered Questions*, ACLU (2014) .......... 76

Oral Argument Transcript, *United States v. Barrett*, No. 24-5774 (Oct. 7, 2025) .......... 76

U.S. Const., Art. II, § 2, cl. 2 .......... 73

## Introduction and Summary of the Argument

According to the government, Jered Stefansky, Will Larsen, and Cory Spurlock operated a cannabis distribution conspiracy; Spurlock killed Stefansky to steal money from the conspiracy, then killed Will and his wife Yesenia to prevent Will from incriminating Spurlock.

Multiple errors plagued this case. First, the investigation began with an unconstitutional tower dump warrant. The district court correctly found a Fourth Amendment violation but incorrectly applied the good faith exception to deny suppression.

Second, the government caused over four years of pre-indictment and pre-trial delay, violating Spurlock's constitutional rights both independently and cumulatively.

Third, this case involved voluminous discovery and trial exhibits, yet Spurlock lacked meaningful access to the discovery and exhibits before and during trial, in violation of the Sixth Amendment.

Fourth, the district court and the government misunderstood the elements of various charges against Spurlock, leading to instructional errors and insufficient evidence on all counts.

Fifth, even if the evidence were sufficient, the weight was heavily against the verdict. The government presented little if any non-incentivized testimony that Spurlock intended to kill the Larsens; it relied instead on unreliable cooperator testimony. Given the extraordinarily weak evidence of intent, a new trial is warranted.

Sixth, an individual ineligible to serve as U.S. Attorney led the prosecuting office and exercised full supervisory authority over the prosecution during the trial, impermissibly tainting the proceedings.

Seventh, the district court improperly sentenced Spurlock on both Counts Seven and Eight.

For these reasons, the Court should reverse and remand with instructions to either dismiss, enter acquittals, conduct a new trial, or conduct a resentencing.

## Jurisdictional Statement

The district court had jurisdiction under 18 U.S.C. § 3231. Spurlock filed a timely notice of appeal on February 4, 2026. 26-ER-5255; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291.

## Detention Status

Spurlock is incarcerated in the Bureau of Prisons with a life sentence.

## Issues Presented

I. Did the police execute an unconstitutional tower dump warrant?

II. Did the government cause prejudicial pre-indictment and pretrial delay?

III. Did Spurlock lack meaningful access to evidence?

IV. Did trial errors occur such as incorrect jury instructions and the prosecution's failure to present sufficient evidence?

V. Was a new trial required given the government's central dependance on unreliable cooperating co-defendants?

VI. Was a new trial required because the U.S. Attorney was invalidly serving?

VII. Did the district court improperly sentence Spurlock on both Counts Seven and Eight?

## Statement of the Case

### I. Cory Spurlock serves in the military and meets B.K. and O.O.[1]

Cory Spurlock was born in Montana. PSR, ¶¶ 86-88. He never met his father. PSR, ¶¶ 86-88. His brother suffers from significant mental illness. PSR, ¶¶ 86-88. He grew up in a volatile household and was occasionally homeless. 16-ER-3209.

Spurlock joined the Marine Corps at 18 and served in active duty from 2005 to 2009 with two tours in Iraq. PSR, ¶¶ 88, 108. He reached the rank of captain and was honorably discharged. PSR, ¶ 108. He received about $6,000 per month through the Department of Veterans Affairs for service-related disabilities. 16-ER-3209. He worked as a high-threat diplomatic security specialist for private companies from 2010 to 2018. PSR, ¶ 105.

In 2012, Spurlock met B.K. at a mechanic's shop. 13-ER-2799-800. B.K. was in the Marine Corps around the same time as Spurlock, although they didn't know each other then. 13-ER-2800.

---

[1] The trial transcripts refer to B.K. and O.O. by their initials. This brief follows that convention.

B.K. served in the military with Will Larsen. 13-ER-2794-95. After, Will sold cannabis and recruited B.K. 13-ER-2796-97. B.K. was arrested in 2010 for drug sales and stopped working with Will. 13-ER-2797-98.

In 2017, Spurlock met O.O. in Israel. 16-ER-3274-75. O.O., an Israeli native, previously served in the Israeli Army. 16-ER-3273-74. She shot guns and practiced knife training as hobbies and would regularly carry weapons. 16-ER-3352-56. Spurlock and O.O. married in 2019. 16-ER-3277.

Spurlock and O.O. lived in Montana and invited B.K. to stay with them in 2019. 13-ER-2803-04; 16-ER-3276-81, 3357-58. B.K. deployed to Iraq from February to October 2020 and began dating Amanda Camacho. 13-ER-2805-06. B.K. was also dating Vanessa Covin (Will's ex-wife) and previously had an affair with Yesenia Larsen (Will's then-wife). 16-ER-3358-60.

## II. Spurlock and O.O. allegedly join Will Larsen's business; coworker Jered Stefansky goes missing.

According to the government, Spurlock and Will conspired to distribute cannabis after B.K. introduced them. 13-ER-2801. O.O.

testified she and Spurlock discussed joining Will's business in late 2019. 16-ER-3283-84. According to B.K., Spurlock told B.K. in 2019 he was going to work with Will, and B.K. advised against it. 13-ER-2807.

Will was a middleman between California cannabis growers and East Coast purchasers. 16-ER-3290. He shipped cannabis to buyers in large crates. 16-ER-3286-88. He established a furniture restoration business as a front in Mound House, Nevada. 16-ER-3284-91.

O.O. testified that once she and Spurlock joined Will, they went to Mound House in May 2020, found a new warehouse location, and signed a lease in June 2020. 16-ER-3362-63.

Jered Stefansky worked for Will; after East Coast buyers sent cash to Mound House, Stefansky brought the money to the California growers. 8-ER-1675-77.

On June 19, 2020, Stefansky drove to Mound House to collect a large cash shipment and went missing. 7-ER-1524-26. Police found his remains in 2021 near Elko, Nevada. 11-ER-2405. At trial, the government alleged Spurlock killed Stefansky to steal the money. The jury failed to reach a verdict on the corresponding charge, which the district court dismissed without prejudice. 2-ER-306.

Shortly after Stefansky went missing, Spurlock broke the Mound House lease, and Will and Spurlock vacated the warehouse. 8-ER-1861-65.

## III. Will and his wife Yesenia are killed.

After his disappearance, Stefanksy's mother, Sheila Sharpe, hired a private investigator. 7-ER-1532-34. The investigator met Will, found the former Mound House warehouse, and discovered Spurlock was on the lease. 8-ER-1659-67. The investigator gave that information to Sharpe. 8-ER-1667. Sharpe publicized Stefansky's disappearance. 7-ER-1542-49, 1644.

The government alleged that Sharpe's investigation prompted Spurlock to plan Will's murder. According to B.K., Spurlock told him he killed Stefanksy to steal money and described a YouTube video where Will called him the most likely culprit. 13-ER-2818-19. Spurlock said Will needed to die because he was a rat, asked B.K. to help kill him, and offered to split any money found on him. 13-ER-2819-21. Spurlock saw Will's wife Yesenia post on social media about an upcoming trip to Reno in November 2020 and decided to kill Will then. 13-ER-2822.

O.O. recalled the conversations differently: Spurlock and B.K. thought Will might've started a new distribution warehouse, and they discussed finding the location and then confronting or blackmailing him, but they didn't discuss killing him. 16-ER-3314-18, 3380.

B.K. testified he left for a road trip with Camacho in late 2020, then at Spurlock's request came to Reno. 13-ER-2822-29. He claimed he, Spurlock, and O.O. then began surveilling Will and Yesenia around Reno. 13-ER-2831. At trial, the government relied on B.K. and O.O.'s testimony to describe their alleged movements. It also presented surveillance footage supposedly showing the Larsens driving a Jeep, followed allegedly by the trio, split between two cars. 12-ER-2515-47; 25-ER-4954-5053. And it presented location information for various phones and B.K.'s truck. 18-ER-3814-63; 26-ER-5063-150.

Late on November 8, 2020, the three cars left Nevada, and the Larsens pulled over in a remote area near Bridgeport, California. B.K. testified he drove behind O.O. and Spurlock, who were in a car together. While driving, he saw flashes and heard gunshots. 13-ER-2852. As he approached the scene, he saw Spurlock kneeling and stabbing something; O.O. drove away in the Larsens' Jeep. 13-ER-2854-56. B.K.

met with Spurlock briefly, got lost, then went back to Reno. 13-ER-2856-58. While driving, B.K. called (or attempted to call) his girlfriends Corvin and Camacho. 13-ER-2859. B.K. claimed that, after reuniting with Spurlock and O.O., Spurlock said he shot Will once, but the gun then jammed, so he stabbed him as well as Yesenia. 13-ER-2860-66. He said O.O. never hesitated in the moment. 13-ER-2859-60. He described finding roughly $1,000 in Will's wallet and gave B.K. several hundred dollars in exchange for a gun. 13-ER-2865.

According to O.O., she and Spurlock were driving behind the Jeep; he had her flash the headlights, and the Larsens pulled over. 16-ER-3330. Will and Spurlock got out and Spurlock started shooting. 16-ER-3332. He called for O.O. to come over, and she "kind of blacked out"; when she came to, Spurlock had her get in the Jeep and drive away. 16-ER-3333.

## IV. The police investigate through a tower dump warrant.

A driver found the Larsens' bodies by the road and called 911 on November 9, 2020. 8-ER-1880-81.

Lacking substantial leads, on November 13, 2020, police obtained a "tower dump" warrant for the cell phone tower closest to the crime

scene. 5-ER-1158-69. This type of warrant directs cell tower operators to provide all phone numbers that interacted with a tower during a specific time range. The return included roughly 1,686 unique devices, some of which were as far as 13.8 miles away. 5-ER-1044, 1049. The detective reviewed the return and identified an attempted call of interest to Yesenia's phone. 5-ER-987-88. Police researched the number that placed this attempted call and determined it was B.K.'s. 5-ER-987-88. The detective then identified a call from B.K.'s number to a number the police later associated with O.O. 5-ER-989. The detective identified another call from B.K.'s number to a number associated with a burner phone, which the government alleges Spurlock placed on the Larsens' Jeep for tracking purposes. 5-ER-989.

After identifying B.K. and O.O.'s phones as numbers of interest in the tower dump returns, detectives sought follow-on warrants for their cell records. They found a common number in those records that they associated with Spurlock, and they determined Spurlock's number was also listed in the tower dump return. 5-ER-992-93, 1002-03. These findings formed the core of the investigation moving forward.

## V. Spurlock was arrested and sat in pretrial custody for over four years.

California authorities obtained arrest warrants for B.K., Spurlock, and O.O. based on the Larsens' deaths. B.K. was arrested first on March 22, 2021. PSR, ¶ 40. While in custody, he gave at least 22 separate statements to law enforcement. 13-ER-2959. Spurlock and O.O. were arrested on March 25, 2021, in Montana. PSR, ¶ 40. The state cases never reached a preliminary hearing.

The FBI participated in the state investigation before, during, and after Spurlock's arrest. *See* 27-ER-5461-63. The Nevada U.S. Attorney's Office claimed it didn't open a related federal case until May 2022. 27-ER-5396.

B.K. came into federal custody on a criminal complaint in August 2022. 27-ER-5366. He participated in three proffer sessions in August and September 2022, was indicted on a single charge of murder-for-hire conspiracy in January 2023, and subsequently pleaded guilty. 14-ER-2918, 2956; 27-ER-5366.

O.O. began cooperating with the government in December 2022. 16-ER-3388. She was first charged by federal criminal complaint in

April 2023, and later by criminal information in July 2024. 27-ER-5366. O.O. pleaded guilty to two counts of stalking resulting in death related to the Larsens and one count of conspiracy to distribute cannabis. 16-ER-3423-24.

Spurlock was not charged federally for over two years while he remained in state custody, until May 11, 2023; he was detained pending federal trial on May 16, 2023. 3-ER-735; Dist. Ct. Dkt. 6. The government then superseded five times. 2-ER-574, 608; 3-ER-708, 723, 729. The government also trickled discovery disclosures to the defense, in a case involving multiple terabytes of electronic discovery. 5-ER-1102-05. And after initially declining to seek death on eligible counts, the government reversed course months later, diverting critical defense trial resources to mitigation. 3-ER-487-92, 568, 722. Spurlock remained detained throughout and faced significant difficulty accessing evidence and meaningfully participating in his defense. *Infra* Arg. Sec. III.

Spurlock objected to every trial continuance, seeking to vindicate his right to a speedy trial. 4-ER-762, 785, 812; 6-ER-1187-88; 27-ER-

5370. Ultimately, the district court excluded several significant continuances from the speedy trial calculation.

In March 2025, four years after his initial arrest, Spurlock filed a motion to dismiss the indictment for government delay. 27-ER-5458 (motion), 5395 (government's response). The district court held a hearing, 5-ER-1054, and denied the motion, 27-ER-5363.

## VI. Spurlock proceeded to jury trial, was convicted, and was sentenced to life imprisonment.

Spurlock was finally tried on the fifth superseding indictment, which alleged eight substantive counts related to drug trafficking, killing, stalking, and robbery. 3-ER-574 (charging document). Trial lasted 20 days. 26-ER-5325. At appropriate times, Spurlock unsuccessfully moved for a directed verdict under Fed. R. Crim. P. 29 due to legally insufficient evidence. 18-ER-3898; 19-ER-4073-136; 20-ER-4152-55; 22-ER-4573, 4576, 4581-82; 24-ER-4889; 2-ER-307-35; 1-ER-10-23. Spurlock also requested several jury instruction corrections, many of which the court denied. 21-ER-4405-52 (settling instructions) 2-ER-385 (joint proposed instructions).

The jury hung on murder while engaged in narcotics trafficking (Count Two, which was dismissed) but returned a guilty verdict on all others. 1-ER-2, 28.

Following trial, Spurlock again moved for acquittal on all counts for insufficient evidence and for a new trial based in part on the District of Nevada's invalidly serving acting United States Attorney. 2-ER-256, 271, 278, 297, 307, 336. The motions were denied. 1-ER-10, 24; Dist. Ct. Dkt. 736.

Spurlock was sentenced in relevant part to mandatory or discretionary life imprisonment (Counts Three through Six) followed by a consecutive 120 months (Count Eight). 1-ER-4.

## Argument

### I. The government obtained an unconstitutional tower dump warrant.

Individuals have a Fourth Amendment privacy interest in location data sent automatically to companies like cell phone providers. *See Chatrie v. United States*, 609 U.S. 605 (2026). As the district court correctly concluded, the tower dump warrant violated Spurlock's constitutional rights because it didn't target a specific user based on

probable cause, instead seeking huge swaths of data and ultimately impacting 1,686 devices. 1-ER-239-45. But the court erroneously applied the good faith exception and denied suppression. 1-ER-245-49. The Court should affirm the constitutional holding but reverse the good faith ruling.

### A. Standard of review.

This Court reviews a denial of a motion to suppress evidence based on the good faith doctrine de novo. *United States v. Barnes*, 895 F.3d 1194, 1199 (9th Cir. 2018). Factual findings are reviewed for clear error. *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020).

### B. The affidavit was utterly lacking in probable cause.

The warrant violated Spurlock's Fourth Amendment rights—and the good faith exception was unavailable—because the affidavit was devoid of probable cause as to Spurlock and his location records. It plainly did not identify him or attempt to connect him to the alleged crimes in any way.

The district court, however, found arguable probable cause based on the generalized, barebones statement that "most people carry phones now." 1-ER-248. Such a broad justification could apply in almost any

case and failed to establish any factual nexus to Spurlock or anyone else searched, as required by the Fourth Amendment. The court therefore erred in applying good faith to a warrant lacking any semblance of particularized probable cause. *See Marks v. Clarke*, 102 F.3d 1012, 1029 (9th Cir. 1996), *as amended on denial of reh'g* (Feb. 26, 1997).

The Supreme Court has repeatedly found that a search occurs when the government accesses an individual's cell phone location information (CSLI). This privacy right belongs to the individual, and consequently, probable cause must be individualized, as well. Beginning in 2018—prior to the warrant in this case—the Court held that "an *individual* maintains a legitimate expectation of privacy in *the record of his physical movements* as captured through CSLI." *Carpenter v. United States*, 585 U.S. 296, 310 (2018) (emphasis added). In *Chatrie*, the Court reaffirmed that "an *individual* has a legitimate expectation of privacy in his cell-phone location data," regardless of the length of time covered or whether the data is held by third parties. 609 U.S. at 619 (emphasis added).

The affidavit here, however, made no attempt to supply probable cause to search Spurlock's cell phone data, and any belief that it did so

was unreasonable. Nothing mentioned Spurlock, his phone number, or any fact connecting him to the crime. Although "most people carry cell phones now . . . [and] cell phones were found near the bodies and in the abandoned vehicle," 1-ER-248, those phones were the victims'. 5-ER-928. No facts pointed to Spurlock as a possible suspect, and generalized statements about cell phone use did not establish probable cause for Spurlock. *See United States v. Bertini*, No. 23 CR 61 (PGG), 2023 WL 8258334, at *8 (S.D.N.Y. Nov. 29, 2023) (addressing a generalization that people "often have cellphones on their person"). Neither did the conclusory statement that "the person(s) involved in the murder had most likely communicated with one another via cell phone." 5-ER-1166; *see Nathanson v. United States*, 290 U.S. 41, 47 (1933); *United States v. Lauria,* 70 F.4th 106, 128 (2d Cir. 2023).

Furthermore, mere proximity to a crime is no substitute for probable cause. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to a probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Instead, "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* The

government cannot "undercut or avoid[]" this requirement "by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.* "[T]he Fourth Amendment does not permit suspicion by geography." *United States v. Griffin*, 188 F.4th 297, 309 (4th Cir. 2026); *see also United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974) (no probable cause to arrest based on the defendant's proximity to a residence where cocaine was being delivered and his participation in some ambiguous driving and observing activity).

"[I]n the context of CSLI, it must be the case that probable cause is required for 'each person's obtained records,' meaning here 'each phone number contained within the dump.'" *In re Four Applications for Search Warrants Seeking Information Associated With Particular Cellular Towers A/K/A Tower-Dump Warrants*, 2026 WL 2260371 at *10 (S.D.M.S. 2026) ("*Four Applications II*") (citing *United States v. Smith*, 110 F.4th 817, 837 n. 11 (5th Cir. 2024)); *see also State v. Bryant*, 2025 WL 3481348 at *10 (App. Div. N.J. 2025) (holding "[t]here was no probable cause to believe that thousands of individual cell phone users were involved in the [crime] . . . where the police were looking for

two perpetrators and a co-conspirator"). The warrant here did not even attempt to show probable cause for each person's records searched. The mere prevalence of cell phones cannot replace particularized probable cause and justify a search of Spurlock's private data, or that of 1,686 other devices in an undefined area near Bridgeport. Each one of those individuals, including Spurlock, "was clothed with constitutional protection against" the search of their private cellular data. *Ybarra,* 444 U.S. at 91. By failing to establish individualized probable cause and instead targeting individuals based on their proximity to the crime, the warrant runs contrary to both *Carpenter* and *Ybarra.*

To be sure, there are circumstances where the government need not identify the name of the individual to be searched and/or seized. However, these so called "all persons" warrants, while constitutional, are still bound by the dual constraints of particularity and probable cause. Therefore, "a warrant to search 'all persons present' for evidence of a crime may only be obtained when there is reason to believe that all those present will be participants in the suspected criminal activity." *Marks*, 102 F.3d at 1029; *see also State v. De Simone*, 60 N.J. 319, 323 (N.J. 1978); *State v. Sims,* 75 N.J. 337, 345 (N.J. 1978). These

situations might include where the area to be searched is, "for example, a building or apartment used as a crack house, a barn used as a methamphetamine lab, or a warehouse used exclusively as a storage place for arms." *Marks*, 102 F.3d, at 1029. However, probable cause to search all persons present in a physical area cannot be demonstrated in areas open to the public, like convenience stores, commercial spaces, or even private residences that might contain innocent friends and family members. *Id.*; *see also Sims*, 75 N.J. at 351.

The warrant here did not "guard against the authorization of a dragnet likely to include the innocent" or limit the search to a crack house, barn or warehouse used for criminal activity. *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 364 (4th Cir. 2004); *Marks*, *see* 102 F.3d at 1029. Police didn't know how many individuals' records would be searched, let alone suggest they were all engaged in criminal activity. *See id.* Instead, the affidavit admitted that the targeted area was a "major [traffic] corridor." 5-ER-1166. Police further admitted they knew at the outset that the warrant would return "a lot" of data and that with tower dumps no one can know how much will be seized. 5-ER-965.

Neither the warrant nor the affidavit provided Spurlock's name, phone number, or any facts to infer his involvement in the killings. To support the search of the protected records of 1,686 people, the government provided only a generalized statement that most people carry cellphones. *Ybarra* prohibits these kinds of "all persons" warrants and therefore no reasonable officer could rely on them "unless supported by probable cause to each individual present" in the area around the cell site, which extended at least 13.8 miles. *Marks*, 102 F.3d at 1026-27 (rejecting reasonable reliance on an all persons present warrant and recognizing *Ybarra* as clearly established law for the purposes of qualified immunity); 5-ER-1049.

### C. General warrants aren't subject to the good faith exception.

The district court correctly identified tower dump warrants as general warrants devoid of particularity but incorrectly applied the good faith exception. Tower dumps by design allow "permeating police surveillance" and are the "equivalent to a request for 'access to an entire haystack because it may contain a needle.'" 1-ER-244 (citing *In re Four Applications for Search Warrants Seeking Information Associated With Particular Cellular Towers A/K/A Tower-Dump Warrants,* 3:25-CR-38-

CWR-ASH, 2025 WL 603000 at *8 (S.D.M.S. 2025) (*"Four Applications I"*). Such general warrants do not fall under the good faith exception. *See United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985).

The Founders created the particularity requirement in response to one of the chief evils of their time: "general warrants" "allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity" and were one of the direct causes of the American revolution. *Riley v. California*, 573 U.S. 373, 403 (2014). As a result, the Constitution forbids, and law enforcement may not rely on in good faith, a general warrant. *See Groh v. Ramirez*, 540 U.S. 551, 558 (2004); *United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985).

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States,* 275 U.S. 192, 196 (1927). General warrants "specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981).

Tower dump warrants describe only an offense or list of offenses for which they intend to uncover evidence. They lack the particularity the Fourth Amendment requires because they do not describe the individual person, phone number, or even a single phone company to be searched. 1-ER-244 (citing *Smith*, 110 F.4th at 837). The subject of the warrant in this case was "[a]ny subjects related to active homicide investigation[.]" 1-ER-244. This is the "equivalent to a request for 'access to an entire haystack because it may contain a needle'" and rendered it a "general warrant[] categorically prohibited by the Fourth Amendment." 1-ER-244 (cleaned up); *see also Smith*, 110 F.4th at 837-38. "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Groh,* 540 U.S. at 563.

The very purpose of tower dump warrants is to dig through the sensitive personal location data of everyone in a geographic area in the hopes that someone might be the suspect. "This is the hallmark of a general warrant—aimless searching with only the hope that the result will justify the means." *United States v. Fuentes*, No. CR-21-358-RAW,

2024 WL 5494054, at *24 (E.D. Okla. Sept. 3, 2024), *adopted,* 2025 WL 484628 (E.D. Okla. Feb. 13, 2025). Thus, the warrants here stand as a "*paradigmatic* example of 'too permeating police surveillance' and a dangerous tool of 'arbitrary' authority." *Carpenter,* 585 U.S. at 396 (Gorsuch, J., dissenting). These general warrants cannot be upheld by the good faith doctrine. *See Four Applications I*, 2025 WL 603000, at *8; *Four Applications II*, 2026 WL 2260371, at *9.

### D. A surveillance technique's novelty doesn't suggest good faith.

The district court expressed "reluctance to suppress evidence" obtained from what it called a "novel investigative technique[]." 1-ER-248. But CSLI isn't new, and in any event, the good faith exception doesn't create a safe harbor merely because the government employs a new technology. The relevant question is not whether tower dumps are novel, but whether a reasonable officer could believe that the warrant satisfied the fundamental Fourth Amendment requirements of probable cause and particularity. That belief isn't reasonable here.

While tower dumps may be relatively new,[2] the constitutional defect in these warrants didn't arise from uncertainty about technology. It arose from the government's decision to use that technology to obtain private data for 1,686 devices (including Spurlock's), without identifying anyone in the warrant, much less articulating probable cause for any one of them, thereby amounting to a general warrant.

The defining feature of tower dumps is their lack of particularity, permitting police to conduct a search without identifying any suspects. This was not "novel" or somehow lost on the government, which had been conducting tower dumps, mostly without a warrant, for over a decade. *See* Brian L. Owsley, *The Fourth Amendment Implications of the Government's Use of Cell Tower Dumps in its Electronic Surveillance*, 16 U. Pa. J. Const. L. 1, at 20-23 (2013) (explaining that as of 2013 the government had been utilizing tower dumps for years). Indeed, the affiant here was instructed by other investigators how to

---

[2] Cell tower dumps have been around since at least 2010 and were already commonplace by 2012. *See* Katie Haas, *Cell Tower Dumps: Another Surveillance Technique, Another Set of Unanswered Questions*, ACLU (2014), https://www.aclu.org/news/national-security/cell-tower-dumps-another-surveillance-technique.

draft the affidavit, 5-ER-955-96, and was aware the warrants would return "a lot" of data with no way to know in advance how much or from whom. 5-ER-965. That a tower dump warrant fails to identify a particular person or account to search is not just an unfortunate side effect of the technique—the very utility of tower dumps lies in the fact that they target everyone.

But it has been clear since the Founding that Fourth Amendment's animating purpose was to prohibit such general warrants. *See Riley*, 573 U.S. at 403. It has been clear since 1979 that probable cause cannot be based on mere proximity to a crime. *See Ybarra*, 444 U.S. at 91. And it has been clear since 2018 that individuals have a privacy interest in their cell phone location information. *See Carpenter*, 585 U.S. at 310. It was therefore unreasonable for an officer in 2020 to believe that a warrant could authorize the search of anyone's data without particularized probable cause. *See Marks*, 102 F.3d at 1026-27. It is axiomatic that when the government seeks an individual's private records—be they from a house or warehouse, an account or database—the Fourth Amendment

generally does not permit officers to search first and identify a suspect later. *See Smith*, 110 F.4th at 837-38.

Given the government's history with tower dumps, applying the good faith exception here would invite the kind of "systematic error" and "reckless disregard of constitutional requirements" that the Supreme Court has warned against. *Herring v. United States*, 555 U.S. 135, 144 (2009). The constitutional defect was not a one-off mistake by a well-meaning detective, *United States v. Campbell*, 603 F.3d 1218, 1235-36 (10th Cir. 2010); *United States v. Master*, 491 F. App'x 593, 596-97 (6th Cir. 2012), or a single filing error by another law enforcement official, *see, e.g.*, *United States v. Medina*, 125 F.4th 310 (1st Cir. 2025). It was a technique the government had previously conducted warrantlessly yet chose to pursue even after *Carpenter* recognized an *individualized* privacy interest in cell phone location information. And the police chose to use the technique despite knowing that it would likely search the private data of "a lot" of people, 5-ER-965, using warrants that lacked any hint of particularized probable cause on their face or elsewhere. Excusing such conduct on the grounds

that the well-known technique was "novel" and the warrant so facially deficient thus rings hollow. 1-ER-248.

The general warrant here was completely devoid of probable cause or particularity; the good faith exception doesn't apply; and the fruits of the warrant should be suppressed. *Crozier*, 777 F.2d at 1381; *Marks*, 102 F.3d at 1026-27. And because the tower dump warrant was the genesis of the entire police investigation in this case, the need for suppression extends to substantially all fruits of the police investigation, including but not limited to evidence seized pursuant to follow-on warrants and testimony or statements from individuals like B.K. and O.O.

## II. The government caused over four years of undue pre-indictment and pre-trial delay.

### A. Standards of review.

This Court reviews the district court's denial of Spurlock's motion to dismiss due to pre-indictment delay for abuse of discretion. *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007). "A district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when" this

Court is "left with a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc) (cleaned up).

This Court "review[s] a district court's denial of a speedy trial claim de novo, although factual determinations underlying the decision are reviewed for clear error." *United States v. Alexander*, 817 F.3d 1178, 1181 (9th Cir. 2016).

### B. Undue preindictment delay occurred.

"The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive pre-indictment delay." *United States v. Sherlock*, 962 F.2d 1349, 1353 (9th Cir. 1989), *as amended*. "Generally, any delay between the commission of a crime and an indictment is limited by the statute of limitations." *Corona-Verbera*, 509 F.3d at 1112. But due process can nevertheless require dismissal of an indictment within this period. *Id.*

A two-part test applies to preindictment delay. First, Spurlock must show "actual, non-speculative prejudice from the delay." *Id.* Second, he "must show that the delay, when balanced against the prosecution's reasons for it, offends those fundamental conceptions of

justice which lie at the base of our civil and political institutions." *Id.* at 1353-54 (cleaned up). Both showings are satisfied.

Here, despite the Nevada U.S. Attorney's Office claiming to open a formal investigation in May 2022, the federal government was involved in the investigation of this case long before. *See* 27-ER-5462-63 (among other things, FBI reports indicated assistance in state investigation); 27-ER-5462 (FBI assists in Spurlock's state arrest).

The government took advantage of Spurlock's lengthy state custody that separated him from his wife to successfully pit O.O. against him. 27-ER-5481-82. For example, in February 2022, FBI agents from Reno, Nevada, interviewed O.O., telling her that Spurlock refused to help her and warning that the criminal process would repeat in Nevada. 16-ER-3395-96; Defense Exhibit (DX)-B-04:00-07:45.[3] Jail call summaries indicated O.O. was frustrated by state case delays, believing her lengthy pretrial custody was intended to pressure her into agreeing with "lies" and pleading guilty. 27-ER-5490-93. Additionally, the government interviewed a witness who reported that Will asked if

[3] Spurlock simultaneously files a motion to transmit physical exhibit DX-B.

he would kill somebody for $20,000—a statement Spurlock likely would have elicited at trial[4]—but that witness passed away in July 2023 before the defense even received discovery. 27-ER-5480.

Claiming general case complexity as the reason for the delay, 27-ER-5416-17, the government fell far short of showing the necessity of such egregious delay balanced against this actual prejudice. *Cf. United States v. Lovasco*, 431 U.S. 783, 796 (1977). And the district court denied relief by "accept[ing] the government's explanation that its investigation into this case started in May 2022, and finding a lack of evidence that the government 'improperly delayed conducting its own investigation' before seeking an indictment." 27-ER-5367 (quoting ECF No. 174 at 4)]. But this Court has considered delay occurring before a U.S. Attorney Office's formal participation in investigation, *United States v. Walker*, 601 F.2d 1051, 1053–54 (9th Cir. 1979), and there's no meaningful reason to carve out federal law enforcement's involvement in the state case here, *see, e.g., United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020) (reiterating investigating agencies' knowledge will

---

[4] The district court erroneously suggested Will's statement to the witness would be inadmissible hearsay.

be imputed to prosecution for purposes of *Brady v. Maryland*, 373 U.S. 83 (1963)).

### C. Spurlock's constitutional speedy trial rights were violated.

The Sixth Amendment separately guarantees federal defendants the right to a speedy trial. 18 U.S.C. § 3173; *Betterman v. Montana*, 578 U.S. 437, 442 (2016). To determine whether delay violates the Sixth Amendment, courts consider the defendant's assertion of the right, along with the length of delay, the reason for delay, and prejudice. *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972).

First, approximately 27 months passed from the first federal indictment to trial. 3-ER-735, 7-ER-1411. And regardless of the cause, the additional 22 months spent in pre-indictment state custody are relevant to the excessive delay. The "delays here are well over one year," "presumptively prejudicial," and "more than sufficient to trigger the speedy trial inquiry under *Barker*." *United States v. Beamon*, 992 F.2d 1009, 1013 (9th Cir. 1993).

Second, the government was responsible for both the pre- and post-indictment delay. This factor is "the focal inquiry." *Alexander*, 817

F.3d at 1182 (citation omitted). Here, the government superseded the original indictment five times (totaling six indictments), 3-ER-574, substantially delayed (or alternatively, duplicated) production of discovery, *see* 5-ER-1102-05, 27-ER-5470-73, and sought to reverse its no-seek decision for death eligible charges, 3-ER-477, 568, all unjustifiably extending the pretrial period. 5-ER-1097-105.

The district court believed that "the government provided valid reasons" to supersede several times, 27-ER-5374, including the delayed second superseding indictment, which issued July 11, 2024, and added the Stefansky-related murder charge, 3-ER-723. The government didn't dispute that it had the information ultimately presented to the grand jury on those counts by 2023, 5-ER-1101, instead claiming it waited until securing O.O.'s plea agreement because "DOJ standards are that we're not supposed to indict something unless we believe we can prove it beyond a reasonable doubt." 5-ER-1127-28. But "DOJ standards" do not overcome the Constitution. In addition, O.O.'s testimony didn't materially alter the government's case regarding Stefansky's alleged murder. 23-ER-4663-76 (relying only briefly on her testimony and more extensively on surveillance footage and CSLI). While "[a] prosecutor

*may* have wide latitude to decide when to seek an indictment, especially when a case involves more than one person," *Sherlock*, 962 F.2d at 1355 (emphasis added), that latitude doesn't overcome the constitutional standards governing speedy trial rights.

The district court further found the government's "chaotic disclosure of significant discovery close to trial" to be "concerning," but excused that conduct by finding other reasons necessitated continuances. 27-ER-5375-76. As the defense explained, by April 2025, of the nearly four terabytes of disclosed data in the case, *three terabytes* arrived since January 2025 alone, much of which was duplicative. 5-ER-1103-04. Although the government described disclosure as "constant[]," 5-ER-1124, that excuse didn't square with the government's acknowledgement, as early as July 2023, that the case had "terabytes of discovery" (that were, as of then, undisclosed due to a pending conflict motion). 4-ER-759. The court was thus wrong to minimize the role that belated disclosures played in delaying Spurlock's trial. *See, e.g.,* 4-ER-761-62 (continuance granted in part due to discovery), 794-95 (defense explaining disclosures following second

superseding indictment impacted trial readiness); 816-17 (continuance granted in part due to discovery).

Finally, although the government filed a notice that it didn't intend to seek the death penalty in July 2024, 3-ER-722, the government reversed course twelve days before the supposedly firm trial date of April 22, 2025, filing a fifth superseding indictment and notice of intent to seek death. 3-ER-490. "[T]he trial could not go forward the following week given the Notice," and was—again—continued as a result of the government's actions. 3-ER-492. And while the death notice was ultimately stricken, the case was delayed again by litigation related to the notice, including the government's interlocutory appeal, which it ultimately dismissed.

Third, as the district court recognized, Spurlock repeatedly asserted his right to a speedy trial, 4-ER-762, 785, 812; 6-ER-1187-88; 27-ER-5370, which "is entitled to strong evidentiary weight" of deprivation. *Barker*, 407 U.S. at 531. He did not engage in conduct that significantly contributed to delay. *Cf. Wilkins v. Macomber*, No. 22-16072, 2024 WL 4036568, at *2 (9th Cir. Sept. 4, 2024).

Fourth, the delay was prejudicial. 5-ER-1106-09; 27-ER-5484-86. This factor "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. Here, Spurlock suffered "oppressive pretrial incarceration" amplifying his "anxiety and concern," *id*., perhaps none greater than that caused by the government attempting to reverse its position on seeking to kill Spurlock "in a dizzying manner." 3-ER-530. This constitutes far worse than average 'anxiety and concern.'" 3-ER-530. Moreover, the delay impaired the defense, "skew[ing] the fairness of the entire system." *Barker*, 407 U.S. at 532; *see also infra* at Sec. III (inability to access discovery and meaningfully participate in defense).

Excessive government delay violated Spurlock's constitutional speedy trial rights, warranting dismissal.

## III. Spurlock lacked adequate access to discovery and exhibits.

### A. Standard of review.

The Court generally reviews Sixth Amendment violations de novo. *See United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004) (involving self-representation).

### B. The defense memorialized access issues.

Spurlock and his attorneys repeatedly raised concerns in 2025 about his inability to access large amounts of relevant information. In an ex parte pleading, the defense argued, "Spurlock must be permitted under the Sixth Amendment full access to his electronic discovery during pretrial litigation and in trial in order to meaningfully assist in his defense." 27-ER-5444. At a hearing, the defense explained the prosecution had produced four terabytes of discovery total, including three terabytes during 2025. 5-ER-1103.

Moving to modify a prior protective order, the defense described additional logistical problems with Spurlock reviewing audio-visual discovery and materials involving B.K. and O.O. 3-ER-465-67. Spurlock sought "unrestricted access" "to enable him to meaningfully assist in his own defense" under the "Sixth Amendment," 3-ER-465-66, which was ultimately denied, 1-ER-199-201.

At an ex parte hearing, defense attorneys referenced their motion "related to the Protective Order and [Spurlock's] access to his discovery." 27-ER-5362. Additionally, the Reno jail, where Spurlock was held during trial, had no "mechanism for the review of electronic

discovery . . . . The only way individuals there [can] review it is through counsel or an investigator showing it to them." 27-ER-5362.

During trial, the defense asked the district court to order the Reno jail to provide Spurlock laptop access for discovery and exhibit review. 8-ER-1886. The court said it would instead allow Spurlock laptop access in the courthouse cellblock during the hour between court recessing for the day and Spurlock's transport back to jail. 13-ER-2791-92.

The defense later asked the court to have Spurlock transported to the courthouse during an upcoming dark day to access the laptop. 15-ER-3196-97. "[I]t's an issue with constitutional import because he needs to participate in his own defense. He can't do that if he doesn't have meaningful access." 15-ER-3198-99. The defense reiterated the request for jail laptop access. 15-ER-3200-01. The court again denied the request and suggested defense counsel spend more time on jail visits during trial. 15-ER-3201-03.

### C. The inadequate access violated Spurlock's rights.

A criminal defendant has a Sixth Amendment right to meaningfully participate in his defense. When a case involves

substantial electronic discovery and exhibits—like the over four terabytes of discovery at issue here—the defendant must have reasonable personal access to the material.

Criminal defense is a "collaborative enterprise." *Villarreal v. Texas*, 607 U.S. 465, 477 (2026). "[A]n accused is entitled to be assisted—not merely directed—by an attorney." *Id.* (cleaned up). "And just as lawyer advises client, so too does client advise lawyer: More than merely allowing the defendant to participate in tactical decisions, consultation enables the lawyer to obtain factual information crucial to making them." *Id.* (cleaned up).

The consultation right manifests in various ways and overlaps with other constitutional rights. *See, e.g.*, *McCoy v. Louisiana*, 584 U.S. 414 (2018) (autonomy to control defense objectives); *Faretta v. California*, 422 U.S. 806 (1975) (self-representation); *Drope v. Missouri*, 420 U.S. 162, 171 (1975) (competency, based in part on ability to aid and assist counsel); *Covino v. Vermont Dept. of Corr.*, 933 F.2d 128 (2d Cir. 1991) (facility transfers impacting consultation). Among this web of rights is the defendant's ability to fully access discovery and trial exhibits.

Spurlock was denied this right before and during trial. While in pre-trial custody, Spurlock lacked meaningful access to audio-visual discovery and certain materials involving B.K. and O.O. During trial, he lacked access to electronic discovery in the facility and had only brief access at the courthouse. The district court rebuffed these concerns, suggesting the defense schedule additional in-person legal visits. But the attorneys were juggling myriad competing demands during the lengthy trial and couldn't reasonably be expected to dedicate additional hours to sitting alongside Spurlock in jail rather than completing trial tasks necessary for effective assistance.

Because Spurlock lacked reasonable access to the discovery and trial exhibits, his Sixth Amendment rights were denied. The error should be deemed structural, like analogous Sixth Amendment errors. *See, e.g.*, *McCoy*, 584 U.S. at 427 (right to control the objectives of the defense). The Court should reverse and remand for a new trial.

## IV. Multiple trial errors occurred.

### A. Standards of review.

"When a party properly objects to a jury instruction," this Court "review[s] de novo whether the instructions given accurately describe

the elements of the charged crime." *United States v. Liu*, 731 F.3d 982, 987 (9th Cir. 2013) (cleaned up). "An error in describing an element of the offense in a jury instruction is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* at 992 (cleaned up).

The government must present sufficient evidence of guilt. "[E]vidence supports a conviction, if, viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) (cleaned up). "More than a 'mere modicum' of evidence is required to support a verdict." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010); *see also id.* at 1167 ("mere speculation"). The Court reviews sufficiency claims de novo. *See United States v. Gonzalez*, 528 F.3d 1207, 1211 (9th Cir. 2008).

This Court "review[s] the district court's determination of whether testimony is offered as an expert or a lay witness for abuse of discretion." *United States v. Holmes*, 163 F.4th 547, 560 (9th Cir. 2025).

This Court "review[s] for an abuse of discretion the district court's denial of a motion for a new trial made on the grounds of retroactive misjoinder." *United States v. Lazarenko*, 564 F.3d 1026, 1042-43 (9th Cir. 2009).

This Court "review[s] de novo whether venue was proper." *United States v. Gessen*, 190 F.4th 795, 810 (9th Cir. 2026) (cleaned up). "Venue is a question of fact that the government must prove by a preponderance of the evidence." *United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012).

### B. Counts One and Two (drug weight).

Count One alleged Spurlock conspired to distribute 1,000 kilograms or more of cannabis. That allegation was also an element of Count Two, which charged murder during a qualifying drug trafficking conspiracy. The government failed to prove the necessary weight threshold.

#### 1. Drug distributions before May 2020 don't count.

To establish that a conspirator is responsible for a specific drug weight, the government must prove the conspiracy distributed the

alleged amount *after* the defendant joined, not *before*. Here, the government's weight calculation depended on distributions occurring before May 2020. But even assuming the trial evidence showed Spurlock joined the conspiracy, the earliest he could've joined was May 2020. The government's theory of weight was insufficient.

#### a) Weight depends on drugs distributed after a defendant joins the conspiracy.

Under 21 U.S.C. § 846, to prove a conspiracy involving specific drug weight, the government must establish "the defendant's mental state was the same as if the defendant had been charged with the underlying [substantive] offense." *United States v. Collazo*, 984 F.3d 1308, 1333 (9th Cir. 2021) (en banc). Although "the government need not prove the defendant's knowledge of the drug type and quantity" or that specific distributions were "reasonably foreseeable," *id.* at 1333-34, the government must "prove[] beyond a reasonable doubt that the underlying [substantive] offense involved the [charged] drug type and quantity," *id.* at 1336, and "was [an] object of the conspiracy," *United States v. Irons*, 31 F.4th 702, 717 (9th Cir. 2022).

Thus, a defendant isn't responsible for distributions occurring before the defendant joined a conspiracy. The defendant must first conspire to commit a substantive offense, and a substantive offense must *then* occur as an "object of the conspiracy," *Irons*, 31 F.4th at 717, before drug weight liability can attach. *See Collazo*, 984 F.3d at 1320 (the defendant must agree "some member of the conspiracy *would commit* the relevant underlying offense"). Conspiracy liability therefore doesn't cover distributions occurring before the defendant's involvement.

The district court rejected this argument. 21-ER-4411. It cited *United States v. Garcia*, 497 F.3d 964, 967 n.1 (9th Cir. 2007), which states, "under the general law of conspiracy, if you join an ongoing conspiracy, you're responsible for everything that went on before it." "This proposition is correct only in the context of establishing vicarious liability for acts establishing the crime of conspiracy *itself*." *Id.* While the government can prove a conspiracy with evidence predating a defendant's involvement, that principle doesn't cover drug weight in conspiracy cases. In that context, a defendant isn't liable for distributions occurring before the defendant's agreement, just like a

defendant isn't liable for "substantive offenses committed in the course of a conspiracy" before the defendant's involvement. *Id.*

Because the jury instructions provided insufficient guidance about weight calculations, 1-ER-57, the Court should reverse and remand for a new trial regarding weight.

#### b) Spurlock didn't join before May 2020.

The government's weight calculation assumed Spurlock joined the conspiracy at least by January 2020. But no rational juror could find Spurlock joined before May 2020. The government therefore failed to prove weight.

O.O. testified she and Spurlock had initial conversations with Will about the conspiracy in late 2019. 16-ER-3284-86, 3362-63. But "preliminary negotiations" aren't an agreement. *United States v. Melchor-Lopez*, 627 F.2d 886, 892 (9th Cir. 1980). The duo joined in May 2020; shortly after, they went to Mound House to scout a new warehouse location. 16-ER-3363. They worked with Will for two months total, i.e., May and June 2020. 16-ER-3364. The documentary evidence is similar: Spurlock first engaged in meaningful financial

activity in Nevada in May 2020 and signed the warehouse lease in June 2020. 25-ER-4943; 28-ER-5548-797; 29-ER-5799-6004.

B.K. agreed Spurlock said in 2019 that "he was going into business with Will." 13-ER-2807; *see* 1-ER-15. That's consistent with preliminary negotiations in 2019; B.K. didn't testify Spurlock said he was already involved. Although O.O. proposed a front business named "Albright," and a shipping label from December 2019 had the name "Albrightson," that suggests only that O.O. gave Will an idea for a name during the preliminary discussions; it doesn't show active involvement. 1-ER-15.

Because the evidence doesn't rationally support the conclusion Spurlock joined the conspiracy before May 2020, and because the government's weight argument relied on shipments predating May 2020, the evidence was insufficient to support the jury's weight finding. The Court should reverse and remand for entry of acquittal on weight and Count Two.

### 2. The government failed to prove the weight exceeded 1000 kilograms.

Even if Spurlock was responsible for weight dating back to 2019, the government still failed to prove weight. A DEA agent presented two flawed calculation methods. First, she identified 18 labels for outbound shipments from Mound House from January to June 2020, with 7,867 pounds of gross weight. 17-ER-3627-29. She identified three inbound shipments ranging from 270 to 300 pounds. 17-ER-3629-30. She assumed the inbound shipments were East Coast buyers returning shipping crates for reuse, so all outbound shipments had 300 pounds of crate weight. 17-ER-3630. She multiplied 300 pounds by 18 shipments to determine total crate weight, then subtracted that figure from gross weight, for a net cannabis weight of 2,467 pounds—barely over the 1,000-kilogram (2,205-pound) threshold. 17-ER-3630-31.

The agent had no firsthand knowledge of weight or whether any of the 18 shipments contained cannabis. 17-ER-3669-72. She assumed the three inbound shipments were buyers returning crates, but only one came from an address that previously received an outbound shipment. 17-ER-3676-80. Three outbound shipments had gross weights below

300 pounds, but her methodology assumed each outbound shipment—including these three—had 300 pounds of crate weight, so these three shipments added *negative* net weight to her calculations. 17-ER-3686-88. There were two outbound shipments with two pallets, not one, but she still assumed those two shipments had only 300 pounds of crate weight each, not 600 pounds; accounting for those two errors, the net cannabis weight fell below 1,000 kilograms. 17-ER-3694-97; 18-ER-3719-30. This speculative and error-ridden testimony cannot rationally support the weight finding.

The agent's second method was even worse. It apparently involved reviewing Will's documents and photos, attempting to divine price information, and using prices to determine weight. 17-ER-3631-49; *see* 26-ER-5151-203 (underlying photos). But the agent provided no substantial detail about how she conducted this analysis. The basis for this second opinion is inscrutable.

The district court's contrary analysis is summary and unpersuasive. 1-ER-15. The Court should reverse and remand for entry of acquittal on weight and Count Two.

### 3. The district court erroneously allowed the agent's testimony as lay, not expert, opinion.

The district court erroneously overruled Spurlock's objection to the agent's expert testimony. Evidence is subject to Fed. R. Evid. 702 if it requires "special knowledge, skill, training, or education." *Holmes*, 163 F.4th at 560 (cleaned up). A litigant cannot "evad[e] the rule "through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, committee notes on 2000 amendment.

The district court concluded the agent's testimony was "proper lay opinion." 17-ER-3490. "If all she's doing is identifying her review of the evidence, and helping adding up the math, then it's really up to the jury." 17-ER-3490-91. But her testimony wasn't mere arithmetic that would be "familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005); *see also United States v. Pontz*, 132 F.4th 10, 20 (1st Cir. 2025) (similar). Rather, her two calculation methods required drawing various assumptions and choosing modes of analysis that depended on specialized experience. The district court abused its discretion when it mischaracterized this testimony as lay, so a new trial on weight is warranted.

### C. Count Two (conspiracy-motivated murder).

Assuming there was sufficient evidence Spurlock caused Stefansky's death, there was no evidence his motive was to *promote* the cannabis conspiracy, as opposed to stealing money and *hurting* the conspiracy. The Court should direct an acquittal.

The homicide offense, 21 U.S.C. § 848(e)(1)(A), applies to "any person [1] engaging in or [2] working in furtherance of a continuing criminal enterprise, or any person [3] engaging in [a qualifying drug trafficking offense] . . . who" causes a homicide.

There are "three ways" to violate this statute. *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009). The first is if "a person kills while engaging in a continuing criminal enterprise." *Id.* Because the CCE statute uses "engaging in" as a term of art, this clause captures murders caused by "drug kingpins." *Id.* (cleaned up). The second way is if "a person kills while working in furtherance of a continuing criminal enterprise." *Id.* (cleaned up). This phrase captures murders caused by the kingpin's "henchmen." *Id.* (cleaned up). The third way is if "a person kills while engaging in" a qualifying drug trafficking

offense. *Id.* (cleaned up). Unlike the CCE statute, this clause uses "engaging in" in the conventional sense.

For all three clauses, the government must prove "a substantive, and not merely temporal, connection between the murder and the predicate offense." *United States v. Vasquez*, 899 F.3d 363, 379 (5th Cir. 2018) (cleaned up). The murder must be "committed to further the [conspiracy's] criminal objectives," for example by "further[ing] the organization's image and reputation." *United States v. McCullah*, 76 F.3d 1087, 1102-03 (10th Cir. 1996).

The district court erroneously concluded the motive element applies only when the government charges a defendant with a murder "in furtherance of" a continuing criminal enterprise. 19-ER-4100-101. That language serves to cover CCE drug henchmen; it doesn't remove the motive element from the other clauses.

No rational juror could conclude that, assuming Spurlock killed Stefansky, he did so "to further the [conspiracy's] criminal objectives." *McCullah*, 76 F.3d at 1102. The government theorized Spurlock embezzled money from and thereby *undercut* the conspiracy. The Court should reverse and remand for entry of acquittal.

### D. Count Three (murder-for-hire).

Count Three alleged Spurlock conspired with B.K. to commit murder-for-hire resulting in death under 18 U.S.C. § 1958(a). 3-ER-576-77. This offense required proof that Spurlock: (1) conspired to use or cause another to use a facility in interstate commerce; (2) with the intent that murder be committed; (3) in exchange for payment of a thing of pecuniary value; and (4) a person died as a result. 9th Cir. Model Crim. J. Instr. § 16.7; 1-ER-59. "'[A]nything of pecuniary value' means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1).

The district court erred by failing to instruct the jury that the third element—a promise of payment—requires more than the mere possibility of financial gain. Conspiracy under § 1958(a) requires that the person solicited "clearly understood they would receive something of pecuniary value in exchange for performing the solicited murderous act." *United States v. Chong*, 419 F.3d 1076, 1082 (9th Cir. 2005). Had Congress intended § 1958(a)'s pecuniary value requirement to more broadly "cover murder in *expectation* of pecuniary gain it could have

drafted it to do so, as it did in other statutes." *United States v. Wicklund*, 114 F.3d 151, 153-54 (10th Cir. 1997) (emphasis added) (citing 18 U.S.C. § 3592(c)(8)).

"[T]he intent to pay someone to commit murder is," therefore, "a critical element of 'murder-for-hire.'" *United States v. Phillips*, 929 F.3d 1120, 1124 (9th Cir. 2019) (quoting *United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993)). Speculative economic gain will not do. *See id.* Rather, the evidence must show the existence of a "legitimate promise to pay" for the killing. *Id.* at 1125 (cleaned up).

The government presented insufficient evidence of non-speculative consideration, or at a minimum the erroneous instruction was harmful. At trial, the government offered nothing more than Spurlock's purported statement that *if* Will had cash on him, he and B.K. would split it. 13-ER-2821; 14-ER-3036 (B.K. agreeing he did not actually know whether money would be recovered). No evidence suggested Spurlock promised to pay B.K. for the killing; indeed, had Will been found with no money on him, B.K. would expect to obtain nothing. At best, Spurlock and B.K. hoped to discover an unknown amount of cash on Larsen. But this expectation was not—and by its nature could not

be—(1) a promise (2) of payment. Thus, the evidence did not demonstrate B.K. "knew he would receive any compensation specifically for the murder," *Phillips*, 929 F.3d at 1124, and no rational jury could have found this element satisfied beyond a reasonable doubt. At least, the instructional error requires retrial.

Moreover, insufficient evidence supported conviction. In denying a directed verdict on this ground, the district court was wrong, as a matter of law, to find that consideration could take the form of an expected share of money. 1-ER-17-18; 19-ER-4110-11. The court was additionally wrong to rely on B.K.'s testimony that, after the killing, Spurlock "wanted to buy the gun from me that I purchased" and "paid me several hundred dollars for it." 13-ER-2865; 19-ER-4111 (mischaracterizing the exchange as "reimbursement"). There was no evidence suggesting Spurlock agreed to reimburse B.K. for the gun *before* the homicide, *see Gessen*, 190 F.4th at 804; *United States v. Anderson*, 188 F.4th 571, 581 (2d Cir. 2026) ("[I]t is the essence of a consideration, that, by the terms of the agreement, it is given and accepted as the motive or inducement of the promise."); and, in any

event, reimbursement for incidental expenses doesn't satisfy § 1958(a). *Chong*, 419 F.3d at 1083.

Separately, the government didn't prove B.K. entered into a genuine agreement. B.K. made several statements indicating that he didn't actually want to kill Will. 13-ER-2821, 2842-43, 2851, 2883, 2885-86. That B.K. purchased a gun and joined Spurlock and O.O. to follow the Larsens in Reno, 1-ER-17 (district court ruling), doesn't rationally support the conclusion that B.K. affirmatively agreed to kill Will, much less that he did so in exchange for non-speculative consideration. *See United States v. Loveland*, 825 F.3d 555, 560 n.18 (9th Cir. 2016) ("[A]cquiescence in the object or purpose of a conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient.") (cleaned up). Because insufficient evidence supported Count Three, reversal and entry of acquittal is warranted.[5]

---

[5] Spurlock preserves for en banc or Supreme Court review an argument that mere cell phone use as-applied to otherwise intrastate activity exceeds Congress's authority to legislate under the Commerce Clause. *But see United States v. Stackhouse*, 105 F.4th 1193, 1199 (9th Cir. 2024) (rejecting argument regarding federal kidnapping).

### E. Count Four (witness tampering).

Count Four charged Spurlock with witness tampering by killing under 18 U.S.C. § 1512(a)(1)(C). 3-ER-577. This offense required proof that Spurlock: (1) killed Will Larsen; (2) with the intent to (a) prevent his communication (b) about a federal offense (c) to federal law enforcement. 1-ER-60; *Fowler v. United States*, 563 U.S. 668, 671, (2011).

While "no state of mind need be proved" with respect to the federal status of law enforcement, 8 U.S.C. § 1512(g), "'more than the broad indefinite intent' to prevent communication with law enforcement officers, generally, [is] required," because "a broad intent without a federal nexus would 'extend the scope of this federal statute well beyond the primarily federal area that Congress had in mind.'" *United States v. Johnson*, 874 F.3d 1078, 1081 (9th Cir. 2017) (cleaned up). Thus, "the Government must show a reasonable likelihood that, had, e.g., the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Fowler*, 563 U.S. at 677.

### 1. Instructional error occurred, and the evidence was insufficient.

The district court erred by lessening the government's burden to prove a reasonable likelihood that Will would have communicated with a federal officer. "A reasonable likelihood is lower than more likely than not but higher than a mere possibility." *Martinez v. Ryan*, 926 F.3d 1215, 1230 (9th Cir. 2019); 22-ER-4588. But the court instructed the jury that the likelihood must be "more than remote or simply a hypothetical possibility." 1-ER-60. While this language comes from *Fowler*, its effect on a layperson would be to permit conviction on less than a mere possibility. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 917 (9th Cir. 2008) (correct statements of law may nevertheless confuse jurors).

The instructional error was not harmless, and the evidence was insufficient on this element. There was no trial evidence showing: a federal investigation prior to Will's death, or that Will would have spoken to federal law enforcement. 19-ER-4113-15. Conversely, evidence showed Will spoke to a state officer once and refused follow-up conversations. 7-ER1456-57, 1465-66. Will was an alleged drug

trafficker, so it's not credible to believe he would've spoken to federal law enforcement about the Stefansky case. There simply was nothing more than the possibility Will might eventually speak with federal authorities.

While the government speculated the charges inevitably would be federal because of the drug conspiracy, 19-ER-4117, murder is predominately a state concern. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (discussing state police powers). And "communication with federal law enforcement officers is almost always a *possibility*." *Fowler*, 563 U.S. at 676. To accept the government's position would permit conviction on "little more than the possible commission of a federal offense." *Id.*

The trial "evidence was too remote" to establish the reasonable likelihood requirement. *Johnson*, 874 F.3d at 1083; *see United States v. Gatlin*, 90 F.4th 1050, 1064 (11th Cir. 2024) (no reasonable likelihood sex trafficking victim recantations would reach federal authorities, despite federal investigation). The Court should reverse and remand for entry of acquittal or at a minimum a new trial.

### 2. The error requires two severed retrials.

Pretrial, the district court properly recognized that without Count Four, the first two counts must be severed and tried separately from the remainder, given the two groups' lack of similarity. 3-ER-718-21; *see* 27-ER-5391-93 (denying severance once Count Four was properly pled in superseding indictment)]; *see* Fed. R. Crim. P. 8(a) (offense joinder), 14(a) (relief from prejudicial joinder). But in denying retroactive misjoinder at the close of the government's case, the court erroneously found that, even if Count Four lacked sufficient evidence, "given what [the court] heard in terms of the [trial] testimony," the counts were properly joined because the Stefansky counts gave "context" to the others. 19-ER-4123-24. This was legal error.

"'Retroactive misjoinder' arises where joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper." *Lazarenko*, 564 F.3d at 1043 (cleaned up). A new trial is warranted upon a showing of "compelling prejudice," including "[p]rejudicial spillover from evidence used to obtain a conviction

subsequently reversed." *Id.* (cleaned up). The inquiry involves: "(1) whether the evidence was so inflammatory that it would tend to cause the jury to convict on the remaining counts; (2) the degree of overlap and similarity between the dismissed and remaining counts; and (3) a general assessment of the strength of the government's case on the remaining counts." *Id.*

Relying only on context, the district court abused its discretion by applying the wrong legal test. *United States v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014). Under *Lazarenko*, each group of counts involved some of the most serious, violent crimes known to our society; without Count Four connecting them, inflammatory evidence of drug conspiracy and drug homicide would certainly influence a jury to convict on unrelated stalking, killing, and robbery counts (and vice versa). The jury instructions did not adequately protect against this spillover. *Cf. United States v. Cuozzo*, 962 F.2d 945, 951 (9th Cir. 1992). As the court previously determined, the offense groups involved "different circumstances" tied together only by "the government's broad assertion of similarity." 3-ER-718. And, as discussed herein, the government's case on the remaining counts was weak.

Given the insufficient evidence supporting Count Four, retroactive misjoinder warrants a new trial on the remaining counts. Alternatively, this Court should remand for the district court to conduct a proper *Lazarenko* balancing in the first instance.

### F. Counts Five and Six (transitory fear).

Counts Five and Six charged stalking resulting in death under 18 U.S.C. § 2261A. The statute applies when a defendant (1) travels in interstate commerce with the intent to kill, injure, harass, or intimidate a victim; and (2) the defendant's conduct causes the victim to experience a reasonable fear of death or serious bodily injury, or substantial emotional distress.

The core element is causing fear. But most victims of violent crime experience fear. The stalking offense therefore cannot apply when the victim experiences only "transitory" fear. *United States v. Jackson*, 24 F.4th 1308, 1312 (9th Cir. 2022) (requiring "more than a transitory holding" for kidnapping). The government failed to prove the Larsens felt more than transitory fear.

The text requires a victim to experience "reasonable fear." But victims of violent crime often experience fear; in theory, stalking could

cover multiple crimes like conventional assaults. This "careless concept of the crime" would cause "the boundaries of potential liability [to] be lost in infinity." *Chatwin v. United States*, 326 U.S. 455, 464 (1946) (involving kidnapping).

By analogy, kidnapping requires the defendant to "hold[]," i.e., restrain, a victim. 18 U.S.C. § 1201(a). But victims of violent crimes are often restrained in some sense. This Court has therefore interpreted kidnapping to require "more than a transitory holding," i.e., more than transitory restraints that significantly overlap with an associated crime. *Jackson*, 24 F.4th at 1312.

The same logic applies here. Absent limiting principles, stalking overlaps with multiple subsidiary offenses that naturally produce fear. The statute therefore requires fear exceeding the subsidiary offense. This construction respects "basic principles of federalism" and avoids "the deeply serious consequences of adopting . . . a boundless reading" that would "reach purely local crimes." *Bond v. United States*, 572 U.S. 844, 859-60 (2014).

A contrary interpretation would render part of the companion domestic violence statute superfluous in all but "the most unlikely

situations." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). 18 U.S.C. § 2261(a)(1) applies when a defendant travels interstate with a specified intent and "commits or attempts to commit a crime of violence against [an] . . . intimate partner." But under the government's view of stalking, this separate provision is largely superfluous because domestic violence victims typically experience fear. If the offense requires more than transitory fear, the surplusage problem vanishes.

The district court rejected this limitation. It disputed whether kidnapping was "an instructive analogy to stalking" and discounted the surplusage argument but failed to meaningfully explain either conclusion. 21-ER-4428-29. It also relied on *United States v. Wills*, 346 F.3d 476 (4th Cir. 2003), but that case isn't relevant; it merely rejected, on plain error, a defense argument that an instruction improperly allowed the jury to convict if the victim "was placed in fear as a result of [the victim's] own [interstate] travel," rather than the defendant's travel. *Id.* at 493.

The government was thus required—but failed—to present sufficient evidence Will and Yesenia experienced more than transitory fear. At most, the evidence possibly showed they experienced transitory

fear at the Bridgeport crime scene. But the government presented no evidence that either felt fear beforehand, much less that they were aware they were being surveilled. The Court should reverse and remand for entry of acquittal. At a minimum, the district court erroneously rejected Spurlock's proposed jury instruction regarding transitory fear, so the Court should reverse and remand for a new trial.

### G. Counts Seven and Eight (robbery and firearm use).

The government presented insufficient evidence on both charges. It also failed to prove venue in Nevada for the alleged California robbery.

1. Spurlock was charged in Count Seven with interference with commerce by robbery under 18 U.S.C. § 1951 (Hobbs Act robbery). This offense required proof that Spurlock: (1) knowingly obtained money or property from or in the presence of Will Larsen; (2) by means of robbery; (3) believed that Will Larsen parted with the money or property because of the robbery; and (4) the robbery affected interstate commerce. 1-ER-63; 9th Cir. Model Crim. Jury Instr. § 9.8.

Spurlock was charged in Count Eight with causing death by firearm during and in relation to a crime of violence under 18 U.S.C.

§§ 924(c) and 924(j). A conviction under § 924(c) required proof that Spurlock: (1) committed a crime of violence, charged as the Hobbs Act robbery in Count Seven; and (2) knowingly used a firearm during and in relation to the robbery. 1-ER-65; 9th Cir. Model Crim. Jury Instr. § 14.22. Conviction under § 924(j) required additional proof that Spurlock, while violating subsection (c): (1) caused the death of Will Larsen through the use of a firearm; and (2) the killing constituted murder under 18 U.S.C. § 1111, meaning it was an (a) unlawful killing (b) with malice aforethought. 1-ER-65-66; *Barrett v. United States*, 607 U.S. 128, 137 (2026).[6] The evidence was insufficient for both counts.

For Count Seven, even if theft of drug proceeds suffices for interstate commerce, the government failed to prove that the money taken from Will's wallet was, in fact, drug proceeds. Whether Will had

---

[6] Spurlock preserves for en banc or Supreme Court review two arguments involving these charges. First, a conviction for Hobbs Act robbery should require proof of an actual effect on interstate commerce; proof that a defendant robbed a drug dealer of drugs or drug proceeds isn't conclusive. *But see Taylor v. United States*, 579 U.S. 301, 307 (2016) (rejecting argument). Second, Hobbs Act robbery isn't a crime of violence, so it cannot be a predicate offense for §§ 924(c) or (j). *But see United States v. Dominguez*, 48 F.4th 1040 (9th Cir. 2022) (rejecting argument).

a "past history engaging in drug trafficking, and . . . no other profession," 19-ER-4136 (district court finding); 13-ER-2806-07 (B.K. testimony), does not prove beyond a reasonable doubt that his spending cash was drug money. This error invalidates Count Seven as well as Count Eight.

2. Even if the evidence was sufficient, the Court should vacate the counts for improper venue, as neither the robbery nor killing occurred in Nevada. The Constitution requires that a defendant be tried where the crime was committed, meaning "the location of the offense's 'essential conduct elements.'" *Abouammo v. United States*, 608 U.S. 597, 602 (2026) (citation omitted). Because all "acts that the prosecution must prove to secure a conviction" for Counts Seven and Eight occurred in California, the convictions must be vacated. *Id.*

Over defense objection, 2-ER-425-26; 21-ER-4442-43, the district court incorrectly instructed the jury that venue was proper if "some act in furtherance of the crimes charged or, where a conspiracy is charged, either the agreement or one of the overt acts in furtherance of the agreement began in, continued in, or was completed, in the state and federal district of Nevada," 1-ER-48. But an "act in furtherance" is not

an element of the substantive offenses with which Spurlock was charged, and thus, this instruction was incorrect as a matter of law.

The first three elements of Count Seven (taking money by means of robbery) were all alleged to have occurred in Bridgeport, California—not within the District of Nevada. As to the fourth element, "in a prosecution under the Hobbs Act, venue is proper in any district where commerce is affected because the terms of the statute itself forbid affecting commerce in particular ways." *United States v. Fortenberry*, 89 F.4th 702, 708 (9th Cir. 2023) (emphasis omitted). Even assuming the government proved Spurlock stole drug proceeds from Will, it didn't prove the theft influenced commerce in Nevada. Will lived in California and appeared to be on his way home. 9-ER-2048; 13-ER-2849. Will and Spurlock left the Mound House warehouse location in June 2020. 8-ER-1862-64; 16-ER-3293-94.

Nor is robbery a continuing offense under 18 U.S.C. § 3237(a). *Cf. United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) ("A kidnaping, once begun, does not end until the victim is free."); *Gessen*, 190 F.4th at 808 (analyzing murder-for-hire, which involves "overarching plot," as continuing offense).

The trial evidence was insufficient to establish venue for Count Seven, and in turn for Count Eight. Reversal for retrial in Nevada with proper jury instructions, or retrial in the proper district due to insufficient evidence, is warranted.[7]

## V. The evidence militated heavily against the verdict.

Even if sufficient in the abstract, the evidence nevertheless weighed heavily in Spurlock's favor. The Court should reverse and remand for a new trial.

### A. Standard of review.

Under Fed. R. Crim. P. 33, "[i]f the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict [and] grant a new trial." *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (cleaned up). This Court reviews the denial of

---

[7] Spurlock preserves for Supreme Court review an argument that the failure to prove venue should bar retrial anywhere. *But see Smith v. United States*, 599 U.S. 236 (2023) (rejecting argument).

such a motion "to determin[e] whether the district court clearly and manifestly abused its discretion." *Id.* at 1212.

### B. The government's case relied overwhelmingly on unreliable cooperating co-defendants.

The crux of the government's case was B.K. and O.O.'s testimony. Both witnesses accepted plea deals and agreed to cooperate against Spurlock and were thoroughly impeached. Because these cooperators were critical to the government's case, and because they were so unreliable, the district court manifestly abused its discretion in denying the motion for a new trial.

For most charges, the government alleged Spurlock personally killed (or intended that a co-conspirator kill) the Larsens. The government failed to present meaningful non-incentivized evidence supporting this theory. The police never recovered a murder weapon. There was no substantial forensic evidence like DNA or fingerprints tied to Spurlock. He didn't provide incriminating statements. The surveillance video and cell phone records didn't establish which members of the trio killed the Larsens (or which members had the required intent to kill for aiding and abetting). Indeed, the cell phone

records didn't directly place Spurlock at the exact scene of the Larsens' killing. The prosecution could fill this gap only through B.K. and O.O.'s self-serving testimony. But both witnesses were so unreliable that Rule 33 requires a new trial.

B.K. was thoroughly unreliable. He told his girlfriend he didn't do anything and wasn't at the crime scene. 13-ER-2876-86; 14-ER-2959-61. He didn't intend to harm the Larsens, but he pled guilty to murder-for-hire anyway. 13-ER-2883-86; 14-ER-2952-53. He was facing a mandatory life sentence, but if the prosecution liked his testimony, he could get a lower sentence. 14-ER-2918-35. He said he hadn't been promised a specific outcome but told his dad he expected a sentence between 12 and 15 years (he ultimately received 10 years). 14-ER-2929-35, 3018-19. He had an astonishing 22 interviews total with police. 14-ER-2954-59. He falsely denied having an affair with Yesenia. 14-ER-3012-13; *contra* 16-ER-3359-60. He used steroids, and steroid use can provoke extreme violent reactions, potentially consistent with the grizzly murders. 14-ER-3008-17; 16-ER-3360-61; 20-ER-4157-60, 4177-231.

O.O.'s testimony was equally troubling. After her arrest, she refused to cooperate for nearly two years, then in her first proffer suggested B.K. was responsible for the murders. 16-ER-3392-93, 3402. But she thought the prosecution believed B.K.'s statements, not hers, so she changed her story to match B.K.'s. 16-ER-3402-16. She told her family the government wanted her to join B.K. in falsely accusing Spurlock, and the lie would set her free. 16-ER-3412-14, 3419-22. She expected a 10-year sentence (she ultimately received about seven years). 16-ER-3437-40. She conveniently claimed that when the fatal incident began, she "kind of blacked out." 16-ER-3333.

These two witnesses were essential to Spurlock's alleged intent to kill. Both pled guilty to avoid substantial prison terms and expected—and received—exceptionally lenient sentences. Both made multiple inconsistent statements.

"The use of . . . accomplices . . . may raise serious questions of credibility." *On Lee v. United States*, 343 U.S. 747, 757 (1952); *see also United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) ("The use of informants . . . is fraught with peril.). The dangers are

paramount here. These verdicts shouldn't stand when they rest on such weak foundation.

## VI. The leader of the prosecuting office was invalidly serving.

During trial, Sigal Chattah erroneously claimed to lead the U.S. Attorney's Office. *See United States v. Jackson*, 187 F.4th 1198 (9th Cir. 2026), *cert. petition filed* (Oct. 8, 2026). Because she improperly held supervisory authority, a new trial is appropriate.

### A. Standard of review.

The Court typically reviews the denial of a Rule 33 motion for "abuse of discretion." *United States v. George*, 960 F.2d 97, 101 (9th Cir. 1992). A district court abuses its discretion by committing legal error. *See Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010). The Court generally applies de novo review to statutory interpretation questions under the Federal Vacancies Reform Act (FVRA), 5 U.S.C. § 3345 et seq. *See Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 554 (9th Cir. 2016). It reviews an Appointments Clause claim de novo. *Cody v. Kijakazi*, 48 F.4th 956, 960 (9th Cir. 2022). It reviews a district court's decision whether to

grant relief under its supervisory powers for "abuse of discretion," although underlying "legal issues . . . receive de novo review." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020).

### B. The improper service requires retrial.

Retrial is necessary for three reasons. First, under the FVRA, if an improperly serving acting officer performs a delegable function (i.e., a function the officer could delegate to someone else), the action is "voidable." *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1077 (9th Cir. 2024) (cleaned up). The U.S. Attorney oversees criminal prosecutions. *See* 28 U.S.C. § 547(1); U.S. Dep't of Just., Just. Manual § 9-2.001. Thus, Ms. Chattah's supervision of Spurlock's trial (or a decision not to supervise) is a "voidable" action that taints the entire trial. *Gonzales*, 107 F.4th at 1077.

Second, under the Appointments Clause, U.S. Const., Art. II, § 2, cl. 2, "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Lucia v. SEC*, 585 U.S. 237, 251 (2018) (cleaned up). Likewise, a defendant who successfully challenges the appointment of a head

prosecutor is entitled to relief. *See United States v. Comey*, 810 F. Supp. 3d 768, 781-82 (E.D. Va. 2025), *appeal pending*; *United States v. Trump*, 740 F. Supp. 3d 1245, 1303 (S.D. Fla. 2024). Courts should select "remedies with bite" to ensure litigants have incentive to challenge improper appointments. *Cody*, 48 F.4th at 960. Here, Ms. Chattah's service was unlawful under the FVRA and therefore unconstitutional under the Appointments Clause. A proper remedy with bite would be a retrial.

Third, courts can provide relief for "a due-process violation" or under their "supervisory powers." *Bundy*, 968 F.3d at 1030. When a criminal trial proceeds under an invalid U.S. Attorney, a due process violation occurs. *Cf. Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807-09 & n.21 (1987); *Erikson v. Pawnee Cnty. Bd. Of Cnty. Com'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001). Alternatively, a retrial is proper under the supervisory authority to "protect[] the integrity of the federal courts" and "deter future illegal conduct" given the seriousness of the statutory and Appointments Clause violation. *Bundy*, 968 F.3d at 1030 (cleaned up).

The district court suggested Ms. Chattah wasn't "present" and didn't "participate[] in [the] trial in any manner." 1-ER-26. But the reasons for a new trial don't depend on Ms. Chattah having personally tried or observed the case. In any event, her name appeared on multiple government pleadings (exhibit lists, witness lists, etc.), and she retained supervisory authority over the line prosecutors. The court also suggested a lack of prejudice. 1-ER-15. But the presence of an invalid U.S. Attorney is a structural error. *Cf. SW General, Inc. v. N.L.R.B.*, 796 F.3d 67, 79-81 (D.C. Cir. 2015). Regardless, while a defendant may sometimes have to show prejudice to secure dismissal, *see Bundy*, 968 F.3d at 1031, Spurlock seeks a retrial, not dismissal.

Because the U.S. Attorney was invalidly serving, the Court should order a retrial under a validly serving U.S. Attorney.

## VII. The Court should remand for Counts Seven and Eight sentencing errors.

### A. Standard of review.

This Court reviews an unobjected-to procedural sentencing error for plain error. Fed. R. Crim. P. 52(b). To warrant relief: (1) "there must be an error that has not been intentionally relinquished or

abandoned"; (2) "the error must be plain—that is to say, clear or obvious"; (3) "the error must have affected the defendant's substantial rights"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 134-35 (2018) (cleaned up).

### B. The Court plainly erred by sentencing Spurlock on both counts.

Spurlock was convicted of Count Eight, causing death through use of a firearm during a crime of violence, under § 924(c) and § 924(j). 1-ER-3, 31; 3-ER-579. But § 924(c) is a lesser-included offense of § 924(j), and thus the government cannot secure a conviction under both subsections. *See Barrett v. United States*, 607 U.S. 128, 139 (2026); *cf. Lora v. United States*, 599 U.S. 453, 462 (2023) (explaining the subsections' different sentencing authority). Moreover, as the government conceded in *Barrett*, it cannot secure a conviction for both an underlying predicate offense and § 924(j). *See* Oral Arg. Tr. at 47-49.[8]

[8] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-5774_6jf7.pdf

The district court therefore couldn't sentence Spurlock on Count Seven's underlying Hobbs Act predicate and Count Eight's § 924(j) enhancement. To the extent the court intended to disaggregate Count Eight's § 924(c) and § 924(j) allegations and proceed on § 924(c), it's unclear what legal authority permits such action, and, in any event, it didn't do so. 1-ER-3. This Court should therefore remand with instructions to dismiss the Count Eight conviction.

Alternatively, if the district court could permissibly sentence Spurlock on one of Count Eight's components, it erroneously imposed convictions on both § 924(c) and § 924(j). This Court should remand with instructions to conduct a resentencing and dismiss one of the two components.[9]

The district court plainly erred when it imposed the convictions and sentence on Count Eight. These errors independently affected Spurlock's substantial rights, as he is suffering from improper convictions under Count Eight and is serving a consecutive sentence

[9] Should this Court vacate one or more convictions on any of the counts, Spurlock requests remand for a full resentencing on all remaining counts. *See United States v. Evans-Martinez*, 611 F.3d 635, 645 (9th Cir. 2010) ("[R]emand of all sentences is often warranted.").

under § 924(c). Finally, this Court "regularly deem[s] the fourth prong of the plain error standard to have been satisfied where, as here, the sentencing court committed a legal error that may have increased the length of a defendant's sentence." *United States v. Joseph*, 716 F.3d 1273, 1281 (9th Cir. 2013) (citation omitted).

## Conclusion

The Court should reverse and remand with instructions to enter acquittals, dismiss the indictment with prejudice due to delay, or conduct a retrial.

Dated: October 27, 2026.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Michael W. Price*
Michael W. Price
NACDL, Fourth Amendment Center

*/s/ Jeremy C. Baron*
Jeremy C. Baron
Assistant Federal Public Defender

*/s/ Sidney W. Thaxter*
Sidney W. Thaxter
NACDL, Fourth Amendment Center

*/s/ Aarin E. Kevorkian*
Aarin E. Kevorkian
Assistant Federal Public Defender

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 26-689

The undersigned attorney or self-represented party states the following:

- (●) I am unaware of any related cases currently pending in this court.
- ( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.
- ( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Jeremy Baron **Date** Oct 27, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-689

I am the attorney or self-represented party.

**This brief contains** 13,996 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jeremy Baron **Date** 10/27/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** 26-689

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Mr. Cory Spurlock, # 59367-510
FCI Victorville Medium I
Federal Correctional Institution
P.O. Box 3725
Adelanto, CA 92301

**Description of Document(s)** *(required for all documents)*:

Appellant Cory Spurlock's Opening Brief

**Signature** s/ Jeremy Baron **Date** Oct 27, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*