Case No. 26-689

**United States Court of Appeals**
**for the Ninth Circuit**

| | |
|---|---|
| United States of America,<br>Plaintiff/Appellee,<br>v.<br>Cory Spurlock,<br>Defendant/Appellant. | D.C. No. 3:23-cr-00022-MMD-CLB |

Appeal from the United States District Court
for the District of Nevada

# Appellant Cory Spurlock's Excerpts of Record Volume 1 of 29

Rene L. Valladares
Federal Public Defender
*Aarin E. Kevorkian
*Jeremy C. Baron
Assistant Federal Public Defender
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577

*Counsel for Appellant Cory Spurlock

AO 245B (Rev. 09/20) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Nevada

UNITED STATES OF AMERICA
v.
CORY SPURLOCK

## JUDGMENT IN A CRIMINAL CASE

Case Number: 3:23-cr-22-MMD-CLB

USM Number: 59367-510

Christopher Frey, AFPD and Kate Berry, AFPD
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) __________

☐ pleaded nolo contendere to count(s) __________
which was accepted by the court.

☑ was found guilty on count(s): 1, 3, 4, 5, 6, 7, and 8 of the Fifth Superseding Indictment (ECF No. 363) on September 12, 2025
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. §§ 846, 841(a)(l) and 84l(b)(l)(A)(vii) | Conspiracy to Possess with the Intent to Distribute and to Distribute Marijuana | 6/23/2020 | 1 |
| 18 U.S.C. § 1958(a) | Murder-for-Hire Conspiracy | 3/2021 | 3 |
| 18 U.S.C. § 1512(a)(l)(C) | Tampering with a Witness by Killing | 11/8/2020 | 4 |

**(see page 2 for continued offenses)**

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The jury was deadlocked on count 2 of the Fifth Superseding Indictment (ECF No. 363)

☑ Upon motion by the United States, Count 2 was dismissed without prejudice on October 16, 2025 (ECF No. 722)

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/26/2026
Date of Imposition of Judgment

[signature]
Signature of Judge

Miranda M. Du, U.S. District Judge
Name and Title of Judge

1/28/2026
Date

AO 245B (Rev. 09/20) Judgment in a Criminal Case
Sheet 1A



DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1512(a)(l)(C) | Stalking Resulting in Death | 11/8/2020 | 5 |
| 18 U.S.C. § 1512(a)(l)(C) | Stalking Resulting in Death | 11/8/2020 | 6 |
| 18 U.S.C. §1951 | Interference with Commerce by Robbery | 11/8/2020 | 7 |
| 18 U.S.C. §§ 924(c) and 924(j)(l) | Causing Death Through Use of a Firearm During and in Relation to a Crime of Violence | 11/8/2020 | 8 |

DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

**Count 1 - 120 months; Count 3 - Life; Count 4 - Life; Count 5 - Life; Count 6 - Life; Count 7 - 240 Months; Count 8 - 120 Months.**

**Counts 1, 3, 4, 5 and 7 are to run concurrently as to each other. Count 6 is to run consecutive to count 5 and concurrent as to counts 1, 3, 4 and 7. Count 8 to run consecutive as to all other counts.**

☑ The court makes the following recommendations to the Bureau of Prisons:

Recommendation for placement of Defendant (in order of preference):
(1) FCI Sheridan, (2) FCI Otisville; (3) FCC Coleman USP-2; or (4) FCI Tucson.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ____________ ☐ a.m. ☐ p.m. on ____________ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on ____________ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on ____________ to ____________

at ____________ , with a certified copy of this judgment.

____________
UNITED STATES MARSHAL

By ____________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

**FIVE YEARS as to COUNT 1 only** and no supervised release to all other counts - 3, 4 ,5, 6 ,7 and 8.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court, not to exceed 104 tests annually.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the specific risks posed by your criminal record and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the specific risks posed by your criminal record.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________ Date ____________

DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

## SPECIAL CONDITIONS OF SUPERVISION

1. **Search and Seizure** – You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

   The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

2. **No Contact** – You must not communicate, or otherwise interact, with any member of William or Yesenia Larsens' family, either directly or through someone else, without first obtaining the permission of the probation office.

3. **No Contact** – You must not communicate, or otherwise interact, with co-conspirator Bradly Kohorst, either directly or through someone else, without first obtaining the permission of the probation office.

4. **No Contact** – You must not communicate, or otherwise interact, with co-conspirator Orit Oged, either directly or through someone else, without first obtaining the permission of the probation office. However, this no contact condition will not apply if Ms. Oged and Mr. Spurlock are still legally married.

DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 700.00 **To be paid immediately** | $ N/A | $ N/A | $ N/A | $ N/A |

☐ The determination of restitution is deferred until ____________. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Clerk, U.S. District Court<br>Attn: Financial Officer<br>Case No. 3:23-cr-22-MMD-CLB<br>333 Las Vegas Boulevard, South<br>Las Vegas, NV 89101 | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ ____________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/20) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments



DEFENDANT: CORY SPURLOCK
CASE NUMBER: 3:23-cr-22-MMD-CLB

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $ 700.00 due immediately, balance due

☐ not later than ____________, or
☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

It is further recommended that any unpaid balance shall be paid at a monthly rate of not less than 10% of any income earned during incarceration and/or gross income while on supervision, subject to adjustment by the Court based upon ability to pay.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

CORY SPURLOCK,

Defendant.

Case No. 3:23-cr-00022-MMD-CLB-1

ORDER

## I. SUMMARY

Defendant Cory Spurlock was indicted on eight counts. Following a jury trial, the jury entered a verdict of guilty on seven counts and deadlocked on one count (count two).[1] (ECF No. 714.) Defendant filed a motion for judgment of acquittal, or, in the alternative, for a new trial. (ECF No. 719 ("Motion").)[2] For the reasons discussed below, the Court denies the Motion.

## II. RELEVANT BACKGROUND

The bodies of Will Larsen ("Larsen" or "W.L.") and Yesenia Larsen ("Y.L.") were found on the side of U.S. Highway 395, north of Bridgeport, California in November 2020. A body, later identified to be of Jered Stefansky (J.S.), who was reported missing in June 2020, was discovered in Pershing County, Nevada in March 2021. Defendant was indicted on charges involving all three killings allegedly arising in part from marijuana trafficking that involved a location in Mound House, Nevada. The Fifth Superseding Indictment charged Defendant with eight counts: (1) conspiracy to possess with intent to distribute and to distribute marijuana between November 2019 and June 2020; (2) murder

[1]The Court subsequently granted the government's motion to dismiss count two. (ECF No. 722.)

[2]The government responded (ECF No. 726) and Defendant replied (ECF No.728).

Case: 26-639, 10/27/2026, DktEntry: 19.2, (11 of 254)

while engaged in narcotics trafficking relating to the killing of J.S. between November 2019 and June 2020; (3) murder for hire conspiracy relating to the killing of W.L. between October 2020 and March 2021; (4) tampering with a witness by killing of W.L. on or about November 2020; (5) stalking resulting in death relating to W.L. between October and November 2020; (6) stalking resulting in death relating to the killing of Y.L. between October and November 2020; (7) interference with commerce by robbery in November 2020; and (8) causing death of W.L. through use of a firearm during and in relation to a crime of violence in November 2020. (ECF No. 363 (Fifth Superseding Criminal Indictment); ECF No. 470 (striking special findings in the Indictment).) On the third day of deliberations, the jury returned a verdict of guilty on counts one, three, four, five, six, seven and eight; the jury deadlocked on count two. (ECF No. 714.)

Defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) ("Rule 29 Motion") after the government's case in chief. (ECF No. 683.) The Court heard argument and orally denied the motion. (ECF No. 688.) Defendant subsequently renewed the motion at the close of the defense's case and again after the government's rebuttal. (ECF Nos. 700, 711.) The Court denied the motions. (*Id.*)

## III. DISCUSSION

The Court reviews Defendant's post-verdict motion for judgment of acquittal renewing his earlier Rule 29 Motion under a sufficiency of the evidence standard. *See United States v. Gonzalez*, 528 F.3d 1207, 1211 (9th Cir. 2008). A criminal defendant's challenge to the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979). *Jackson* requires a court, upon such a motion, to construe the evidence "in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). When "'faced with a record of historical facts that supports conflicting inferences' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"

Case: 26-639, 10/27/2026, DktEntry: 19.2, (12 of 254)

*United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson*, 443 U.S. at 326).

Citing to the correct standard, Defendant then repeatedly grounds his arguments on how the government relied primarily on two cooperating witnesses (B.K. and O.O.), whose testimony lacked credibility and should be disregarded. (ECF No. 719 at 17, 19, 21-22.) But "it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). Moreover, when considering conflicting inferences, the Court "must presume . . . that the trier of fact resolved any conflicts in favor of the prosecution." *Nevils*, 598 F.3d at 1164 (internal quotation marks omitted). As further discussed below, Defendant essentially asks the Court to construe the evidence in the light most favorable to him and asks the Court to resolve any conflicting inferences in his favor.

The Court offers one glaring example here. In connection with his discussion of the element of fear essential to count five and of Spurlock's commission of the criminal acts, Defendant separately discussed and discounted B.K. and O.O.'s testimony. Defendant noted that B.K. testified about what Spurlock recounted to him and pointed to the absence of mention of any threats to Larsen. (ECF No. 719 at 19-20.) But the part of B.K.'s testimony relevant to support an inference of fear is that Spurlock said that he shot Larsen, but that did not put him down; he tried again but the gun jammed so he used a knife to stab him.[3] This testimony coupled with O.O.'s testimony—that when she got out of the vehicle, she saw Larsen, who "looked startled" and had a "nervous laugh"—when construed in the light most favorable to the prosecution, could allow a rational trier of fact to find Larsen experienced fear of being stalked before his death. In his reply brief, Defendant argues that O.O.'s testimony as to Larsen's nervous laugh could not evidence fear because Spurlock had his hands in his pocket and Larsen was shot when he turned

[3]Dr. Knight's testimony as to Larsen's cause of death—multiple gunshot wounds and sharp force injuries—is consistent with B.K.'s testimony as to how Spurlock recounted his killing of Larsen.

toward the driver's seat. (ECF No. 728 at 9.) But presuming any conflicting inferences must be resolved in the government's favor, a rational juror could find that Larsen's nervous laugh was evidence of fear seconds before his death even if he did not see Spurlock with a firearm, given the circumstances of the encounter. Spurlock and Larsen experienced a falling out during the course of their marijuana trafficking operation months earlier, and Larsen and his wife were driving home from Reno on a remote stretch of U.S. Highway 395 on a dark November evening when the vehicle behind them flashed their headlights to suggest there was an issue with the trailer. After he pulled over, Larsen encountered Spurlock who had no apparent reason to be there. Under these circumstances, a rational trier of fact could find that Larsen experienced fear even if Spurlock did not make any explicit threats and even if the first gunshot was fired when Larsen was not looking at Spurlock.

Defendant generally argues the government fails to satisfy its burden to establish the elements of all counts.[4] (ECF No. 719 at 2.) Defendant argues in the alternative that the Court should order a new trial because the government presented insufficient or weak evidence. For the same reasons that the Court rejects Defendant's arguments in support of a judgment of acquittal, the Court finds this is not an "exceptional" case[5] and declines to exercise its discretion to order a new trial based on Defendant's contentions as to "serious problems with the government's case." (ECF No. 719 at 28.)

The Court will first address Defendant's argument as to count one and counts three through eight in turn below. The Court will then address Defendant's argument as to venue.

---

[4]As noted, the jury deadlocked on count two (ECF No. 714) and the Court subsequently granted the government's motion to dismiss count two (ECF No. 722). The Court declines to address Defendant's renewed arguments as to count two even though dismissal is without prejudice because this count is no longer before the Court.

[5]Although determining whether to grant a motion for a new trial is left to the district court's discretion, "it should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (citation and internal quotation marks omitted).

### A. Count One: Marijuana Distribution Conspiracy

Defendant argues that the government failed to establish the existence of the underlying marijuana distribution conspiracy, that Defendant joined the conspiracy before May 2020, and that the weight of the cannabis equaled or exceeded 1,000 kilograms. (ECF No. 719 at 3-4.) The Court addressed the second argument in its oral ruling denying the Rule 29 Motion and will briefly reiterate its ruling here.

Count one charged Defendant with conspiracy to possess with intent to distribute and to distribute marijuana between November 2019 and June 2020. (ECF No. 363 at 2.) Defendant focused on O.O.'s testimony that she did not see cannabis when she was at the Mound House location. (ECF No. 719 at 3.) But as the government points out, they offered extensive evidence at trial as to the existence of a marijuana distribution conspiracy involving Larsen dating before November 2019, including testimony from B.K. and O.O. (ECF No. 726 at 4-5.) In addition, Sheila Sharpe testified as to the marijuana distribution conspiracy with Larsen, and how her son J.S., who went missing after he drove to the Carson City area in Nevada to pick up drug money, was involved in that conspiracy. She even testified that she allowed J.S. to store marijuana at her house twice. Moreover, Sharpe testified that after J.S. disappeared, Jay, another individual involved in the drug trafficking conspiracy, told her about over $100,000.00 in J.S.'s safe that she retrieved and gave to another individual involved in the drug trafficking organization. On cross-examination of Tom Green, defense counsel inquired how he knew from Sharpe that J.S. was going to Mound House, Nevada to pick up drug money and how unusual it was for him to meet a drug trafficker like Larsen before he was arrested.[6] The evidence of the existence of the underlying marijuana distribution conspiracy involving Larsen and others is simply too extensive to recount.

---

[6]Indeed, in arguing that Larsen "would have been unwilling" to speak to federal law enforcement as to count four, Defendant points out that "Larsen was running an illegal large-scale cannabis trafficking business involving significant quantities of cannabis and cash." (ECF No. 719 at 16.)

Case: 26-639, 10/27/2026, DktEntry: 19.2, (15 of 254)

As for when Spurlock joined the conspiracy, the government recounted evidence presented through O.O. and B.K.'s testimony to establish that Defendant joined the conspiracy by at least December 2019, including B.K.'s testimony that Defendant told him he was going into business with Larsen in 2019, O.O.'s testimony about using a furniture restoration business with the name of "Albright" as a front for the marijuana distribution business, and the government's evidence of shipping receipts with the same business name from at least December 2019. (ECF No. 726 at 4-5.) Defendant argues in his reply brief that O.O. and B.K. "were entirely lacking in credibility such that no reasonable juror could rely on them to find Mr. Spurlock guilty beyond a reasonable doubt." (ECF No. 728 at 2.) Again, however, the Court cannot determine witness credibility in considering Defendant's Motion. *See Alarcon-Simi*, 300 F.3d at 1176; *see also Nevils*, 598 F.3d at 1164 (a court cannot "usurp the role of the finder of fact" in resolving conflicting inferences).

As for evidence of the drug weight being equal to or in excess of 1,000 kilograms, in denying Defendant's Rule 29 Motion, the Court recounted both methods that the government offered through the testimony of DEA Special Agent Wilkinson and that a rational jury could find the government established drug weight beyond a reasonable doubt. The government's response summarized this evidence. (ECF No. 726 at 7.) Viewed in the light most favorable to the government, this evidence could support a rational juror's finding that the government has established the requisite drug weight beyond a reasonable doubt.

**B. Count Three: Murder for Hire**

Defendant argues the government failed to offer evidence of an agreement to commit murder-for-hire, that there was insufficient consideration, and there was no interstate nexus. (ECF No. 719 at 11-15.) The government responds that viewed in the light most favorable to the government, any rational juror could find that the evidence supports these elements beyond a reasonable doubt. (ECF No. 726 at 9-12.)

There is no dispute that the government is required to establish "a clear mutual agreement between the solicitor and the hitman of payment in exchange for murder." *United States v. Phillips*, 929 F.3d 1120, 1124 (9th Cir. 2019). In denying Defendant's Rule 29 Motion, the Court recited evidence from which a rational juror could find B.K. implicitly agreed to commit murder-for-hire. While Defendant argues there is no support in the case law that evidence of an agreement or acceptance of an agreement could be implicit or inferred (ECF No. 719 at 13), Defendant fails to offer any authority to support his argument that B.K. must expressly state his acceptance of the agreement. As Defendant points out, B.K. testified that in October 2020 Spurlock asked him to help in the killing of Larsen and stated that "the monetary value was worth it" but B.K. did not agree. (ECF No. 719 at 11 (citing B.K. Tr. Vol. 1 at 32-33).) According to Defendant, B.K. did not change his mind, and he testified that he tried to persuade Spurlock not to kill Larsen. (ECF No. 719 at 11-12.) But Defendant's argument is based on a construction of the evidence in the light most favorable to him. For example, Defendant points to B.K.'s testimony that he did not want to kill Larsen and while they were following the Larsens around the Reno-Carson City area, he was hoping that Spurlock would not. (ECF No. 719 at 12.) But Defendant ignores B.K.'s testimony that when Spurlock called him while he was on his road trip with Amanda Camacho[7] and said he needed B.K.'s help, B.K. "said okay." B.K. testified he knew what that meant (i.e., what he was agreeing to)—come to Reno to help Spurlock follow the Larsens—knowing that Spurlock's plan was to kill Larsen and Y.L. if necessary. Thus, the jury could find B.K. changed his mind from when he initially indicated that he did not agree with Spurlock to kill Larsen. Moreover, the jury could view this evidence and B.K.'s testimony as to their actions and find that B.K. agreed to help Spurlock kill Larsen.

---

[7]Amanda Camacho had testified that when they were discussing their road trip, Spurlock said B.K. needed to stay close for "recon" because they were looking for somebody. On cross-examination, she testified that Spurlock said that he needed B.K. to help with something, but it was B.K. who said it was for "recon."

The following evidence, when viewed in the light most favorable to the prosecution, could lead a rational juror to find that B.K. accepted Spurlock's offer to assist in the killing of Larsen in exchange for a split of the money that they expected would be found on Larsen: B.K. was on a road trip with Camacho in Salt Lake City when Spurlock called him to come to Reno and B.K. understood that the purpose of joining Spurlock was to follow Larsen and kill Larsen; B.K. purchased a firearm in Salt Lake City as Spurlock directed; B.K. met up with Spurlock and O.O. in Reno and joined them in surreptitiously following the Larsens around Reno and when they left Nevada; and after B.K. saw Larsen's limp body and saw Spurlock stab at something on the ground, B.K. followed Spurlock's instruction to find O.O. and met up with them back at their R.V. in Dayton, Nevada.

As for consideration, Defendant argues that whether Larsen had money on him was speculative and further argues in his reply that the government had not shown a thing of pecuniary value was promised because what Defendant "offered" B.K. was "a cut of speculative money." (ECF No. 728 at 7.) The government counters that while the drug proceeds had not yet been obtained, the promise of payment was clear. (ECF No. 726 at 10.) The jury was instructed that Defendant "must have clearly understood he would give or receive the thing of pecuniary value in exchange for the murderous act." (ECF No. 706 (Jury Instructions) at 28.) *See Phillips*, 929 F3d at 1124 ("The words 'as consideration for' do not strictly import contract law, but instead require a clear mutual agreement between the solicitor and hitman of payment in exchange for murder.") (quoting *United States v. Chong*, 419 F.3d 1076, 1081-82 (9th Cir. 2005).)

B.K. testified that Spurlock said they would be locating Larsen at the time of year when they anticipated Larsen would have a substantial amount of drug money on him.[8]

---

[8]Defendant repeatedly points to the wide gap between what B.K. testified they expected to find on Larsen (potentially a million dollars) and what Spurlock later told B.K. he found (around $1,000) to argue that any pecuniary value promised was speculative. (ECF No. 719 at 14; ECF No. 728 at 11.) But a rational juror could find this element was satisfied based on Defendant telling B.K. what he expected to find on Larsen from his experience with Larsen and promising to share they money. That the promise of pecuniary gain was less than expected does not preclude a rational juror from finding there nevertheless was a clear understanding of a promise of pecuniary gain. In other

Spurlock offered a 60-40 split with B.K. getting 60%. Given B.K.'s testimony about their relationship and dealings with Larsen, their belief that Larsen would have a substantial sum of money with him was not pure speculation. In fact, B.K. testified that while they were following the Larsens, they observed Larsen participating in a drug sale outside the hotel in Reno where the Larsens were staying.[9] Viewing these evidence in the light most favorable to the government, a rational trier of fact could find that Spurlock clearly understood he had promised to share a substantial sum of money and that the expected value of that promise was not speculative.

The interstate nexus argument is premised on the Court agreeing with Defendant's argument that there was no agreement, which the Court rejected. The government pointed to evidence of a phone call that Spurlock made to B.K. when he was in Salt Lake City, Utah while Spurlock was in Reno, Nevada for B.K. to purchase a firearm and then to leave for Reno. B.K. testified he did as instructed.

**C. Count Four: Witness Tampering**

Defendant argues the government failed to prove a reasonable likelihood that a relevant communication would have been made to a federal law enforcement officer and that Spurlock had the intent to kill Larsen. (ECF No. 718 at 15-17.) As for the latter, Defendant does not address the evidence that a rational juror could find Spurlock had the intent to kill and did kill Larsen when they found guilt as to the other counts. Instead,

---

words, the gap between was found and what was promised to be found does not mean a promise was not made or was made based on pure speculation.

[9]B.K. and O.O. testified that they observed who they believed to be Larsen engaging in a drug transaction outside his hotel in Reno when they were surveilling the Larsens. B.K. testified based on his experience in marijuana trafficking that he saw Larsen come out of the hotel with some kind of "deal" because Larsen brought out a trolley with boxes that B.K. knew to contain marijuana. B.K. testified he observed Larsen exchange a few handshakes with others, who took the boxes from Larsen and then left. As the government points out in its response, O.O. also testified that Larsen conducted what appeared to be a drug transaction. (ECF No. 726 at 16.) Defendant argues that B.K. and O.O.'s testimony amounts to pure speculation. However, viewing the evidence in the light most favorable to the government, a rational juror could infer that Larsen was engaging in a drug transaction as B.K. testified based on his experience engaging in marijuana trafficking.

Defendant argues that the government relies entirely on two cooperating witnesses' testimony to establish Spurlock's intent to kill and that Spurlock was responsible for the killing. (*Id.* at 17.) However, again, the Court cannot usurp the jury's role in determining witness credibility.

As to Defendant's first argument on the reasonable likelihood that a relevant communication would have been made to a federal law enforcement officer, the government "need not show that [a relevant] communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it was more likely than not." *Fowler v. United States*, 563 U.S. 668, 678 (2011). As the government points out in its response, the Court previously identified evidence such that, viewed in the light most favorable to the government, a rational juror could find a reasonable likelihood that that Larsen would have communicated with a federal law enforcement officer. (ECF No. 726 at 12.) In particular, the Court found that Sharpe generated significant media attention about her missing son, including from her appearance on a YouTube podcast in October 2020. Additionally, after having met with local law enforcement officers through Tom Greene's contacts and efforts on her behalf, Sharpe met with an FBI agent in Nevada in October 2020, even though she did not think it was an official interview. B.K. testified that Spurlock said Larsen gave an interview on the podcast about J.S.'s disappearance and that Larsen needed to die because he was "rat." O.O. testified that she overheard Spurlock's conversation with B.K. where Spurlock said Larsen was accusing him of the disappearance of J.S. and they traveled to Reno to shut Larsen up for making such an accusation.

**D. Counts Five and Six: Stalking Resulting in Death (of W.L. and Y.L.)**

Defendant contends that even under the Court's resolution of the legal disputes, the government failed to offer evidence to prove the third element—that Defendant's conduct placed the Larsens in reasonable fear of death—and the fourth element—that the Larsens died as result of Defendant's conduct. (ECF No. 719 at 19-21.) Defendant again insists that the Court disregard B.K. and O.O.'s testimony, which the Court cannot

do for the reasons discussed earlier. And as the Court noted, Defendant improperly characterizes the testimony of B.K. and O.O. and draws inferences in his favor. Evidence that Defendant, B.K. and O.O. stalked the Larsens includes B.K. and O.O.'s testimony, as well as surveillance videos that the government offered showing that their vehicles followed the Larsens' vehicle through Carson City as it stopped at a storage facility and continued on U.S. 395 Highway, south into California. Ample evidence supports the jury's finding of causation beyond a reasonable doubt. Viewing the evidence in the light most favorable to the government, the jury could find that Larsen experienced fear before his death based on O.O.'s testimony that Larsen "looked startled" and that she saw him give a "nervous laugh." The jury could find the same from B.K.'s testimony that Spurlock told him Larsen did not die from the first gunshot, and that Spurlock tried unsuccessfully to fire a second shot before using a knife to stab Larsen. Dr. Knight's testimony—that Larsen died of gunshot wounds and sharp force injuries—is consistent with B.K.'s testimony as to what Spurlock described.

In other words, there was a period of time between when Larsen realized Spurlock was involved in stopping him on the side of a remote stretch of U.S. Highway 395 and when Larsen died from injuries that Spurlock inflicted. A rational juror could find that this period of time was even longer for Y.L., based on B.K.'s testimony that he saw Spurlock appeared to be stabbing at something next to the Larsens' vehicle and that Spurlock later told him he was curious what it would be like to stab through a breast implant and now he knew. Dr. Knight's testimony—opining as to evidence of stab wounds on Y.L.'s left breast (Exhibit 33-h), right breast (Exhibit 33-3) and other sharp force injuries—is also consistent with B.K.'s testimony.

In sum, the Court agrees with the government that it established all elements of counts five and six beyond a reasonable doubt.

**E. Count Seven: Interference with Commerce by Robbery**

Defendant's arguments that the government failed to establish the essential elements of this offense relies on contentions that the Court has rejected in addressing

the other counts, including the evidence that Defendant was criminally responsible for robbing and killing Larsen and that the agreement and discussion to take money from Larsen was purely speculative. (ECF No. 719 at 22.) Defendant makes an additional argument as to jurisdiction—that the robbery affected interstate commerce—that the Court finds unpersuasive. Viewing the evidence in the light most favorable to the government, a rational juror could find that Larsen had no source of income other than from drug trafficking out of Mound House, Nevada, so money that Spurlock found on Larsen was the source of drug proceeds. And a rational juror could find that Spurlock intended to steal drug proceeds based on B.K.'s testimony that they anticipated to find a substantial amount of drug money on Larsen during that time of year.

**F. Count Eight: Causing Death Through Use of a Firearm During a Crime of Violence**

Defendant's argument is premised on his contention that the government failed to prove a Hobbs Act robbery as charged in count seven and that he was responsible for killing Larsen, which is based solely on B.K. and O.O.'s testimony. Defendant's arguments are deficient for the reasons discussed above.

**G. Venue**

Defendant contends that at a minimum, the government failed to establish venue for counts three, four, seven and eight.[10] (ECF No. 719 at 24-27.) Defendant argues that the government failed to prove by a preponderance of the evidence[11] that Spurlock was in the District of Nevada when an agreement was reached to commit murder for hire. (*Id.* at 25.) As the Court noted, B.K. testified that Spurlock called him from Reno while B.K.

---

[10]Defendant argues the government failed to prove venue for all eight counts. (ECF No. 719 at 24.) However, Defendant did not elaborate on these other counts so the Court will address only arguments raised with respect to each of the four counts.

[11]The government must prove venue by a preponderance of the evidence. *United States v. Lukashov,* 694 F.3d 1107, 1120 (9th Cir. 2012.)

was on road trip with Camacho and said he needed B.K.'s help, B.K. "said okay."[12] B.K. testified he knew what that his response meant he was going to Reno to help with Spurlock's plan was to kill Larsen. Viewing the evidence in the light most favorable to the government, a rational juror could find that B.K. agreed to commit murder-for-hire during the phone call with Spurlock that was made when Spurlock was in the District of Nevada.

As for count four, Defendant argues that for venue to be proper in Nevada, the government would have to prove by a preponderance of the evidence that Spurlock "intended to frustrate a federal investigation that had a reasonable likelihood of commencing specifically in the District of Nevada." (ECF No. 719 at 27.) The government responded that J.S. was involved in the drug trafficking operation in Nevada and the ultimate investigation intended to be affected was in the District of Nevada. (ECF No. 726 at 18.) The Court agrees with the government. In finding that a rational juror could find a reasonable likelihood that that Larsen would have communicated with a federal law enforcement officer, the Court considered evidence that Sharpe met with an FBI agent in Nevada after having met with local law enforcements in Nevada through Tom Green. J.S. disappeared when he drove to the Carson City area to retrieve drug money and investigation into his disappearance was mainly conducted by local law enforcement in Nevada, not California.

Defendant argues that venue for counts seven and eight was not proper in Nevada because the alleged acts—robbery and murder—took place in California, and the government failed to establish that the robbery affected commerce in Nevada. "'[I]n a prosecution under the Hobbs Act [count seven], venue is proper in any district where commerce is affected because the terms of the statute itself forbid *affecting commerce* in particular ways.'" *United States v. Fortenberry,* 89 F.4th 702, 708 (9th Cir. 2023) (quoting *United States v. Bowens,* 224 F.3d 302, 313 (4th Cir. 2000).) The government responded that it established venue by a preponderance of the evidence under the Hobbs Act. (ECF

---

[12] As Defendant points out, B.K. testified he did not agree to participate when Spurlock asked him in October 2020. (ECF No. 719 at 11-12.)

No. 726 at 18.) The Court agrees with the government. As the Court noted, a rational juror could find the money taken from Larsen was part of drug proceeds from a drug trafficking organization that operated out of Mound House, Nevada, thus affecting commerce in Nevada.

**IV. CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Defendant's motion for judgment of acquittal, or, in the alternative, a new trial (ECF No. 719) is denied.

DATED THIS 5th Day of December 2025.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

United States of America,

Plaintiff,

v.

Cory Spurlock,

Defendant.

No. 3:23-cr-00022-MMD-CLB

**ORDER**

During the months of August and September, 2025, Defendant Cory Spurlock was tried on several serious charges. These include conspiracy to distribute marijuana (count one), murder while engaged in narcotics trafficking – victim J.S. (count two), murder-for-hire conspiracy – victim W.L. (count three), tampering with a witness by killing – victim W.L. (count four), stalking resulting in death – victim W.L. (count five), stalking resulting in death – victim Y.L. (count six), interference with commerce by robbery – victim W.L. (count seven), and causing death through use of a firearm during a crime of violence – victim W.L. (count eight). ECF Nos. 363, 470. On September 12, 2025, a jury found Defendant guilty on all charges except count two, on which the jury deadlocked. ECF No. 714.

Defendant has now filed a motion for new trial based on two grounds: (1) the undersigned judge's ruling that Acting U.S. Attorney Sigal Chattah is not validly serving, *see United States v. Garcia*, No. 2:25-cr-00227-DGC-BNW, 2025 WL 2784640 (D. Nev.

Sept. 30, 2025), and (2) an alleged act of juror intimidation. ECF. No. 718. The judge presiding over Defendant's case has referred the first ground of the motion to the undersigned judge. ECF No. 729. For reasons set forth below, the undersigned will deny Defendant's motion based on the first ground.[1]

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Proc. 33(a). "A court may grant a new trial under Rule 33 if 'the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *United States v. Solomon*, No. 3:22-CR-00022-ART-CSD, 2025 WL 1169132, at *7 (D. Nev. Apr. 21, 2025) (quoting *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992)). "A motion for a new trial is at the discretion of a district judge and should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *Id.* (quoting *United States v. Pimental*, 654 F.2d 538, 545 (9th Cir. 1981)); *see United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984); *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012).

"The heavy burden of proving a new trial is warranted rests with the defendant." *United States v. Alvear*, No. 2:20-cr-00229-CDS-MDC, 2024 WL 94014, at *7 (D. Nev. Mar. 1, 2024); *see United States v. Klein*, No. 3:22-CR-84-SI, 2023 WL 6481846, at *2 (D. Or. Oct. 5, 2023) ("Defendants also bear a 'heavy burden' in meeting the requirements to establish that a new trial is warranted.") (citing *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006)); *United States v. Halali*, No. 14-cr-00627-SI-1, 2017 WL 3232566, at *2 (N.D. Cal. July 28, 2017) ("The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district

---

[1] Given the deference and respect that ought to exist between the branches of government, the Court has stayed its disqualification order in *Garcia* pending the Ninth Circuit's review. *See United States v. Garcia*, No. 2:25-CR-00227-JAD-BNW, 2025 WL 2985284 (D. Nev. Oct. 23, 2025). Because this motion concerns the appropriate remedy even if the disqualification order is correct, and because sentencing in this matter has been set for December, the Court concludes that it should rule on the motion now.

court must find that there is a real concern that an innocent person may have been convicted.") (quoting *United States v. McCourty*, 562 F.3d 458, 475 (2d. Cir. 2009)). Defendant Spurlock has not carried this heavy burden.

Although the undersigned judge remains fully persuaded that Ms. Chattah has not been validly appointed as Acting U.S. Attorney under the Federal Vacancy Reform Act and cannot act in that capacity under authority granted through general delegation statutes, *see Garcia*, 2025 WL 2784640 at *4-14, Defendant has not shown that the invalidity of her appointment or service had any effect on his criminal trial. Defendant does not suggest that Ms. Chattah was present or participated in his trial in any manner, and the Assistant U.S. Attorneys responsible for this case assert that they are doing so "under authority granted to them directly by the Attorney General." ECF No. 725 at 6.

Nor has Defendant identified any prejudice he suffered as a result of Ms. Chattah's leadership of the U.S. Attorney's Office, let alone prejudice that would amount to a miscarriage of justice. Even if Ms. Chattah's invalid appointment could be characterized as a detriment in Defendant's case, Defendant was insulated from that detriment by a District Judge who presided daily at trial, supervised the presentation of evidence and arguments by the lawyers, admitted only evidence that was relevant and admissible under the Federal Rules of Evidence, instructed the jury on the law that governs the case, and oversaw the process of jury deliberation. Other than a single instance of alleged juror intimidation that Defendant raises in this motion – which was addressed during trial and will be ruled on by the presiding judge – Defendant does not suggest that any of these trial procedures were improper or unfair. Nor does he suggest that the Assistant U.S. Attorneys who tried this case acted improperly or in a way that was unfairly prejudicial. Further, Defendant's guilt was decided by jurors selected through a careful process to ensure their fairness in evaluating the evidence and reaching a verdict. Defendant has not shown that Ms. Chattah's invalid appointment affected any of these procedures or produced a miscarriage of justice in this case. The Court cannot conclude that a new trial is required under Rule 33(a).

Nor is the Court persuaded by Defendant's other arguments – that a new trial should be granted in light of *United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024), or *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). ECF No. 718 at 5-7. The court in *Trump* found that the invalidly-serving special prosecutor was the only representative of the government who had signed the indictment. 740 F. Supp. 3d at 1254. The Ninth Circuit found in *Bundy* that the government engaged in flagrant misconduct causing substantial prejudice to the defendant. 968 F.3d at 1030-42. Defendant provides no evidence of Ms. Chattah's direct involvement in this trial or of comparable misconduct and prejudice.

Defendant asks the Court to order that Ms. Chattah have no further involvement in his case and that the attorneys handling the case certify that they are not being supervised by her. This is the remedy the Court has stayed pending the Ninth Circuit's ruling on appeal. *Garcia*, 2025 WL 2985284, at *1-2. As in other recent cases, the Court will deny Defendant's requests without prejudice. *See, e.g.*, ECF No. 125, *United States v. Ward*, No.2:08-cr-00224-KJD-RJJ (D. Nev. Oct. 23, 2025).

**IT IS ORDERED** that Defendant's motion for a new trial is **denied in part** with respect to the first argument in his motion – that Ms. Chattah is not validly serving as the Acting U.S. Attorney (ECF No. 718 at 2-7).

Dated this 7th day of November, 2025.

David G. Campbell

David G. Campbell
Senior United States District Judge

✓ FILED ____ RECEIVED
____ ENTERED ____ SERVED ON
COUNSEL/PARTIES OF RECORD
SEP 12 2025
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: ____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

CORY SPURLOCK,

Defendant.

Case No. 3:23-cr-00022-MMD-CLB

VERDICT

We, the Jury in the above-captioned case, upon our oaths, do say:

1. **<u>COUNT ONE</u>:** We find the Defendant,

**CORY SPURLOCK**, Guilty [Guilty / Not Guilty], of the offense of *Conspiracy to Possess with Intent to Distribute and to Distribute Marijuana* as charged in Count One of the Indictment.

If you find the defendant not guilty of Count One, you must acquit on Count Two and move to Count Three.

If you find the defendant guilty of Count One, you must also answer the following question:

We, the jury, unanimously find beyond a reasonable doubt that the amount of marihuana distributed was equal to or in excess of 1000 kilograms of a mixture or substance containing a detectable amount of marihuana. [Yes / No] (Yes circled)

If you answer Yes to that question, move to Count Two. If you answer No to that question, you must acquit on Count Two and move to Count Three.

2. **COUNT TWO:** We find the Defendant,

**CORY SPURLOCK,** DEAD LOCKED [Guilty / Not Guilty]

of the offense of *Murder While Engaged in Narcotics Trafficking* as charged in Count Two of the Indictment (Jered Stefansky).

3. **COUNT THREE:** We find the Defendant,

**CORY SPURLOCK,** GUILTY [Guilty / Not Guilty]

of the offense of *Murder-for-Hire Conspiracy* as charged in Count Three of the Indictment (Will Larsen).

If you find the defendant guilty of *Murder-for-Hire Conspiracy,* you should proceed to consider whether the murder-for-hire resulted in death.

As to whether the murder-for-hire conspiracy resulted in death, we the Jury find that the murder-for-hire conspiracy RESULTED [Resulted / Did not result] in death.

4. **COUNT FOUR:** We find the Defendant,

**CORY SPURLOCK,** GUILTY [Guilty / Not Guilty]

of the offense of *Tampering with a Witness by Killing* as charged in Count Four of the Indictment (Will Larsen).

5. **<u>COUNT FIVE</u>:** We find the Defendant,

**CORY SPURLOCK,** GUILTY [Guilty / Not Guilty]

of the offense of *Stalking* as charged in Count Five of the Indictment (Will Larsen).

If you find the defendant guilty of *Stalking*, you should proceed to consider whether the stalking resulted in death.

As to whether the stalking resulted in death, we the Jury find that the stalking RESULTED [Resulted / Did not result] in death.

6. **<u>COUNT SIX</u>:** We find the Defendant,

**CORY SPURLOCK,** GUILTY [Guilty / Not Guilty]

of the offense of *Stalking* as charged in Count Six of the Indictment (Yesenia Larsen).

If you find the defendant guilty of *Stalking*, you should proceed to consider whether the stalking resulted in death.

As to whether the stalking resulted in death, we the Jury find that the stalking RESULTED [Resulted / Did not result] in death.

7. **<u>COUNT SEVEN</u>:** We find the Defendant,

**CORY SPURLOCK,** GUILTY [Guilty / Not Guilty]

of the offense of *Interference with Commerce by Robbery* as charged in Count Seven of the Indictment (Will Larsen).

If you find the defendant guilty of Count Seven, move to Count Eight. If you find the defendant not guilty of Count Seven, you must find the defendant not guilty on Count Eight.

8. **COUNT EIGHT:** We find the Defendant,

**CORY SPURLOCK,** Guilty [Guilty / Not Guilty]

of the offense of *Using a Firearm During and in Relation to a Crime of Violence.*

If you find the defendant not guilty of the offense of *Using a Firearm During and in Relation to a Crime of Violence*, do not proceed to the next paragraph; leave it unanswered. If you find the defendant guilty of the offense of *Using a Firearm During and in Relation to a Crime of Violence,* proceed to the next paragraph.

We find the Defendant,

**CORY SPURLOCK,** Guilty [Guilty / Not Guilty]

of the offense of *Causing Death Through Use of a Firearm During and in Relation to a Crime of Violence* as charged in Count Eight of the Indictment (Will Larsen).

DATED THIS 12TH Day of September 2025.

FOREPERSON



ER_0031

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CORY SPURLOCK,<br>Defendant. | Case No. 3:23-cr-00022-MMD-CLB<br>JURY INSTRUCTIONS |

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not. You must decide the case solely on the evidence and the law. Do not allow personal likes or dislikes, sympathy, fear, public opinion, prejudices, or biases, including unconscious bias, to influence you. Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias also can affect how we evaluate information and make decisions.

You also should not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community. You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others; they are all important. Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return—that is a matter entirely up to you.

Case: 26-639, 10/27/2026, DktEntry: 19.2, (34 of 254)

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

In reaching your verdict you may consider only the testimony and exhibits received in evidence. The following things are not evidence and you may not consider them in deciding what the facts are:

1. Questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2. Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence.

3. Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

The evidence you are to consider in deciding what the facts are consists of:

1. The sworn testimony of any witness;
2. The exhibits received in evidence; and
3. Any facts to which the parties have agreed.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1. the witness's opportunity and ability to see or hear or know the things testified to;
2. the witness's memory;
3. the witness's manner while testifying;
4. the witness's interest in the outcome of the case, if any;
5. the witness's bias or prejudice, if any;
6. whether other evidence contradicted the witness's testimony;
7. the reasonableness of the witness's testimony in light of all the evidence; and
8. any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

A defendant in a criminal case has a constitutional right not to testify. In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

You have heard testimony from witnesses who testified to opinions and the reasons for their opinions. This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of these witnesses.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

The following witnesses fall into this category: Corey Shroeder, Icel Kuznetsova, Christopher Johnson, Kara Gregor, David Keller, Keith Brown, Kimberly Davis, Steve Shinmei, Nicole Jayne, Joseph Gentile, Dr. Laura Knight, Elvira Koeder Schaper, Steve Green, Brandon Reynolds, Daniel Harris, Dr. Mikel Matto, Dr. Elizabeth Johnson, Rick Wyant, Dr. Harrison Pope, Dr. Richard Leo, Dr. Larry Simms, Karen Lowe, Josiah Roloff, and Trevor Clark.

You have heard testimony from S.S., a witness who received immunity. That testimony was given in exchange for a promise by the government that the witness will not be prosecuted for conspiracy to distribute marihuana on or about January 22, 2015 or from January 2020-June 2020.

For this reason, in evaluating the testimony of S.S., you should consider the extent to which or whether her testimony may have been influenced by this. In addition, you should examine the testimony of S.S. with greater caution than that of other witnesses.

You have heard testimony from B.K., a witness who pleaded guilty to crimes arising out of the same events for which the defendant is on trial. This guilty plea is not evidence against the defendant, and you may consider it only in determining this witness's believability.

For this reason, in evaluating the testimony of B.K., you should consider the extent to which or whether his testimony may have been influenced by this. In addition, you should examine the testimony of B.K. with greater caution than that of other witnesses.

You have heard testimony from O.O., a witness who pleaded guilty to crimes arising out of the same events for which the defendant is on trial. This guilty plea is not evidence against the defendant, and you may consider it only in determining this witness's believability.

For this reason, in evaluating the testimony of O.O., you should consider the extent to which or whether her testimony may have been influenced by this. In addition, you should examine the testimony of O.O. with greater caution than that of other witnesses.

The parties have agreed to certain facts that have been stated to you. Those facts are now conclusively established.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

Case: 26-689, 10/27/2026, DktEntry: 19.2, (45 of 254)

The punishment provided by law for these crimes is for the court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment. The defendant is not on trial for any conduct or offense not charged in the indictment.

The indictment is not evidence. The defendant has pleaded not guilty to the charges. The defendant is presumed to be innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant does not have to testify or present any evidence. The defendant does not have to prove innocence; the government has the burden of proving every element of the charges beyond a reasonable doubt.

The indictment alleges that some act or acts in furtherance of the crimes charged occurred in Nevada. There is no requirement that all aspects of the crimes charged or, where a conspiracy is charged, the entire conspiracy take place here in the state and federal district of Nevada. Before you may return a verdict of guilty, however, if that is your decision, the government must convince you that some act in furtherance of the crimes charged or, where a conspiracy is charged, either the agreement or one of the overt acts in furtherance of the agreement began in, continued in, or was completed, in the state and federal district of Nevada.

Unlike all the specific elements of the crimes charged that I have described elsewhere in these instructions, this fact regarding venue need only be proven by a preponderance of the evidence. This means the government need only convince you that it is more likely than not that some act in furtherance of the crime charged or, where a conspiracy is charged, part of the conspiracy took place here.

The government, however, must prove all the offense-specific elements of any crime charged, as I have described elsewhere in these instructions, beyond a reasonable doubt. The lesser standard of preponderance of the evidence only applies to your decision on the issue of venue.

You must decide whether the marihuana conspiracy charged in Count One of the indictment existed, and, if it did, who at least some of its members were. If you find that the conspiracy charged in Count One did not exist, then you must return a not guilty verdict on Count One, even though you may find that some other uncharged drug conspiracy existed. Similarly, if you find that the defendant was not a member of the conspiracy charged in Count One, then you must find the defendant not guilty of Count One, even though the defendant may have been a member of some other uncharged drug conspiracy.

Case: 26-689, 10/27/2026, DktEntry: 19.2, (50 of 254)

A defendant may be found guilty of the crimes charged in Counts Two, Five, and Six even if the defendant did not personally commit the act(s) constituting the crime if the defendant willfully caused an act to be done that if directly performed by him would be an offense against the United States. A defendant who puts in motion or causes the commission of an indispensable element of the offense may be found guilty as if he had committed this element himself.

A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count. However, if you acquit the defendant on Count One, you must also acquit the defendant on Count Two. If you find the quantity of marijuana is less than 1,000 kilograms in Count One, you must also acquit the defendant on Count Two. Additionally, if you acquit the defendant on Count Seven, you must also acquit the defendant on Count Eight.

The indictment charges that the offenses alleged were committed "on or about" a certain date.

Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the dates alleged in the indictment, it is not necessary for the government to prove the offense was committed precisely on the date charged.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

Mere presence at the scene of the crimes involving the murders of Will Larsen and Yesenia Larsen or mere knowledge that murders are being committed is not sufficient to establish that the defendant committed a crime. The defendant must be a participant and not merely a knowing spectator. The defendant's presence may be considered by the jury along with other evidence in the case.

The defendant is charged in Count One of the indictment with conspiracy to possess with intent to distribute or to distribute marihuana in violation of Section 841(a) and Section 846 of Title 21 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, beginning on or about November 2019 and ending on or about June 23, 2020, there was an agreement between two or more persons to possess with intent to distribute or to distribute a mixture or substance containing a detectable amount of marihuana; and

Second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

If you find that the government has not proven each element beyond a reasonable doubt and acquit the defendant on Count One, you must also acquit the defendant on Count Two.

"To distribute" means to deliver or transfer possession of marihuana to another person, with or without any financial interest in that transaction.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of marihuana to another person, with or without any financial interest in the transaction.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in Count One of the indictment—a plan to distribute, or to

possess with intent to distribute, marijuana—as an object or purpose of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by knowingly participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who knowingly joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

The terms “marihuana” and “marijuana” mean all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.

The terms “marihuana” and “marijuana” do not include— (i) hemp, as defined in section 1639o of title 7; or (ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

The term “hemp” is defined in 7 U.S.C. § 1639o as “the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.”

If you find the defendant guilty of the charge in Count One of the indictment, you are then to determine whether the government proved beyond a reasonable doubt that the amount of marihuana that defendant intended to possess with intent to distribute or intended to distribute equaled or exceeded 1,000 kilograms of a mixture or substance containing a detectable amount of marihuana. Your determination of weight must not include the weight of any packaging material. Your decision as to weight must be unanimous.

The government does not have to prove that the defendant knew the quantity of marihuana.

The defendant is charged in Count Two of the indictment with murder while engaged in narcotics trafficking in violation of Section 848(e)(1)(A) of Title 21 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant must have engaged in the narcotics conspiracy alleged in Count One;

Second, the drug conspiracy must have involved at least 1,000 kilograms or more of marihuana, the quantity of drugs set forth in 21 U.S.C. § 841(b)(1)(A);

Third, while engaging in the narcotics conspiracy, the defendant must have intentionally killed, or counseled, demanded, induced, procured or caused the intentional killing of another person (Jered Stefansky); and

Fourth, the killing of that other person (Jered Stefansky) must have actually resulted from the defendant's actions.

Instruction No. 24

The defendant is charged in Count Three of the indictment with using interstate commerce facilities in the commission of a conspiracy to commit murder-for-hire in violation of Section 1958 of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant conspired to use or conspired to cause another to use an interstate facility (a cellular telephone operating on interstate networks);

Second, the defendant did so with the intent that murder be committed;

Third, the defendant intended that the murder be committed in exchange for payment of a thing of pecuniary value; and

Fourth, Will Larsen died as a result of defendant's participation in this offense.

As to the first element, a "facility in interstate or foreign commerce" includes means of transportation and communication. 18 U.S.C. § 1958(b)(2).

"Pecuniary value" means anything of value, whether in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage. The defendant must have clearly understood he would give or receive the thing of pecuniary value in exchange for the murderous act.

Instruction No. 25

The defendant is charged in Count Four of the indictment with tampering with a witness by killing in violation of Section 1512(a)(1)(C) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, that on about the date charged, the defendant killed Will Larsen; and

Second, that the defendant did so with the intent to prevent a communication about the commission or possible commission of a federal offense to a federal law enforcement officer.

The government must prove there was a reasonable likelihood that had Will Larsen communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer. The government need not show that such a communication, had it occurred, would have been made to a federal law enforcement officer beyond a reasonable doubt, or show that such a communication would have more likely than not been made to a federal law enforcement officer. But the government must show that the likelihood of communication to a federal officer was more than remote or simply a hypothetical possibility.

The defendant is charged in Count Five of the indictment with Stalking Resulting in Death in violation of Sections 2261A(1)(A)(i) and 2261(b)(1) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant traveled in interstate commerce from a time unknown but no earlier than on or about October 2020 and continuing up to an including on or about November 8, 2020;

Second, that while he traveled in interstate commerce, the defendant had the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate, another person, Will Larsen;

Third, in the course of or as a result of the defendant's travel, the defendant engaged in conduct that placed Will Larsen in reasonable fear of death or of serious bodily injury to Will Larsen; and

Fourth, Will Larsen died as a result of the conduct.

"Serious bodily injury" means bodily injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

The defendant is charged in Count Six of the indictment with Stalking Resulting in Death in violation of Sections 2261A(1)(A)(i) and 2261(b)(1) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant traveled in interstate commerce from a time unknown but no earlier than on or about October 2020 and continuing up to an including on or about November 8, 2020;

Second, that while he traveled in interstate commerce, the defendant had the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate, another person, Yesenia Larsen;

Third, in the course of or as a result of the defendant's travel, the defendant engaged in conduct that placed Yesenia Larsen in reasonable fear of death or of serious bodily injury to Yesenia Larsen; and

Fourth, Yesenia Larsen died as a result of the conduct.

The defendant is charged in Count Seven of the indictment with robbery in violation of Section 1951 of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly obtained money or property from or in the presence of Will Larsen;

Second, the defendant did so by means of robbery;

Third, the defendant believed that Will Larsen parted with the money or property because of the robbery; and

Fourth, the robbery affected interstate commerce.

If you find that the government has not proven each element beyond a reasonable doubt and acquit the defendant on Count Seven, you must also acquit the defendant on Count Eight.

"Robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence.

To convict the defendant of Interference with Commerce by Robbery, the government must prove that the defendant's conduct affected or could have affected interstate commerce. Conduct affects interstate commerce if it in any way involves, interferes with, changes, or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among the states or between the United States and a foreign country. The effect can be minimal.

It is not necessary for the government to prove that the defendant knew or intended that his conduct would affect commerce; it must prove only that the natural consequences of his conduct affected commerce in some way. Also, you do not have to find that there was an actual effect on commerce. The government must show only that the natural result of the offense would be to cause an effect on interstate commerce to any degree,

however minimal or slight.

When the defendant has been charged with robbing or attempting to rob a drug dealer, the government satisfies the “affecting commerce” element of this crime if it shows that the defendant robbed or attempted to rob a drug dealer of drugs or drug proceeds.

The defendant is charged in Count Eight of the indictment with causing death through the use of a firearm during and in relation to a crime of violence in violation of Sections 924(c) and 924(j)(1) of Title 18 of the United States Code.

For the defendant to be found guilty of the Section 924(c) charge in Count Eight, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant committed the crime of Interference with Commerce by Robbery as charged in Count Seven of the indictment, which I instruct you is a crime of violence; and

Second, the defendant knowingly used the firearm during and in relation to that crime.

If you conclude the defendant is guilty of the Section 924(c) charge, you should then consider whether the defendant is guilty of the Section 924(j) charge. For the defendant to be found guilty of the Section 924(j) charge in Count Eight, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant caused the death of Will Larsen through the use of a firearm; and

Second, the killing constituted murder under Title 18, United States Code, Section 1111.

A defendant "used" a firearm if he actively employed the firearm during and in relation to Interference with Commerce by Robbery.

A defendant used a firearm "during and in relation to" the crime if the firearm facilitated or played a role in the crime.

Title 18, United States Code, Section 1111(a) defines murder as the unlawful killing of a human being with malice aforethought. To kill with malice aforethought means to kill either deliberately and intentionally, or recklessly with extreme disregard for human life.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence.

It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you may have about the defendant's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community. All persons are entitled to the presumption of innocence and the government has the burden of proof.

It would be equally improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision making process.

To repeat, your verdict must be based exclusively upon the evidence or the lack of evidence in the case.

You are to perform the duty of finding the facts without bias or prejudice as to any party. You are to perform your final duty in an attitude of complete fairness and impartiality.

The case is important to the government, for the enforcement of criminal laws is a matter of prime concern to the community. Equally, it is important to the defendant, who is charged with serious crimes.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that accorded to any other party to a litigation. By the same token, it is entitled to no less consideration. All parties, whether government or individuals, stand as equals at the bar of justice. The question before you can never be: will the government win or lose the case. The government always wins when justice is done, regardless of whether the verdict is guilty or not guilty.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves.

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. This includes discussing the case in person, in writing, by phone, or electronic means. This means you may not use any electronic device or media (such as a phone, computer, or tablet), the internet, any text or instant messaging service, or any social media apps to research or communicate about what you've seen and heard in this courtroom. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals or other entities involved in the case.

This restriction also applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court. Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

These restrictions continue during your deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and law presented in this courtroom. Information you find on the internet or through social media might be incomplete, misleading, or inaccurate. And even using your smartphones, tablets, and computers—and the news and social media apps on those devices—may inadvertently expose you to certain notices, such as pop-ups or advertisements, that could influence your consideration of the matters you've heard about in this courtroom.

Case: 26-689, 10/27/2026, DktEntry: 19.2, (68 of 254)

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial, without undue influence by anything or anyone outside of the courtroom. The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.

If any juror is exposed to any outside information, please notify the court immediately.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, on any question submitted to you, including the question of the guilt of the defendant, until after you have reached a unanimous verdict or have been discharged.

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff that you are ready to return to the courtroom.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE MIRANDA M. DU, DISTRICT JUDGE
---o0o---

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:23-cr-022-MMD-CLB |
| Plaintiff, | September 8, 2025 |
| -vs- | United States District Court<br>400 S. Virginia Street<br>Reno, Nevada 89501 |
| CORY SPURLOCK, | |
| Defendant. | **JURY TRIAL DAY 16** |

**TRANSCRIPT OF TRIAL PROCEEDINGS**

A P P E A R A N C E S:

FOR THE GOVERNMENT: MEGAN RACHOW
PENELOPE BRADY
Assist. United States Attorneys
Reno, Nevada

FOR THE DEFENDANT: CHRISTOPHER FREY
KATE BERRY
ALLIE WILSON
Assist. Federal Public Defenders
Reno, Nevada

Proceedings recorded by mechanical stenography produced by computer-aided transcript

Reported by: KATHRYN M. FRENCH, RPR, CCR
NEVADA LICENSE NO. 392
CALIFORNIA LICENSE NO. 8536

Mr. Pickett's testimony, it's our understanding that pretty much anything he could possibly testify about he heard from somebody else, so I'm not sure what the relevance of his testimony is, and how what he has to offer gets around the hearsay rules.

MR. FREY: A contemporaneous objection can address that. If something transgresses the Rules of Evidence, then I would expect that the government would object. But, we're not trying to elicit anything that would transgress the Rules of Evidence. If there is something that is an out-of-court statement, we'd proffer a hearsay exception. But, I don't think the Court can rule before the Court hears the testimony.

THE COURT: All right. Anything else?

MS. RACHOW: No, Your Honor.

THE COURT: I'm going to give you my ruling, since we have a couple minutes, on the issue -- the Count that I deferred when I heard the Rule 29 motion last Friday. I had deferred ruling on Count Four because I wanted to review the relevant case law on the disputed jury instruction as to this Count again, and to give further consideration to the parties' arguments. Having done so, I agree with the government that, viewing the evidence in the light most favorable to the government, the jury could reasonably find that Mr. Spurlock killed Mr. Larsen to prevent him from

discussing the possible commission of a federal crime.

The jury could find there was a reasonable likelihood, and more than a remote probability, that Mr. Larsen would have communicated to a federal law enforcement officer because of the attention that Ms. Sharpe was generating about her missing son; particularly, with the YouTube podcast in October 2020, and that she had talked to an FBI agent in October 2020, even if she didn't think it was an official interview. As Ms. Rachow pointed out, B.K. and O.O.'s testimony could allow for the jury to further draw such an inference.

B.K. testified that Mr. Spurlock said it showed that Will was -- that Mr. Larsen was giving an interview -- referring to the podcast -- and the interview had asked about Jered Stefansky's disappearance -- the interview had asked Mr. Larsen about the disappearance of Jered Stefansky. And that's when Mr. Spurlock told B.K. that "Mr. Larsen says in the video that Mr. Spurlock is the most likely person to be involved with the disappearance."

The next question, then, of B.K. was:

"What did Cory tell you about how he felt about Will Larsen saying that?"

The answer was: "Uh, he said that, for that, Will needed to die because he was a rat, and that was just something that Cory could not abide by."

I'm quoting. I think it was from page 31 through 32 of the first day of B.K.'s testimony.

O.O. testified that she overheard a conversation between Mr. Spurlock and B.K., where Mr. Spurlock said:

"Mr. Larsen was accusing him for the disappearance of the kid."

And then she later testified: "They traveled to Reno to shut up Mr. Larsen for accusing Mr. Spurlock for the disappearance of the kid."

That's on page 169 of her testimony. And the testimony I referenced initially was on pages 45 to 46 of her testimony during trial.

I think the timeline supports the government's argument about both B.K. and O.O.'s testimony they went to Reno to look for Mr. Larsen.

Ms. Berry argues that there's no evidence of a federal investigation, but the government does not have to establish that a federal investigation had been initiated or even existed at the time to show a federal nexus. In fact, I think that's the situation that the Court in Fowler -- the case that counsel all agree is the binding precedent for the Court, given there's no Ninth Circuit case law on the issue of reasonable likelihood -- that, in that case, the court in Fowler addresses instances where the victim does not engage in any communication with law enforcement yet.

Case: 25-689, 10/27/2026, DktEntry: 19.2 (76 of 254)


For those reasons, I deny the motion as to Count Four as well.

All right. I think we're ready to bring in the jury.

THE CLERK: Your Honor, could I just test Dr. Pope? He's on the Zoom. He's going to be defense's second witness.

THE COURT: Is he the first witness?

THE CLERK: He's the second witness. I didn't want to test while the jury is sitting here.

THE COURT: That's fine.

(In the presence of the Jury.)

THE COURT: Good morning. The please be seated.

All right. Who is the defendant's first witness?

MR. FREY: Your Honor, the defense would call FBI Special Agent Christopher Johnson.

**CHRISTOPHER JOHNSON,**
called as a witness on behalf of the Defendant,
was sworn and testified as follows:

THE CLERK: Please be seated.

Please state your first and last name, and then spell both our first and last names for the record.

THE WITNESS: Sure. Christopher Johnson. C-h-r-i-s-t-o-p-h-e-r. J-o-h-n-s-o-n.

MR. FREY: May I proceed, Your Honor?

THE COURT: Yes.

in the morning. But if the defense is resting, I need to find time to canvass Mr. Spurlock. I need to make sure he understands --

MR. FREY: I could suggest that we do it at the morning break tomorrow. We wanted to take the time that we have today with Mr. Spurlock before he's transported back to have some discussions with respect to this. I don't think the Court needs to canvass him twice. So we would like to defer the canvass until tomorrow.

THE COURT: All right. Then I'm going to take a brief recess, and then I'm going to settle jury instructions.

MR. FREY: That's fine, Your Honor.

THE COURT: All right. So let's take a 10-minute break and we'll resume in 10 minutes.

(Recess taken.)

(Outside the presence of the jury.)

THE COURT: All right. Please be seated.

There are several issues that I need to address, and if I forget to address some of them, I'm sure counsel will remind me. First of all, there were three filings over the weekend relating, in part, to the jury instructions.

Let me pull up the document.

One was ECF 694. This relates to the government's response to the defendant's supplemental memorandum as to Count One and Two. The other two were the defendant's

supplemental memorandum, ECF number 691. And then I think it's 692 is the government's proposed additional proposed instruction.

But, anyway, there was three filings relating to, potentially, jury instructions. Before I address the jury instructions, I wanted to briefly address the supplement that was filed in terms of -- hang on. Just let me pull up the documents so I have the reference.

So, the supplement filed as ECF number 691, the supplement addresses Counts One and Two. And to the extent the supplement is an attempt to ask the Court to reconsider the Rule 29 motion ruling, I agree with the government. The motion for reconsideration is denied.

I do want to briefly reference the supplement's discussions about the timeframe of the conspiracy. The supplement only references O.O.'s as testimony. But as I noted during the ruling Friday, regarding the period of the conspiracy, I rely, also, on the fact that the jury could view B.K.'s testimony in the light most favorable to the government in finding that Mr. Spurlock joined the conspiracy sometime in 2019. This is based on B.K.'s testimony about when Mr. Spurlock told him he was doing business with Will Larsen while they were talking on the phone during the time that B.K. was deployed. This is from page 17 -- and there was a lot of objections in between -- and pages 20 to 21

of B.K.'s first day of his testimony on August 26th. And I also relied on the government's argument that the jury could review the Albrighton shipping label in Exhibit 102b, which is a label which extends from January of 2020. So, I didn't just solely rely on O.O.'s testimony. I want to make sure that record is clear.

So then let me go on to the jury instructions, and I'm going to start, as I usually do, with the parties' proposed instructions. So, I'm going to go in order. And I'm referring to the Joint Proposed Instructions. I don't even remember the docket number. It was filed so long ago now. But it's basically --

MS. BRADY: It's 582.

THE COURT: I'm sorry?

MS. BRADY: It's 582.

THE COURT: 582.

Proposed instruction -- the government's proposed instruction, which the defendant objects to, and then the defendant's propose instruction, which the government objects to. So starting with the Superseding Indictment, I'm not going to give the Superseding Indictment as part of the jury instructions. So to the extent that's the government's request, I deny the request.

Starting on -- with the instruction number -- I don't know if my marginalization is open.

Is the Superseding Indictment, government's proposed instruction number 1?

MS. BRADY: Yes.

THE COURT: All right. Moving on to Count One -- my page margins are all off with respect to the numbers, but perhaps you can follow along with what I identify to be the title of each instruction. So starting with Count One, there are two issues with Count One, which I want to make sure the record is clear. First of all, I -- with respect to Count One, I overrule the defendant's objection to the omission of the weight of the marijuana here as an element of the offense. I think that the government's proposed instruction for Count One as to the drug weight properly instructs that the jury must find the drug quantity beyond a reasonable doubt. See United States versus Collazo, 984 F.3d 1308 at 1321. It is a Ninth Circuit 2021 decision holding that: "Any fact that increases the penalty of a crime constitutes -- must be submitted to the jury and proved beyond a reasonable doubt." And so I think the instruction includes a separate instruction on the weight of the drug that the jury must find beyond a reasonable doubt. That's sufficient for sentencing enhancement. But, the jury does not have to find that the drug involved in the conspiracy was over a 1,000 kilograms for Mr. Spurlock to be convicted of Count One. I don't consider that as an element, an essential element of the

offense in Count One; therefore, I overrule the objection; and I accept defendant's objection as to that instruction as to Count One in deleting the sentence that begins with "it does not matter..." that deviates from the Ninth Circuit Model Instruction 12.1, so that will be excised from the instruction.

I will also add to that instruction number -- for Count One, that, if the -- if the jury finds the government has proven -- has not proven the elements beyond a reasonable doubt as to Count One, they must acquit the defendant as to Count Two. So I inserted that instruction throughout some of the instructions to reflect that Count One and Count Two, essentially, are related. If they acquit on Count One, they must acquit on Count Two.

MS. BERRY: Your Honor, I'm sorry. The sentence you're excising, "it does not matter," I'm having a little trouble following because of the way the government --

THE COURT: I'm sorry. Can you speak louder.

MS. BERRY: Oh. Said no one ever. I can. Thank you.

The sentence you're excising, "it does not matter," I couldn't tell if you were referencing Count One, conspiracy; Count One, marijuana defined; or Count One, determining the amount of controlled substance, which instruction you were modifying.

THE COURT: It's the first one, Count One, conspiracy elements.

MS. BERRY: Okay. Government labels all of them as Count One, but --

THE COURT: Oh. The first page of Count One.

So, hang on. Perhaps I can do this. Let me see if my pdf version has the instruction number, because I made a lot of modifications on Word. I don't know if the numbering got modified. So, hang on.

So I'm referring to the pdf document, page 7 of ECF 582. It's part of that first discussion of Count One.

MS. BERRY: Oh.

THE COURT: The last paragraph that would be excised is, "It does not matter whether the defendant knew that the substance was marijuana. It's sufficient the defendant knew that it was some kind of federally controlled substance."

MS. BERRY: I understand.

Thank you, Your Honor.

THE COURT: All right. So that's what I am going from.

The next instruction is still Count One for conspiracy. So, I agree with the defendant that there is a potential concern, risk the jury may have some confusion as to the sentence relating to plan. So, I modified that

sentence. This is on -- let me try to tell you where it is.

So on page 8 of the pdf document, it would be currently line 8 to 9. The sentence that starts on line 8 would be, would now read -- and I'm going to give counsel a copy of these instructions, probably, by tomorrow -- "You must find that there was a plan to commit at least one crime of the crimes alleged in Count One of the Indictment." And it's going to be, hyphen, "a plan to distribute or to possess with intent to distribute marijuana as an object or purpose of the conspiracy." So to clarify what they must find as part of the plan, consistent with the defendant's objection.

So that's the only change I have to Count -- to page -- I'm going to refer to the page -- page 8, Count One, conspiracy.

And then for the next-- Count One, the definition of marijuana. I included -- I noted the objection, and it will include the definition of hemp, as defined in 7 USC Section 1369(o). So, I sustain the objection.

And then the next one, the next instruction -- still Count One -- determining the amount of controlled substance. This begins on page 11 of ECF 582. I accepted the instruction as to the determining the weight of the drug. But I agree with the defendant that the last sentence should be -- that that last sentence is not in the pattern jury instruction, although it's taken from the commentary. I agree with the

defendant it's not part of the pattern instruction. I'm not going to include it. So, I'm going to delete the sentence that begins on line 11 of page 11: "You may infer the agreed upon drug amount based on the conduct of the conspirators, but may not speculate as to the amount."

For Count Two --

MS. BERRY: Your Honor, one question before -- about Count One, if I may, before you move to Count Two.

THE COURT: Yes. So, for Count One I have additional rulings based on the supplement. So let me give that, and then you can make whatever you want for the record. And that is regarding Count One in the supplement to memo, that's ECF number 691, as I said I reviewed both 691 and the government's response.

Regarding Count One, Mr. Spurlock's counsel argues that the underlying Section 841(a)(1) offense must be an offense that postdates, not predates, the defendant joining the conspiracy. In support of this argument, defendant cites to dicta in the case I referenced earlier -- United States versus Collazo, 984 F.3d 1308 at 1320. It's a Ninth Circuit 2021 decision -- to argue that liability can only attach if there is a conspiratorial argument that a member would commit a crime in the future.

The government counters that Mr. Spurlock is incorrect because Count One charges him with a conspiracy, not

a substantive offense, based on a Pinkerton liability. I agree with the government. See United States versus Garcia, 497 F.3d 694, at Footnote 1. It's a Ninth Circuit 2007 decision. Therefore, I find that the pattern instructions are correct as to the conspiracy law in this circuit, and deny defense's proposed instructions as to postdate defendant's joining a conspiracy. These are the additional instructions that were proposed as part of ECF number 692.

All right. Before I move to Count Two, do have a record you want to make with respect to Count One?

MS. BERRY: I don't think I need to make a record beyond what's in the supplement. We just incorporated what's in the supplement. My only question related to Count One was the, the issue of acquittal on Count One. I just wanted to be explicit that because the government charged a 1,000 kilograms or more, and incorporated that language into Count Two, it's not just that if the government -- if the jury -- if the jury were to acquit on Count One, then they automatically have to acquit on Count Two. But, if the jury were to acquit on Count One, but find the 1,000 kilogram threshold was not met in Count One, they have also have to acquit on Count Two.

THE COURT: Ms. Brady, do you agree with that?

MS. BRADY: No. I think they can find him guilty of a lesser included of Count One. But, they would

have to acquit him of Count Two if it was just a lesser included.

THE COURT: So, Ms. Berry's argument is if the jury were to convict of Count One, but they find that the amount of drug involved is less than 1,000 kilograms, they have to acquit him of Count Two.

MS. BRADY: That's correct. If they found him guilty of something less than 1,000 kilograms, they would have to acquit on Count Two.

THE COURT: So then that should be incorporated, then, into the instructions on the --

MS. BRADY: And I think -- didn't you that you had done that? Sorry.

THE COURT: I just said if they are acquit him of Count One, I did not reference the quantity of drugs involved.

MS. BRADY: I think it has to be that quantity.

THE COURT: One option is -- so the parties do not seem to dispute the verdict form. One option is to include this idea into the verdict form as well, instead of just the instruction. Because if this additional nuance, I think it would be too confusing to leave it -- to not include it in the verdict form, to say perhaps it could be incorporated -- and I'm going to have counsel make this change -- because so far there's no dispute. And I just changed the

format of the verdict form, so we'll e-mail you the formatted verdict form. But, you can incorporate it if you agree -- so you can take the first stab in doing the changes -- that if they find -- so the question about the quantity of drug involved, if they find it's less than 1,000 kilograms, then that they must -- then they skip question two relating to Count Two, or they must acquit him of Count Two. Something to that effect, so it kind of gives the jury kind of a roadmap in doing the verdict form as well.

MS. BERRY: Your Honor, I'm happy to do that. We'll collaborate with the government.

Just for record, I understand the Court's ruling. We object to the government being able to seek a lesser included on Count One, and we think that they must prove 1,000 kilograms, and that simplifies this issue on Count Two, for the record.

THE COURT: Yes, that's been raised multiple times. I think you preserved your record.

So moving on then to Count Two, I have multiple notes. Let me see which one I should start with. I have multiple notes because of the supplemental filing.

So on Count Two -- I'm now at page 13 of the supplement. I'm accepting that instruction. The supplement raises some additional issues, so I'm going to give you my ruling on Count Two. I overrule the defense objection

as to the third element. I think that the government's proposed instruction properly instructs as to the offense charged in the superseding Indictment. Section 848(e)(1)(A) applies to, and I quote: "Any person engaging in, or working in furtherance of a continued criminal enterprise; or any person engaging in an offense punishable under Section 841(b)(1)(A)."

And, here, Mr. Spurlock is charged with having violated Section 841(b)(1)(A), not with having engaged in or worked in furtherance of a continuing enterprise under 848(c). See United States versus LaFleur, L-a-f-l-e-u-r, 971 F.2d 200, at 212. It's a Ninth Circuit 1991 decision.

Mr. Spurlock's proposed instruction number 13 for the same charge seeks to add language that defines "engaging in" by adding, and I quote: "There must be a substantive, but not merely temporal, connection between the killing and conspiracy charged in Count One." Citing to Vasquez.

I reviewed the defendant's supplemental argument as to this point, and I do not find support in case law as to the third prong regarding killing or engaging in an offense punishable under Section 841(b)(1). Therefore, in sum, I find that the jury instructions need not provide language that the murder must have been intended to further the conspiracy because the defendant is not charged with engaging in and continuing a criminal enterprise.

The jury instructions, similarly, need not address a substantive connection between the murder and Section 841(b)(1)(A) offense. So, I will adopt the instruction that the government proposed as proposed. That's on page 13 and 14 of ECF 582.

MS. BERRY: Your Honor, in light of the -- oh. I'm sorry.

THE COURT: Sorry?

MS. BERRY: I'm sorry, judge.

In light of the fact that everybody agrees that the weight must be proven in order to move forward on Count Two, I do think that the weight should be not just on the verdict form, but incorporated into the language of Count Two. And so while we included -- we included it twice in our proposed jury instruction on page 61 of ECF number 582, if the Court does not include that introductory paragraph, I think the first element does need to include the weight. Our propose language was that: "Mr. Spurlock was engaged in or working in furtherance of the conspiracy charged in Count One of the Indictment, a conspiracy to distribute or possess with intent to distribute a 1,000 kilograms or more."

THE COURT: I think that's a reasonable request.

Does the government have any objection?

MS. BRADY: We actually have that in our instruction, so it's the second element: "The drug conspiracy

must have involved at least the quantity of drugs set forth in 21 USC 841(b)(1)(A)." And then after the fourth element it says --

THE COURT: Well --

MS. BRADY: -- it defines what that is.

MS. BERRY: I just think that's more confusing.

THE COURT: I do agree it's confusing. So, we can leave the second element, instead of referencing citation to the statute -- hang on. Let me compare the two.

We could just simply say the drug conspiracy must have involved at least 1,000 kilograms or more of marijuana, instead of citing to the statute, and then saying what the statute defines.

So, let me go back to that. So instruction number 13 will now read, the modification will be -- so I'm going to keep the first element the same. So the second, "The drug conspiracy must have involved at least 1,000 kilograms or more of marijuana..." And then I'm going delete, then, what -- the paragraph that says what Title 21 provides; in other words, the definition of the amount of drugs, I'm going to delete that. So the instruction would have just four elements, with the second element having the addition of the amount of drugs.

All right --

MS. BERRY: Your Honor, the only other -- I

think that there's no doubt that Mr. Stefansky is the alleged victim of Count Two, and the government's instruction doesn't name him. Our proposed instruction does. I think that it makes sense to name him. Otherwise, there could, potentially, be confusion.

THE COURT: With whom?

MS. BERRY: Mr. Larsen. I mean they're all drug-related killings, to some extent, under the government's theory. And so there's no reason not to name him.

MS. BRADY: I think he's named in the verdict form.

THE COURT: He's named in where?

MS. BRADY: I think I put their initials in the verdict form. I could be --

THE COURT: They're not in the Count Two instructions.

Hang on.

What is the -- Ms. Berry, you gave me the instruction, the page number for the defendant's proposed instruction --

MS. BERRY: It's 61. Yes, Your Honor.

THE COURT: So we can insert that name in two locations I think, in reference to -- in the third and fourth element. So I'm still working off of page 13 of the government's proposed instruction. So, "While" -- third --

"while engaging in narcotics conspiracy, defendant must have intentionally killed..." da, da, da -- "...killing of another person..." I could put his name in parentheses.

Any objection to saying Mr. --

MS. BRADY: No.

THE COURT: We can put his name at this point.

MS. BERRY: I think we could just omit "another person" and say Jered Stefansky.

MS. BRADY: Your Honor, I think to more accurately track the language, it should be "killing of another person," either comma Jered Stefansky, or in parentheses.

THE COURT: I agree. I tend to try to neutralize it to track the language of the elements in the statute. So, I'm going to put the name in parentheses. This is a matter of style and grammar.

Fourth, the person of -- that other person. Again, that other person, I can put his name in parentheses again.

Okay. So those are the changes that will be made to Count, I think we're on Count Two, page 13.

Count three --

MS. BERRY: Your Honor, I'm sorry. I don't -- I'll just make a standing record so I don't have to do this on every Count. I'll just say that, you know, for this Count, we ask for the language to be included related to the substantive

connection between the offense and the narcotics trafficking. And to the extent this court disagrees with the defense on the language proposed in our instructions, we incorporate all of our arguments made in our proposed instructions, the defense brief, and all other briefing on these issues.

THE COURT: I will say that's true for both sides. Whatever you've already indicated you object to, unless you specifically say you withdraw your objection, the record will reflect that you still maintain the objection. I appreciate that you're working with the Court to make the changes. I'm going to say unless you specifically indicate that you agree that the changes address your concern, I'm going to assume that you're still reserving your objection.

For Count Three -- this is on page 15 of ECF 582 -- I agree with the defendant's objection as to a nonspeculative act of consideration. See United States versus Chong, C-h-o-n-g, 419 F.3d 1076 at 1082. It's a Ninth circuit 2005 decision. So the revisions includes an addition to the last sentence in the government's proposed instruction: "The defendant must have clearly understood he would give or receive the thing of pecuniary value in exchange for the murderous act." That just tracks the language of the comment to the Ninth Circuit Pattern Instructions, Section 16.7, so that sentence will be added.

Count Four --

MS. BERRY: I'm sorry, Your Honor. I don't -- I made some promises about not making any more records, but I, on this Count, I think that that is insufficient. As a matter of law, it cannot be speculative.

So it is true that the mere possibility of financial gain is not enough. And so while I understand your Court's ruling related to the Rule 29, it is a correct statement of the law that the mere possibility of financial gain is not sufficient to meet that element. And without that being in the jury instruction, we have no basis for making those arguments. I mean we can make them, of course, because it's a correct statement of the law, but there is nothing for the jury to go back to. And so they could convict Mr. Spurlock of this offense without considering the speculativeness of the financial gain in this case. And so given the record we have, which is that Mr. Spurlock said if there is some money on him -- the offer that was made is if there was some money on him, we'll split it 60/40 -- then with the statement that he didn't then enter the agreement -- I think the jury has to be instructed that there must be more than the possibility of financial gain, for them to properly assess this Count under the law. The "mere possibility" language is in the cases.

THE COURT: So the pattern jury instruction doesn't include that statement. But, accounting for the objection, I added one of the sentences from the comments.

Where would you propose, if I were to consider it, to add that language? And what would be said?

MS. BERRY: So what we propose -- and I'm looking at page 63 of our proposed instructions -- is basically what the Court is proposing to do, but I think this does it in a way that the jury will understand the issue more clearly, which is the "mere possibility of financial gain is not enough to satisfy the quid pro quo requirement of murder for hire." I think if the Court isn't willing to give that sentence, a different modification of that sentence could be given. I think you could even take out the "quid pro quo," which is also in the case law, and just say the "mere possibility of financial gain is not enough to satisfy the requirements of murder for hire," or to satisfy the fourth element of murder for hire. But, the agreement to prompt -- this is an unusual case where the agreement itself, the promise and what's accepted, is what makes this a murder for hire, and not just a financially motivated killing. And there is no dispute that there's enough in the record for the jury to conclude that this was a financially motivated killing, if they accept the testimony of B.K.. But, what the jury has to know is a desire for financial gain does not a murder for hire make. There has to be an agreement, and the agreement has to be more than -- provide more than a mere possibility. Otherwise, they could easily convict on this record with

something that's legally insufficient.

THE COURT: So I agree with the government that the defense's instruction adding the language about the mere possibility of financial gain in the elements part suggests that this is an added element, which it is not. So I want to hear Ms. Brady's response to that request that instead of adding it right below the fourth element, to further include -- so, for example, I haven't thought this through, but one option would be the paragraph that says pecuniary value, where I just added "the defendant must have clearly understood he would give or receive a thing of value in exchange for the murderous act," it could be that I would consider that the -- something to the effect the mere possibility of financial gain is not enough.

MS. BRADY: I think, to address the objection, as you had stated you were going to take something from the commentary, I think putting whatever you were going to take from the commentary to address that issue under pecuniary value makes sense. I'm not sure about the exact language, but --

MS. BERRY: I would not object to the proposal Your Honor's suggesting of including the commentary, plus this additional phrase. If the compromise is "the mere possibility of financial gain is not enough," I will take it.

THE COURT: I don't know if I've decided to

do this yet, but I will -- I want to think about the fact that the additional sentence makes it clear that it's not a mere possibility of financial gain, instead of adding that explicitly.

There's a reason why I favor and tend to follow the pattern instructions, is the instructions given have to reflect the current state of the law, but they also have to be non-argumentative, and given in a neutral way. And so when I add these -- add and subtract from these instructions, I give them careful consideration. So, for now, I will consider it. I'm not sure I will add it yet. But I will most definitely add the sentence that I already indicated. I want to think about adding to that additional sentence with the sentence that Ms. Berry proposed, "the mere possibility of financial gain is not enough."

MS. BERRY: Just to perfect the record on this issue, Your Honor, there is no dispute that money is a thing of pecuniary value; so, that, I don't think is what needs to be clarified. It's the concreteness of the agreement and whether the -- it's a totally contingent agreement. And so the agreement that has been articulated is that "if he has money on him, you will get a cut." And while I understand Your Honor's ruling that you don't think that that's legally -- that, as a matter of law, that requires an acquittal. The jury has to be given the opportunity to

determine if that is sufficiently concrete to convict.

THE COURT: All right. Thank you.

Let me move on to the next instruction then.

So for Count Four, this Count, I -- there's no dispute as to the two elements. The only dispute between the parties is adding "reasonable likelihood--" no, there was two disputes. One is adding it, as the government proposed, as a separate instruction; and two, the spirit about what it should say. And as to the first dispute, I agree with the defendant that "reasonable likelihood" should be incorporated into the instruction as to the elements. So, there should be just one instruction on Count Four. Based on that, I start -- and so that's my first ruling.

My second ruling is I find -- well, I tend to agree with the defendant that the government's proposed instruction on reasonable likelihood -- let me pull it up. Hang on.

While the government takes selective quotes from Fowler -- this is -- and I know I've referred to Fowler a number of times -- just so the record is clear, I'm referring to United States versus Fowler, 563 U.S. 668, at -- from 2011.

So, give me one minute.

So I decided that, because of that, to start -- to incorporate -- oh, have you been given a copy yet?

THE CLERK: No.

THE COURT: Let's not hold that as a mystery.

I incorporated the -- I basically started with the defense's proposed instruction, and I modified the instruction as to reasonable likelihood. And there are track changes for counsel.

MS. BRADY: Your Honor, I don't have any objection to your proposed instruction.

THE COURT: Ms. Berry?

MS. BERRY: The government is faster than I am.

THE COURT: Oh, I may have left an additional sentence in there. That was part of my notes. Hang on. Let me see.

I was trying to compare what was the difference between the government's first sentence and the defendant's first sentence. I can't remember if I deleted that yet. So that may be like a fugitive sentence that doesn't belong. So let me pull it up.

MS. BERRY: Your Honor, this language, "remote, outlandish or hypothetical," is that from Fowler?

THE COURT: Yes. And you want to know which page of Fowler, and I'll tell you. It's from -- it's almost at the end of the decision, before Justice Scalia's concurrence on page 2050 -- no, 678. Basically, I pulled language from those two paragraph, where the courts stated its holding.

I'm trying to find my version though. Hang on.

Oh, here we go. So I added -- the sentence I added -- so, basically, I have to decide. I think what I did was after the second element, I took the government's sentence introducing the reasonable likelihood concept. I insert it there, and then I took the defendant's language to see what the difference is between the two. So I think, after the comparison, I'm inclined to delete that added -- what I refer to as the fugitive sentence. So, the reasonable likelihood paragraph would start with: "The government must prove there was a reasonable likelihood that...", and then it goes on to the end. And I think I even included the holding in Fowler.

Is my note on there on the version you have?

MS. BERRY: Yes.

THE COURT: I said the holding in Fowler at 678 and Johnson.

MS. BERRY: That is not in this.

THE COURT: Oh. Hopefully, my law clerk deleted that. That was my own note.

The language, I find support for that, Ms. Berry, you asked me, it is from page 678 from Fowler, and also from Johnson, 874 F.3d at 10 -- 874 F.3d at 1078, 1083. It's a Ninth Circuit 2017 decision discussing Fowler did not hold -- did not specifically address the issues that the defendant raised.

MS. BERRY: Your Honor, if it's possible, I

would like to reread Fowler with this in hand and --

THE COURT: You may.

MS. BERRY: -- mull it, and decide if I have an objection.

THE COURT: That's why I printed it out for counsel so you have if before our discussion. But, that's my tentative ruling to resolve all the parties' dispute with respect to Count Four.

All right. Let me go back then to -- but just know that the final instruction will not have the sentence, the actual sentence that the government proposed as redundant.

All right. So I'm continuing on then in order. So the next instruction for Counts Five and Six both relate to stalking resulting in death. And for that instruction, here's my ruling. There were supplemental memorandum filed at ECR number 668 and 676. First, with respect to the interstate commerce element, the government disputes that Mr. Spurlock's propose instruction would contain "from the State of Montana to the State of Nevada to the State of California" to the interstate commerce element.

I agree -- so the defendant countered that tracks the language of the Indictment and should be included. I agree with the government that the statute only requires travel in interstate commerce, and that the government's proposed instruction adequately reflects the elements. So, I

will not include that additional language in the instruction.

Second is the parties' dispute about reasonable fear. And I realize that the stalking instructions are really important, so I'm going to give you my detailed ruling on the reasonable fear element. I think you've already gathered my decision on the jury instructions from my ruling on the Rule 29 motion.

So, Mr. Spurlock argues that a stalking victim must experience more than transitory fear, analogizing to the federal kidnapping law. I disagree that kidnapping is an act, or even an instructive analogy to stalking. Defendant cites to United States versus Jackson, 24 F.4th 1308, It's a Ninth Circuit 2022 decision, to support their proposition that stalking doesn't apply to merely transitory fear. However, that case addresses the kidnapping statute. And the kidnapping statute discusses -- contains a detention element, and holds language of the statute. See 24 F.4th at 1313. That's from the Jackson decision; as well as, 18 USC Section 1201(a). In contrast, the statute at issue here 180 USC Section 2261(a) contains no such language requiring any duration of time that the victim experienced reasonable fear from which a court could reasonably read in such a requirement.

Mr. Spurlock's counsel also makes a structural argument, claiming that if reasonable fear was transitory,

then Section 2261(a) would render Section 2261(a)(1) superfluous. The Court does not agree. Section 2261(a) criminal acts of stalking with the intent to kill, injure, harass, or intimidate another person, and that places the person in reasonable fear of death or serious bodily injury.

Section 2262(a)(1)(A)(1) criminalizes one who travels interstate with the intent to kill, injure, harm, or harass an intimate partner, and who commits or intends to commit a crime of violence. In other words, while Section 2261(a) punishes conduct that places a person in fear of death, serious bodily injury or substantial emotional distress, Section 2261(a)(1)(A)(1) punishes the commission, or attempted commission of crimes of violence against an intimate partner. Therefore, I do not find the issue that defendant raised.

Additionally, the government cites to United States versus Wills, 346 F.3d 476, at 493 to 494, it's a Ninth Circuit 2003 decision, to support its argument that the victim must be placed in reasonable fear of death or serious bodily injury, but that there's no requirement as to the timeframe.

Mr. Spurlock responds that because the defendant in Wills did not expressly present the same argument that Mr. Spurlock makes here, the case is not on point. I, again, do not agree. In wills, the jury submitted a question as

to whether if the victim was shot without warning and died instantly, whether it would preclude a finding of reasonable fear. The trial court then gave a supplemental instruction that it can't really comment on the hypothetical, other than to say the burden is on the government to prove beyond a reasonable doubt that, at some point, the victim was reasonably in fear of death or serious bodily injury. The jury was, effectively, instructed that the duration of reasonable fear did not matter, if the reasonable fear was found.

And while Mr. Spurlock is correct that the primary question of jury instruction on review considered a different jury instruction, I also -- the Court there address the supplemental instructions, stating the supplemental instruction was not in error, plain or otherwise. That's at page 494 of that decision.

Finally, moving on to causation. Mr. Spurlock argues that the Court should instruct the jury as to proximate cause, citing to Burrage, B-u-r-r-a-g-e versus United States, 571 U.S. 204 from 2014. I, again, do not agree. In that case, the Supreme Court considered the death results enhancement under a penalty provision of the Controlled Substances Act. The enhancement applies when death or serious bodily injury results from the use of such substance.

The Court held that in the absence of a statutory

definition of "results from," it would give ordinary meaning to the term, which is defined as a "but for" causation requirement.

The other cases that the defendant cites I do not find to be persuasive.

The defendant also argued the Court should provide a temporal causation instruction, citing to a single case, United States versus Montgomery, 635 F.3d 1074. It's an Eighth Circuit 2011 decision. I disagree, and I find the facts in Montgomery to be improperly analogous to this case.

So, for that reason, I adopt the government's proposed instruction as to Counts Five and Six.

Count Seven --

MS. BERRY: Your Honor, one question on Counts Five and Six. Your instruction may have already done this, but I think we should put in Will and Yesenia Larsen's names rather than their initials.

THE COURT: Yes. We can change that to put in their names.

MS. BERRY: Thank you.

THE COURT: Next is the instruction on Count Seven, which is on page 43 of ECF 582. I am going to adopt the -- overrule the objection and adopt the government's proposed instruction because it mirrors the Ninth Circuit pattern instruction.

The next one is the -- also for Count Seven, on page 24, this relates to affecting interstate commerce, the instruction will adopt as proposed. I realize the defendant is raising an objection to preserve a challenge under Taylor versus United States, 576 U.S. 301. It's a 2016 decision. That's beyond my ability to resolve, so you can preserve your objection to challenge Taylor at a later time.

Moving on to Count Eight. So Count Eight, then, is on page 20 -- I realize I've been referring to the actual page number of ECF 582 as opposed to the ECF number. The actual page number is 26. I'm adopting the defendant's proposed -- well, sustaining the objection, adopting the defendant's request that the Court include both charges under Section 24(c). Because the government doesn't really object, and I'm accepting the government's -- I'm adopting the defendant's objection as to concluding -- as to the concluding sentence. Under the statute the degree of murder does not matter. And because the government does not object to including -- using the Ninth Circuit pattern instruction for Section 924(c) as a lesser included offense, but objects to the additional language that the defendant adds, I am using the Ninth Circuit Pattern Instruction 14.22 for Section 24(c) and include the additional elements of Section 24(J). So, counsel will see the changes once you get the draft instructions.

I don't think there's any dispute as to the aiding

and abetting instruction, on page 28.

The next is testimony of witnesses under special circumstances. So because the instruction, the final jury instructions will be filed on the docket, I still think there's a need to include initials.

Is there any objection to refer to the cooperating witnesses by their initials?

MS. BERRY: Your Honor, we would ask that the version that is submitted to the jury includes their whole names, and that a different version with just initials be filed publically.

THE COURT: All right. Even though I will read that into the record, the record will -- I'm going to ask the court reporter to make we use their initials, of cooperating witnesses. I just have to make a note that the final instruction that's filed will be this version.

You know what? I don't want to risk that. There's just too many -- I don't want to risk a mistake happening and the wrong version is filed on the docket, especially when the jurors have already heard the names of the actual individuals involved. So, for them to see -- I don't see any -- I don't find it any less helpful for the jury to see an instruction that refers to the cooperators by their initials, so I'm going to keep the instruction as is. I think that interest in protecting them, outweighs any confusion by the jury, which I

don't find there will be confusion.

MS. BERRY: Your Honor, just for the record, I'm not concerned about the confusion. I'm concerned about the appearance of protecting the cooperators. Whether the jury believes B.K. and O.O. is the determining factor in the decision of guilt or innocence, and any appearance that the Court is protecting them and their safety in some way, I think could be prejudicial towards Mr. Spurlock. The Court is well aware of who these people are. When the instructions are read and provided to them, I think their names should be given in full.

THE COURT: Does the government have a position?

MS. BRADY: Your Honor, I do think their names should remain initials. There are other places where we put initials, for example for the deceased, so I don't think the jurors -- unless you're going to change it to include their full names, like, for example, in the stalking instruction I have W.L. instead of William Larsen. And if we do that, it would lessen whatever the defense's concern is about it seeming to be different, that their initials are used and other people's aren't.

MS. BERRY: Well, I have asked that all of the victims be named fully. I think everybody should be named. We've been discussing this for four weeks using their names. I think it's odd to use initials at this stage, and creates

the wrong impression.

THE COURT: So there's no -- there's no question that the jurors know the identity of the individuals we are all referencing. The reason I hesitate to agree to put the full name, is the concern that the wrong jury instruction may be filed on the docket. So my staff just has to make sure we file the right instruction. And I will verify before we file it.

So, I reconsider. I grant that request. The actual instruction will include names, but the final jury instruction that's going to be filed on the docket will only use initials for the instruction that relates to cooperators.

So, next is the instruction on expert witness testimony. And generally, you know, I include who they are. There's a long list. Do you think there's a need to include the names of all the individuals who have been certified as experts?

MS. BRADY: Your Honor, I don't. I think you can instruct them that you had deemed and found certain people to be experts in various areas, and those people are included in this instruction, or something to that effect, so we're not listing 25 people in this instruction.

THE COURT: Ms. Berry.

MS. BERRY: I fear that I'm the difficult one here today, but we would ask that our -- that the experts be

named. You know, one, critical argument for us is going to be that the government put forward 20 forensic experts, none of whom said anything that was substantively relevant to Mr. Spurlock's guilt. And so it is -- it's a critical issue for us in the case. It's typical in cases that every expert is listed. That's the way it's been in every case I've ever done. And so I would ask that they be left in.

I would offer to write the list, and send it to the government to make sure it's complete, and provide it to the Court, so that I'm taking on the work of that. But I do think that it should be done.

THE COURT: Well, you're right that, generally, I include the names of the expert witnesses because there's only a few. But, I am reluctant, as I said, to name all -- give a list.

What I can do, though, is -- well, first all, there's no requirement that I do this. The parties can point out who the expert witnesses are.

MS. BERRY: The pattern does suggest that the individuals are supposed to be named, by the way the pattern is phrased.

THE COURT: I can list them at the end of the instruction. So, for example, the instruction will say, "You've heard testimony from witnesses who testified about their opinions...", and then it goes on to read, and then the

following witnesses are offered -- how about the following witnesses fall into this category, and then you just identify who they are.

MS. BERRY: I'm fine with that.

THE COURT: There was no dual testimony, so all the -- the expert witnesses were only offered as expert witnesses. So, we would have the list -- I had also asked the courtroom deputy to keep the list, I think. But amongst all of you, I'm sure you have a list that's accurate for me to insert.

MS. BERRY: Your Honor, would you like me to propose a list, or work with the courtroom deputy to see if there is one? I did offer to be of assistance since I'm being difficult.

THE COURT: Why don't you prepare the list and share it with government counsel to make sure you agree.

MS. BERRY: I will.

THE COURT: All right. Well, now, I have instruction numbers on my document. Instruction number 12, on page -- actually 13. My pagination is off. Page 32, you all have that. There's no objection.

Knowingly define, the next one, there's no dispute. I will adopt that one.

For the proof of intent or knowledge, which is the government's proposed instruction on page 34 -- I think now I

have it. It's government proposed instruction number 15 -- I agree with the defendant that the pattern instruction on knowledge is sufficient, so I will reject and not adopt this instruction.

So the next instruction is separate consideration of multiple Counts. This is government's proposed number 16. This is where I added -- I decided to add an additional sentence -- two sentences, to explain about the connection between Count One and Two, but it doesn't account for the drug weighed. So currently, I have -- "however --" I added these two sentences: " -- if you acquit the defendant on Count One, you must also acquit the defendant on Count Two. Additionally, if you acquit the defendant on Count Seven, you must also acquit the defendant on Count Eight."

I can say, "However, if you acquit the defendant on Count One, you must acquit the defendant on Count Two. If you find the drug weight is less than -- the quantity of drug is less than 1,000 kilograms..." So, I'm going to insert another sentence. "If you find the quantity of marijuana is less than 1,000 kilograms, you must also acquit the defendant on Count Two.

Any objection to that addition?

MS. BRADY: No, Your Honor.

MS. BERRY: I don't think so, Your Honor. I'll look at the language.

THE COURT: The next instruction, statements by the defendant, there's no objection.

The venue instruction --

MS. BERRY: Your Honor, for statements by defendant, um, I'm actually not sure if this applies in this case.

MS. BRADY: There was testimony from officer --

THE COURT: There is many testimonies about what Mr. Spurlock, allegedly, said, right?

MS. BRADY: Right; to Officer Bare in the car, when he said "Am I being arrested for trafficking?"

THE COURT: Is that the only state --

MS. BRADY: That's the only one.

THE COURT: Oh, that's what the instruction is designed --

MS. BERRY: Yeah, the statement -- I don't know -- I don't think that it makes sense to give this instruction because --

THE COURT: I agree. I don't want it to be confusing. I think, certainly -- I wasn't even thinking about that statement. I was thinking there had been testimony about what Mr. Spurlock, allegedly, said.

MS. BRADY: You could add "you have heard testimony that the defendant made a statement in the presence of law enforcement," to draw specific attention to it's that

statement. But, they do need to be told that they have to decide whether he made it and how much weight to give it.

MS. BERRY: But he didn't make a statement. He asked a question. I don't think it qualifies as a statement as a legal matter.

MS. BRADY: I think he said "I'm being arrested for trafficking, right," or something like that.

THE COURT: I'm sorry, Ms. Brady. You need to speak into the mic.

MS. BRADY: Sorry. I think he said it as more of a statement, but without having it in front of me --

THE COURT: What was the alleged statement again?

MS. BRADY: I think he said, Excuse me, officer, for my own edification, is the warrant for trafficking, or am I being arrested for trafficking -- or I'm being arrested for trafficking. I can't remember specifically.

MS. BERRY: I can re-listen to the statement. It was definitely a question. It was not a statement. And the government can certainly argue that it's indicative of something, if it chooses to, but I don't think it qualifies as a statement, such that an instruction should be given. And, it suggests to the jury that he made a statement to law enforcement, which is inaccurate, particularly when there was no testimony about that question, and so the jury doesn't know

if he was told something while he was being cuffed, and he's asking a question about it. I mean there's just nothing in the record that supports this conclusion that it's a statement. It implies something that doesn't exist.

THE COURT: So I was trying to look through my notes, and this is from Devon -- no. On cross-examination of Bryce Bare, I think the clip, the clip from the audio or video -- I can't remember -- was Mr. Spurlock was asking why he was being arrested. I don't know if he's -- so counsel can certainly find me that statement -- or do you that testimony, that clip?

MS. BRADY: I don't. I don't down here because our technical person has left, so I don't have it down here.

THE COURT: Yeah, that's a conversation between Agent Kroschel and Mr. Spurlock. It was Exhibit 53a.

MS. BERRY: I think I asked a single question on cross, Mr. Spurlock asked you why he was being arrested, correct? And he said yes.

THE COURT: All right. Ms. Brady, you can try to convince me otherwise, but I think that the way the testimony has come in, especially if I add that you've heard the statement that defendant made a statement to law enforcement, that suggests that -- and I think gives significant weight to a statement that could be argued was a question. So I think that the instruction could mislead the

jury into focusing on that statement. Counsel can still argue as to the evidence that's been admitted. But the way the evidence came in, I don't think that this instruction should be given because it draws too much attention. It suggests that more attention should be given to that question. So, tentatively, I'm not going to give this instruction, unless Ms. Brady convinces me otherwise.

All right. On the venue question, on the venue issue, I overrule defendant's objection as to venue because the government has proposed a Ninth Circuit Pattern Instruction which accurately reflects the law in this circuit. Moreover, the offense charges are continuing offenses under 18 USC Section 3237. See United States versus Lukashov, L-u-k-a-s-h-o-v, 694 F.3d 1107, at 1120 to 1121. It's a Ninth Circuit 2012 decision. But, I decided that it would be clearer to actually modify the instruction, the pattern instruction. So instead of -- for the second -- the third sentence in that venue instruction, it would be, at line 8, I replace instead of "took place," I replace took place with "began with, continue in, or was completed in the State and District of Nevada.

MS. BRADY: I'm sorry. Can you repeat that one more time.

THE COURT: So you see the verb "took place," that will now read "began in, continued in, or was

completed..." So I'm tracking the language of the statute.

Does the government have objection to that modification?

MS. BRADY: No, Your Honor.

THE COURT: Ms. Berry.

MS. BERRY: Nothing beyond the general objection we've already raised.

THE COURT: All right. So that modification will be made.

The instruction on stipulated facts, there's no dispute, so that will be given. So, essentially, my ruling addresses -- while I address the government's -- so there are corresponding proposed instructions that defendant gave that I, essentially, addressed already in ruling on the objection. But, there's some additional instructions that the defendant proposed that I need to address. So I begin, first, with defendant's proposed instruction number 1, on the credibility of witnesses. Actually, defendant proposed two instructions on credibility of witnesses. They are the same because I think you took one from the preliminary instruction, the pattern instruction, and one from the closing instruction, both of which I already incorporated in my standard instructions. So, I will use my standard instructions. I'm not going to use defendant's proposed on Count -- instruction number 1.

Defendant proposed instruction number 2 about the jury being guided by the English translation. That was -- I'm not sure it's needed, given the way the evidence came in, so I'm not adopting that instruction.

The next one, defense proposed instructions number 3, relating to transcript or recording in foreign language. I think it's the same, right? I don't think that's needed, so I'm not going to use it.

The defendant's proposed instruction number 4, disputed transcript of recording in foreign language, I don't think that's needed either.

So the next one is defendant's prosed instruction number 5.

Is that instruction needed?

MS. BERRY: I don't think so. I think we included this because of the dispute about the noticed 404(b) evidence of the trip to New York that the Court didn't allow evidence of. So I will confer with my mike team tonight, but I don't think that's necessary at this point.

THE COURT: And then the defense ' propose instruction number 6.

MS. BERRY: There was definitely a lot of impeachment. I've never asked for this instruction before. If it would be possible, Your Honor, I would like to consider this overnight, and let the Court know if we maintain our

request for this.

THE COURT: All right. So that's same part of instruction 5 and 6. I don't think either instruction is needed. The way the evidence came in, I'm not sure that is supported.

So the next one, instruction 7, is the same, credibility of witness instruction. It's the same as defense proposed instruction number 1.

All right. Defense proposed instruction number 8.

Do you still ask that I give this instruction?

MS. BERRY: Yes.

THE COURT: So that instruction will be given.

I did not see -- this is proposed instruction number 9. The government doesn't have any objection to giving this instruction, is that right?

MS. BRADY: No.

THE COURT: Does the defense still request it?

MS. BERRY: Yes, Your Honor.

THE COURT: All right. That instruction will be given.

So, defense proposed instruction number 10, with the government as a party, which the government objects, I overrule the objection. This is one that I include in my standard instructions, standard closing instruction.

The defense proposed instruction number 11, matters

that the jury may not consider, I already have this. I incorporated it into my standard closing instructions, so that my closing instructions, my standard closing instruction will be given.

And then the rest, I think I've already resolved.

MS. BERRY: There's one, Your Honor, that you haven't resolved. It is the mere presence instruction, which we have on page 73, and the duty --

THE COURT: I'm sorry. Before you do that, let me just make a note about the two instructions you were going to verify with your team.

Which instruction is that, mere presence?

MS. BERRY: Sorry, Your Honor. Yeah, so the two, the final we proposed that Your Honor hasn't ruled on yet are on pages 73 and 74.

THE COURT: Oh, I think I remember now.

MS. BERRY: It's the mere presence instruction to be given during closing instructions, duty of jury.

THE COURT: So this is the defendant's proposed instruction number 20. I think the way the evidence has been presented, certainly the jury could find that Mr. Spurlock may have been present, and so they should understand what mere presence at a crime scene could or could not establish.

Does the government object to giving this instruction?

Case: 26-689, 10/27/2026, DktEntry: 19.2, Page 121 of 254


MS. BRADY: Your Honor, we did based on the fact that it deviated slightly from the pattern instruction that required a particular crime be specified. So, it is mere presence as to which crime? And we do think it is unnecessary, as noted in our papers.

THE COURT: So this instruction really only applies to the alleged -- the killings of the Larsens.

MS. BERRY: That's right, Your Honor.

THE COURT: So I -- so to address the government's instruction, I could change it -- to address the government's concern, which I agree, given the multiple charges, mere presence at the scene of the crime involving the Larsens? Involving -- I could name the names, Will Larsen, or mere knowledge the crime is being --

MS. BRADY: So, for example, Your Honor, I -- with Will Larsen, obviously, the drug conspiracy is part of Count One, so that is not one I think mere presence -- I think if you want to relate it just to the homicides of them, then that's going to be, obviously, Counts Three, Four, Five, Six, Seven and eight.

MS. BERRY: Your Honor, I think that it -- actually, I'm sorry, Your Honor. I think this instruction is relevant to Count One as well because his knowledge, if the jury could believe that he knew about Will Larsen's marijuana business but did not participate. I don't think clarifying

which crime is being discussed is necessary and would be overly complicated and clunky. I think this just allows the consent of mere presence to be defined for the jury so that we can make the appropriate arguments in closing.

THE COURT: I think that -- all right. So I'm convinced the instruction should be given as -- hang on.

The jury instruction, the pattern instruction, though, specifies the specific crime involved. If this case just involves the conspiracy in Count One, I would not give this instruction. I don't think the evidence supports giving that instruction as to mere presence. I do think it supports the instruction with respect to the -- it could affect Count Two because it all relates to the murder of Will Larsen and Yesenia Larsen. So, I could say "mere presence at the scene of the crime involving the murders of Will Larsen and Yesenia Larsen, or mere knowledge that a murder is being committed is not sufficient -- instead of "a crime," I would say "a murder."

So with that addition, do either of you object to that modification?

So the government objects to the instruction being given. Do you still object given my modification?

MS. BRADY: Yes, my objection about it being given stands, but your modification, no, I don't have any objection to.

THE COURT: Ms. Berry.

MS. BERRY: We request the version that we've articulated so that we can allow for the argument about the conspiracy, the marijuana conspiracy as well. But given Your Honor's overruling of that, we are fine with the modification proposed by the Court.

THE COURT: All right. That's my final decision. I'll give the mere presence instruction, but I will make the modification to reflect the evidence that's been presented in this case.

There is -- the next one is -- oh, I forgot some additional instructions. The defendant's proposed instruction number 21, that's already included in my standard instructions, so I will give my standard instructions.

All right. Now I think I've addressed all of the instructions, except for the government's proposed instruction that was filed, I think, over the weekend -- probably over the weekend.

MS. BRADY: I think it was yesterday.

THE COURT: This is 6 -- ECF 692, the marital communication.

MS. BRADY: Yes.

THE COURT: Does the defendant object to that instruction being given?

MS. BERRY: Yes, Your Honor. A version of an

invocation instruction is typically given when somebody invokes on the stand, to help the jury understand why somebody invokes. O.O. did not invoke on the stand, and was permitted to testify, just as -- there were objections. But just as the Court doesn't instruct the jury on the Rules of Evidence and why some things were let in and some things aren't, this instruction shouldn't be given. All it does is suggest to the jury there are inculpatory things she knows that she wasn't permitted to say because of this privilege. And so there is no basis for giving it, and it would suggest to the jury more inculpatory information exists that was not shared, and it would not be -- the Court with not instruct the jury on some other evidentiary matter. So, we think it's wholly inappropriate in this case.

MS. BRADY: And Your Honor, the reason I included it as a supplement was because during O.O.'s testimony, there were a lot of objections about what she could and could not testify to. And at one point you actually stated to her -- to us -- I think at this point she understands what she's allowed to, and you actually gave them a little bit of an explanation of this law in that colloquy, and that's why I included it in the instructions.

MS. BERRY: There's also been hundreds of objections about hearsay, and the Court has said to a witness you can only, you know, testify to what you saw or know, not

what you heard, and we're not suggesting a hearsay or any other evidentiary rule instruction, so we think it's inappropriate.

THE COURT: So when I read the instruction, I had the same thoughts as to what both of you articulated. Certainly, it could help clear up and provide some context for why she wasn't able to answer certain questions, or was limited in what she could testify to, which I guess the government could say that could -- the jury may use the gaps to evaluate her credibility. On the other hand, that's no different than any other Rules of Evidence and objections that counsel raised that suggests there may be gaps. But the jury hears what they hear.

So, to give this isolated instruction and not explain the others, I think that could cause the jury to unfairly consider what she didn't say, under the privilege, that could have been said. So, overall, I agree with Ms. Berry, and I think that just because -- just as I don't give other instructions about Rules of Evidence, I'm not going to give this instruction. I would have considered it during the course of trial had this issue been raised, but now, after the fact, I think it's unfairly focusing on her testimony, and the gaps in her testimony in a way that seems favorable to the government, so I am going to decline giving the marital communications privilege instruction.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE MIRANDA M. DU, DISTRICT JUDGE
---o0o---

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, -vs- CORY SPURLOCK, Defendant. | No. 3:23-cr-022-MMD-CLB<br>September 5, 2025<br>United States District Court<br>400 S. Virginia Street<br>Reno, Nevada 89501<br>**JURY TRIAL DAY 15** |

**TRANSCRIPT OF TRIAL PROCEEDINGS**

A P P E A R A N C E S:

FOR THE GOVERNMENT: MEGAN RACHOW
PENELOPE BRADY
Assist. United States Attorneys
Reno, Nevada

FOR THE DEFENDANT: CHRISTOPHER FREY
KATE BERRY
ALLIE WILSON
Assist. Federal Public Defenders
Reno, Nevada

Proceedings recorded by mechanical stenography produced by computer-aided transcript

Reported by: KATHRYN M. FRENCH, RPR, CCR
NEVADA LICENSE NO. 392
CALIFORNIA LICENSE NO. 8536

mind until you hear all the evidence and hear the attorneys' arguments and begin your deliberation.

So, have a good afternoon. We'll see you Monday.

(Out of the presence of the Jury.)

THE COURT: Let's take about a 10-minute recess until one o'clock, and then when we return, I'll hear arguments on the Rule 29 motion. That may lead me to have some questions about the jury instructions, but I don't -- I'm not fully prepared to give you all the rulings on the jury instructions this afternoon. I may have to do this Monday afternoon. But, it may be, if we have time, I may throw some additional questions at you.

So, let's take a break until about 1:00.

(Recess Taken.)

(Out of the presence of the Jury.)

THE COURT: Please be seated.

All right. Who will be arguing the Rule 29 motion?

MS. BERRY: I will, Your Honor.

Your Honor, may I argue from the table? I don't think the podium will accommodate my computer.

THE COURT: Yes, you may.

MS. BERRY: Thank you.

Your Honor, my intention is to go one Count at a time, as I think the government indicated that might be easiest, if that suits the Court.

THE COURT: I think it might be easiest if we go one Count at a time and I rule on one Count at a time.

MS. BERRY: Perfect.

Just for the clarity of the record, we move, pursuant to Rule 29, for acquittal on all eight Counts on all bases. In support of that motion, I'm going to make some particular arguments. Starting with Count One, Count One, of course, is the drug conspiracy. The drug conspiracy Count has three elements, each of which is critical to the Rule 29. The first is the dates of the conspiracy, which is charged in this case as November 2019 to June 23rd, 2020;

Second, the agreement. And the agreement, knowing its purpose and intending to accomplish that purpose; and

Then, third, the weight of the marijuana, with a specific requirement that packaging material cannot be included in that weight.

I'm going to begin with the timeframe of the conspiracy, which the government has not introduced any facts in support of. And this was critical to getting O.O.'s testimony, so I want to thank the Court for deferring our argument on today so that we could have the benefit of O.O.'s testimony.

So, I would like to begin. And if we could pull up O.O.'s testimony, please. We have it so that we can display the pages for everybody so we can be clear about what

we're talking about. There is no evidence in this case that Mr. Spurlock or, of course, O.O. joined the conspiracy November of 2019.

So, if we can first look at page 9. On page 9, O.O. was asked about her meeting -- we don't need to Zoom in -- O.O. was asked about meeting Will Larsen. That's what this introductory page that I'm going to mention is, where she -- simply, she indicates that she met him once earlier, maybe in California. And then after that first time, she didn't see him again for a while, and that she had this recollection that he came twice, once maybe at the end of 2019, and then again maybe in 2020. And then she corrects herself when the government asks her about the date of her birthday, and says it was September 25th of 2019. So, she states at this point that she had had a conversation with Will Larsen in 2019. But, just that.

If we can then take a look at page 12 of her transcript, at the bottom it states: "At some point after your birthday, which was the end of September 2019, did Will Larsen and Cory --" and then at the next page "-- start discussing about Cory getting involved in the marijuana business with Will?

"Yes.

"And were you there for these conversations?

"I don't remember specifically a specific

conversation of how it went. I don't remember if I was..."

And it goes on. So, basically, she doesn't -- she doesn't confirm any date. She gives no date for when the conversations even started, let alone an agreement to join.

Then on page 14, the government tries, again, to establish the 2019 date, but she does not give it to them:

"So I want to take you back to the end of 2019, do you remember a conversation involving the marijuana business?

"Not specifically, but it was something that, uh, we talked about.

"And what did you talk about?"

And then: "It's a conversation about what Will is doing."

And then she says at the end of that paragraph:

"So, essentially, Will was moving?"

She says, "I remember a discussion about whether it's even worth it if we even should, considering it's illegal. And, eventually, we decided that it was worth the try."

So the only thing the government established in 2019 was -- or being charitable to the government -- they established that in 2019 that she saw Mr. Larsen and, at some point, they started having conversations. She doesn't even say that the conversations started in 2019, and there is certainly no discussion of an agreement in 2019. And with

that backdrop, in cross, she made very clear that no agreement happened in 2019.

So if we can please move to page 99 of O.O.'s cross, I asked, about half-way through the page:

"So you testified on direct that you agreed to go into business with Will?

"Yes.

"And some of those conversations -- you had some of those conversation about it before you decided to actually go into business with him. Is that fair?

"Yes.

"Okay. One of the first things that you did when you went into business with him was to find a new location in the Mound House area, correct?

"Yes.

"And I think you testified that there was one location that they were already at, and you and Mr. Spurlock looked for a new location, is that correct?

"Yes.

"And that property search and discovery of the new property happened in May 2020, correct?

"Yes.

"And the lease was signed in June of 2020. Does that sound right?

"That does sound right.

"Okay. So your work for Mr. Larsen, or with Mr. Larsen really began in May of 2020, correct?

"Yes.

"Okay. And --"

And she says, "I believe so.

"And so you worked for him or with him for two months total, correct?

"Yes."

So, taken in the totality, there isn't a single fact in evidence that supports the conclusion that a conspiracy was commenced in November of 2019. She never says that a conversation happened in 2019. But even if there were conversations, as she testified to, these were preliminary conversations, and nothing actually occurred until May of 2020. The Ninth Circuit is clear that preliminary conversations about a conspiracy are insufficient to establish a start date. I think the most important case on this question is United States versus Melchor-Lopez, M-e-l-c-h-o-r, hyphen, L-o-p-e-z, 627 F.2d 886, with a PIN cite 891. In that case -- I'm sorry. It's Ninth Circuit, 1980.

The Ninth Circuit says: "Mere association with members of a conspiracy, the existence of an opportunity to join a conspiracy, simple knowledge, approval, or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal

objective, is not sufficient to make one a conspirator."

It goes on: "An unexercised opportunity to join a conspiracy is insufficient. The government must prove more than preliminary negotiations, and must demonstrate active participation. An agreement to negotiate does not create a conspiracy. The law requires an agreement to carry out an illegal act. Evidence of exploratory and inconclusive discussions cannot establish, beyond a reasonable doubt, that a conspiracy existed."

So, O.O.'s testimony is plainly inadequate to establish the start date of the conspiracy in this case, and the government has no other evidence that a conspiracy started in November of 2019.

I would like to identify a few other relevant pieces of evidence that confirm what O.O. said, which is that it did not commence until May of 2020. First is the testimony of Mr. Musgrove, who stated that Mr. Spurlock was not added to the box in Carson City until May of 2020, and that he only saw him on a couple of occasions. Second, the lease documents from 27 Red Rock, which confirm what O.O. said, which is that discussions about the property happened in May of 2020 and the lease was signed in June of 2020. And then the third significant piece of evidence are the financial records.

Mr. Spurlock's Amex card and Frontwave account are both in evidence. Exhibit 55b is the Amex, and it has his

records going back for a significant period. And the first financial record from Nevada occurred on May 6th of 2020, a $78-ish purchase at the Carson-Tahoe Hotel. And then from his Frontwave account, the first purchase, or the first withdrawal that appears in Nevada occurs on June 23rd of 2020. That's Exhibit 67b from Western Nevada Supply. Just for the record, I'll add those Bates numbers. The Amex, which is Exhibit 55b is USAO-020951. And the Frontwave account is USAO-024735.

So, the government has failed, as a matter of law, to establish the period of time for the marijuana conspiracy.

The second issue that I would like to identify relates to weight. In order for the government to prove this Count, it must establish the thousand kilograms that it has alleged in the Count. Without the duration of the conspiracy that they established, they have no chance of getting to that weight amount. It's factually impossible.

If you look at the shipping records from just May and June of 2020, there is no calculation that renders the total quantity over a thousand kilograms, let alone the government's own calculation. Even if we put aside the clear fact that this conspiracy was only two months, the government still can't get at its weight calculation. As Agent Wilkinson herself had to concede, she's never seen any of these packages assembled. She does not know what the materials were in these. She knows pieces of it, but not the whole thing. She

does not know what the -- where the -- what the relationship is to the inbound and outbound shipments. It was established that the inbound shipments were not -- several were not crates. They were pallets. The fundamental assumptions of her math don't make sense. And, they are just that; they are assumptions based on hypotheses, which, as a matter of law, is insufficient to prove an element of the offense charged.

So, even using her calculations -- or I'm sorry. So her calculations are insufficient to establish the weight in this case. And even if we were to use her calculations, as Mr. Frey demonstrated, her calculations were done incorrectly, where she used individual shipments instead of packages, and so she had not properly deducted the correct amounts. And so if you use her, her own formula, using her own formula we're under the 1,000 kilograms.

Finally, for the Rule 29, I will note that the only testimony that's really relevant to Mr. Spurlock, allegedly, joining the conspiracy is O.O.'s, who is the only testifying coconspirator. But she, herself, never testified about what Mr. Spurlock's role was, what he knew. She never saw him participating in the conspiracy in a way that she testified to. She never even saw any marijuana. She didn't know if marijuana was actually ever on-site. And so her testimony is also insufficient to even place Mr. Spurlock in this conspiracy for the months of May and June.

So with that, we ask this Court to dismiss Count One as a matter of law.

MS. RACHOW: Thank you, Your Honor.

First of all, with conspiracies, the first element is beginning on or about a date and ending on or about a date; there was an agreement between two or more persons -- and in this case, to distribute marijuana. The reason that the November of 2019 date was picked -- and as Your Honor knows, from the way the Indictment is charged, it's not just Mr. Larsen and Mr. Spurlock engaged in this conspiracy. It's charged with Mr. Larsen, Mr. Spurlock, O.O., Jered Stefansky, and others known and unknown to the Grand Jury. There has been plentiful testimony about how all Will Larsen did was distribute marijuana, and how he had various contacts throughout the growers in California and the shipping back east.

With the conversations with O.O., she's able to put in the timeframe of when she and Mr. Spurlock were definitively aware of what Mr. Larsen was doing, and the initial discussions began as far as when they were going to join the conspiracy.

With a conspiracy, a person can join an existing conspiracy at any point in time. So, even if you take just what Ms. Berry is saying, they joined in May of 2020, which still makes them just as liable for the entirety of the

conspiracy as the originators of the conspiracy. And that is the plain language of the jury instruction.

As to --

THE COURT: Hang on just a moment.

Does it make them liable -- I need to look at the Indictment real quick. I have a question.

While that is being pulled up, why don't you respond -- oh. Got it.

MS. RACHOW: And Your Honor, there's also one other point that puts their involvement a little bit earlier. O.O. testified that -- it is --

THE COURT: What were you going say, Ms. Rachow?

MS. RACHOW: She also testified on page 20 that there was a front part of the business. And on page 21, they were talking about calling it Albright. There are shipping receipts in evidence that show Albrighton Restoration as a business, going back to November of 2019.

THE COURT: I'm sorry. You say that's on page 20?

MS. RACHOW: Yes. It is on page 20. It is -- well, she starts talking about the business being a front on page 20. The question is at line 23. Her answer is at line 25. And then when you turn to page 21, at the end of that page, line 23, the question is:

"With this particular furniture front, did it have

a name?"

At 25, her answer: "They were talking about calling it Albright..." And it goes on to 22, line 1: "...I think, which I don't know where that name came from."

THE COURT: That's on -- I see it.

MS. RACHOW: And then do want me to -- does Your Honor have a question?

THE COURT: I have a question. I was looking at the Indictment to see -- I realize the Indictment -- the jury instruction has the elements and the timeframe of the conspiracy, in that the defendant joined in the conspiracy knowing its purpose. I guess I want you to respond to Ms. Berry's question that preparatory -- that the case law suggests that preparatory -- or supports that preparatory work, before joining the conspiracy, does not amount to that's the conspiratory act itself.

MS. RACHOW: And that is correct, Your Honor. But what this is here is that they were very well aware that Will Larsen had this marijuana conspiracy, and they joined this marijuana conspiracy during the timeframe of the conspiracy charged in the Indictment. The fact that the conspiracy for the drug organization operates is with one element. Like, there has to be an organization. There has to be an agreement between one or more people. It doesn't necessarily have to be every single person who is alleged in

the Indictment at that exact moment because people can join conspiracies at any point in time that the conspiracy is still ongoing. And even the language in the jury instruction: "Furthermore, one who knowingly joins an existing conspiracy is as responsible for it as the originators."

So when you look at the totality of all the evidence -- and as Your Honor knows under Rule 29, the Court must determine whether at the time of the motion there was relevant evidence from which the jury could reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. So under that standard, the government believes both Element 1 and Element 2 have been met.

As far as the weight, because, once again, it goes back to once you join the conspiracy, you're responsible for the entirety of the weight in the conspiracy, they only attacked one way that Ms. Wilkinson, or Agent Wilkinson, calculated the marijuana. She testified that she calculated the marijuana amounts in two separate ways. One was with the crates. The other way she did it is she went through all the paperwork and all the pay-owe sheets, and added it all up. And under that, she also came up with 2,272 pounds, which was fairly consistent with the 2467 pounds that she got under her shipping method.

You also had testimony from Ms. Sharpe that she had

been storing 50-gallon bags of marijuana on two occasions for her son in her garage. And with the entirety of this, there certainly is enough evidence that a reasonable juror could find that the conspiracy itself -- which is what the point is -- the conspiracy itself had moved over a thousand kilograms of marijuana.

THE COURT: So you mentioned the Albright record. What exhibit is it that shows the Albright record dating back to the end of 2019?

MS. RACHOW: Court's indulgence.

THE COURT: So Exhibit 102 is the first reference I have for Albright. And I should say I think it's actually Albrighton Restoration.

MS. RACHOW: It might also be in Exhibit 62, which for some reason we don't seem to have that binder down here with us.

And Your Honor, the lease for the property at 17 Martin Drive was signed October 22nd of 2019, which is where Albrighton Restoration was located. And that's Exhibit 6.

THE CLERK: Ms. Rachow, do you need Exhibit 62?

MS. RACHOW: I do.

THE COURT: I guess you were arguing about the shipping label. I was trying to find that particular exhibit showing that there were dual shipping labels for Albrighton at

the 17 Martin Drive before the May-June timeframe of 2020.

MS. RACHOW: And there are. The shipping labels in that exhibit, like the 102, I believe start with January of 2020. The lease for that property was signed in October 22nd of '19, which is Exhibit 6.

THE COURT: All right. Anything further?

Now, I'm going to reference B.K.'s testimony too. Counsel did not reference his testimony, but my notes of his testimony --

MS. BERRY: Your Honor, may I respond to the government before you rule?

THE COURT: Yes. I'm telling you what I looked at, and if you want to add any rebuttal, you may.

MS. RACHOW: And as Your Honor noted, there was also the testimony of B.K. that Mr. Spurlock talked to him about getting involved in the business with Will Larsen. B.K. told him not to do it. Mr. Spurlock told him that they were making millions of dollars.

THE COURT: I was referring to my notes on that testimony that B.K. testified that Mr. Spurlock told him while he was still overseas, that Mr. Spurlock was going into business with Mr. Larsen in 2019. This is when he testified he told Mr. Spurlock that he shouldn't because it's guaranteed to end badly, end quote.

And then in 2020, when he was continuing when he was

overseas in 2020, Mr. Spurlock told him he was working with Mr. Larsen, and that they were packaging and meeting growers and buyers, and he would hear about large amounts of money changing hands. So, there's that testimony.

But, Ms. Rachow, are you finished?

MS. RACHOW: Yes, Your Honor, unless you have any other specific questions.

THE COURT: Ms. Berry, do you have some brief rebuttal?

MS. BERRY: Yes, Your Honor.

Regarding the Albrighton Restoration showing up in early 2020 on shipping labels and the 17 Martin Drive, that's exclusively evidence that Mr. Larsen was involved in marijuana trafficking without an agreement for Mr. Spurlock to participate in that conspiracy. And so that is not evidence of Mr. Spurlock's involvement without evidence connecting him to it at that time, which does not exist in the record.

The government's argument that Mr. Spurlock is responsible for the weight prior to his involvement in the conspiracy is not my understanding of the Ninth Circuit case law. The case that I have relevant to this question that we quickly identified is United States versus Lothian, L-o-t-h-i-a-n, 976 F.2d 1257. It's a Ninth Circuit case from 1992, stating that a defendant cannot be held liable for substantive offenses committed before joining or after

withdrawing from a conspiracy, which also makes complete sense because if you look at the plain language of the statute -- or the elements, the government is required to prove that -- excuse me. I'm scrolling up -- that the agreement involved an amount of marijuana that equaled or exceeded 1,000 kilograms. And the agreement that Mr. Spurlock is charged with does not begin until Mr. Spurlock joins that agreement and joins the conspiracy because he is the one on trial.

In terms of B.K.'s testimony, even viewing it in the light most favorable to the government, it's insufficient to establish that he actually joined the conspiracy prior to 2020. The context provided by Your Honor -- I haven't identified the portion of the transcript yet -- makes clear that he was in discussions with Mr. Larsen potentially, which is confirmed by O.O.'s testimony, but that the fact that B.K. was trying to talk him out of it, suggests, in context, that he had not joined the conspiracy, and B.K. certainly didn't say he joined the conspiracy, and certainly wouldn't know that; and that his only discussion of Mr. Spurlock's work is in 2020. And is just, alone, not sufficient to establish a start date of anytime before 2019 -- excuse me -- before 2020.

THE COURT: All right.

So, I deny the motion. I'll first address the timeframe. I think -- and counsel understand the standard. I

have to view the evidence in the light most favorable to the government, construing all inferences in their favor in determining what a rational jury could find. And under that higher standard, I think that, as to the timeframe of the conspiracy, there are several pieces of evidence that the jury could view. And construing them in the government's favor, and then drawing all inference, reasonable inferences in the government's favor, the jury could find that both Mr. Spurlock and O.O. joined the conspiracy sometime at the end of 2019. Even in O.O.'s testimony that counsel cites to on page 19, she was asked if she remembered a discussion in 2019 -- hang on. Let me pull it up.

It's page 19 of her deposition transcript, where the question began:

"I want to take you back to the end of 2019, and do you remember a specific conversation involving the marijuana business?"

She said: "Not specifically, but it was something that we talked about."

And then she goes on to describe what they talked about in terms of the opportunity to make large amounts of money that is relatively easy.

That, coupled with the further -- the testimony on pages 21 and 22 that Ms. Rachow cited to, where O.O. testified to their discussion about using a front for the business,

and then her testimony was they -- let me see. She states that: "They were talking about calling it Albright" -- presumably, she meant Albrighton -- suggesting that that name only occurred during the course of that discussion. So, that would support the government's argument that you're looking at the shipping label for Albrighton found at exhibit -- I think it's Exhibit 102. Some of the shipping labels date back, as Mrs. Rachow referenced -- I'm looking 102b -- to January of 2020.

In addition, as I said, I also consider B.K.'s testimony, where he described conversations with Mr. Spurlock, about Mr. Spurlock getting involved in business with Mr. Larsen in 2019, and that this occurred when he was overseas, that Mr. Spurlock had started working with Mr. Larsen in 2019 through 2020; that includes them learning about the packaging and meeting growers and buyers, and he would hear about large sums of money being exchanged. That's B.K.'s testimony.

So viewing all the evidence that I just indicated in the light most favorable to the government, a rational jury could find that the conspiracy here spans the period of time that the government is alleging, at least starting in 2020 through June. Certainly there are a lot more evidence of activities in May and June, but it doesn't mean that the jury can't find that the beginning of when they joined the

conspiracy was prior to that period of time.

On the issue of the weight and the amount of marijuana allegedly involved in the conspiracy, I agree with Ms. Rachow that considering Ms. Wilkinson's testimony, the jury could find that the government has met its burden as to the weight. Ms. Wilkinson offered two methods for determining the total pounds of marijuana, using, as counsel mentioned, one way of determining the weight of the package without -- the weight of the contents without considering the package, as she explained, and looking at 18 shipping labels from containers that were shipped from the 17 Martin Drive for Albrighton between January and June of 2020. And then she explained how she determined to use the heaviest crate in determining then taking the difference as to the content. Certainly, Mr. Frey asked her extensive questions about her methodology. But also -- and the jury could look at that and determine what weight to give it, you there's been evidence presented.

She also presented -- testified that the other method was to identify the information as to the weight of marijuana based on Mr. Larsen's notes and photos taken by ATF, as an alternative method, that also exceeded 1,000 grams of marijuana.

On that basis, I deny the motion as to Count One.

Count Two?

MS. BERRY: Your Honor, for Count Two, the government is required to prove that Mr. Spurlock was engaged in this conspiracy charged in Count One involving the distribution -- the conspiracy to distribute and possess a thousand kilograms or more of marijuana; that it was during his engagement in this conspiracy; that Mr. Spurlock killed or counseled, commanded, induced, procured or caused the killing of individuals; and third, that Mr. Spurlock acted intentionally; and then finally, fourth, the death of Mr. Stefansky resulted from the activity of Mr. Spurlock.

We preserve our argument that because the government has not established Count One, it cannot move forward on Count Two. Specifically, I'll emphasize that the government chose to include the 1,000 kilograms as a predicate on Count One, and they included it in their charging of Count Two, and so the failure to prove weight, alone, would be sufficient for the dismissal of Count Two. And we incorporate all of our other arguments related to Count One.

Significantly, the government -- it can't simply be that there was a marijuana conspiracy and that a killing occurred. There is a requirement of a nexus between these two requirements, and the government must prove that the killing was designed and intended to further the conspiracy. So, the government need not prove that it actually fulfilled that goal, but the goal, the killing, must have been designed

and intended to further the conspiracy. And that is simply illogical. No reasonable juror could find that the killing of somebody involved in the conspiracy, and the loss of money for the conspiracy, would further the goals of the conspiracy.

And critically, the government's own drug trafficking expert confirmed that there is no reasonable possibility that the killing of Mr. Stefansky could further the goals of the conspiracy. And there's no evidence that that's what it was designed to do. The goals of a drug trafficking organization, as he testified to, are to make money and to avoid getting caught. Here, the DTO loses money, and loses a valuable member of the conspiracy.

Furthermore, I asked Agent Gentile if one member steals money and keeps it for him or herself, does it benefit the conspiracy and he said no. And so by the government's own presentation of evidence, it's theory of the case on Count Two is impossible. There is no facts supporting it. And they should not be able to go forward on that Count.

Murder is not a federal charge. The government has tried to take two state prosecutions and combined them, and has shoved the facts of this case into charges that distort the purpose of those statutes, and the wording of the elements. And this is our first plain example of that that we're discussing in the Rule 29.

This Count is designed for cases in which, you know,

a drug trafficking organization kills a member of a competing drug trafficking organization to take over that territory, and increase the DTOs spread in the community, their size, their strength, their financial opportunities. It's not designed for a case like this, in which one member of a conspiracy is alleged to have killed another member just to help himself. That's the government's theory, as proven by Ms. Brady's question, well, maybe it wouldn't benefit the conspiracy, but could it benefit the individual? And Agent Gentile responded, logically, yes. But the core of this charge, the statute and the elements, is that it has to have the purpose of benefiting the conspiracy. And so while the government may have enough to survive a Rule 29 if this was a state murder charge, it does not have enough to pursue this as a charge in federal court.

I will also just incorporate that there's been insufficient evidence to support Mr. Spurlock's alleged role in this as well.

MS. RACHOW: Your Honor, there are two ways to violate the statute 848(e). One is the continuing criminal enterprise, which is not charged in this case. And under the continuing criminal enterprise, that's when the person must have been killed in furtherance of the drug trafficking.

The other way to be convicted under this statute is the way the government has charged this Count. It's under

848(e)(1)(A). It's the second, the or, and it's or any person engaging in an offense punishable --

THE COURT: I'm sorry. I have the statute pulled up. Is it 21 USC 848, you said?

MS. RACHOW: Yes. It's 21 USC 848(e)(1)(A).

So, you have the first part of A --

THE COURT: All right. I'm sorry. Go ahead. So this is under 848(b)(1)?

MS. RACHOW: E, as in elephant, (1)(A).

THE COURT: That's I was looking at (e)(1)(A), yes.

MS. RACHOW: Okay. So, again, the first part of A is: "Any person engaging in or working in furtherance of a continuing criminal enterprise." That's one way to violate the statute.

The second way is the way we charged it: "Or any person engaging in an offense punishable under Section 841(b)(1)(A). And I would note United States versus LaFleur, L-a-f-l-e-u-r, 971 F.2d 200, at PIN cite 212, which is a Ninth Circuit 1991 case, it says: "To be guilty of Title 21 United States Code, Section 848(e), murder, a defendant must have been a member of a continuing criminal enterprise, or have been engaged in a drug crime."

So the drug crime here is the conspiracy that was alleged in Count One. And with the specifics to

Mr. Stefansky's murder, is there has been lots of testimony about how they were expecting a shipment. The first time the shipment did come in, and there's contact between Mr. Stefansky's phone and Mr. Spurlock's phone, he turns around. He goes back home. He comes back the second day, that June 19th.

Also on June 19th, we introduce the shipping receipt. We have video of Mr. Spurlock -- or a truck that looks substantially like Mr. Spurlock's truck coming and going. One of the times that truck leaves on that Baron surveillance video, it has a crate on the back of it. The truck driver who delivered the crate said that looked like the crate I had just dropped off. And that crate leaves in the Ford Raptor, or in the black truck, before Mr. Stefansky's rental car comes up. Mr. Stefansky's last phone contact with anyone is to one of Mr. Spurlock's phones, and then Mr. Stefansky is never seen or heard from again.

Will Larsen reached out to Cory Spurlock a couple days after and asked him, in the text messages that were introduce through Agent Wilkinson about messages received on Will Larsen's phone. And then, of course, you had all the testimony with CAST, and Melanie Davis, about how Cory Spurlock had been at her house a couple days before, on the 17th, had driven there in a black truck with a trailer, had left his motorcycle with her, had continued on his way to

Reno, and that then he came back on the evening of the 19th. And while she didn't see how he arrived, but when he left, he left on that motorcycle.

That motorcycle is then tied into Heidi Marty, who testified that on the evening of June 19th, late that evening, she heard somebody on a motorcycle pulling up to the 27 Red Rock. She went out and talked to that person, and that was Mr. Spurlock.

And then as Your Honor has heard, Mr. Stefansky's rental car was found -- many, many months later, granted -- but it was found many months later, and it is parked in the shopping center parking lot that is directly across from Ms. Davis's apartment.

The other thing with that rental car is the mileage was checked against the mileage consistent with what Mr. Stefansky's two trips -- the aborted trip when he turned around at Truckee, and the trip when he made it all the way to the Mound House, and then from the location of Mound House to where the vehicle was found, it was close enough that there was only a 60-mile difference, which leaves the inference, under the evidence and the light most favorable to the government, that Mr. Spurlock drove Mr. Stefansky's rental car and left it at the parking lot across the street from Ms. Davis's apartment.

And then you also have the testimony from

B.K., who said that Mr. Spurlock confessed to him, basically, that he had killed Jered.

In addition, you have that trip from O.O., who she comes down from Montana. She meets Mr. Spurlock in Elko. From the CAST, you know that the location of Mr. Spurlock's phone, that he actually did end up in Elko on the 20th, early in the morning, and that then he told her that she needed to go back, and she had to fly back the next day, and she met them, Will and Cory, down at the Red Rock thing, Red Rock warehouse.

She also testified that when Mr. Spurlock came back to Montana, after they had driven back, retrieved the F-250 that Mr. Spurlock had purchased from Mr. Larsen, that Mr. Spurlock suddenly had a lot more cash, and that she believed it was about 200,000 in cash.

So, the entirety, in the light most favorable to the government is that there was this transaction happening. Mr. Spurlock stole the money. And he killed Mr. Stefansky in relation to that drug crime.

THE COURT: Anything further, Ms. Berry?

MS. BERRY: No, Your Honor.

THE COURT: All right.

So I, of course, agree that if the jury were to acquit on Count One, then they have to acquit on Count Two; so, the two Counts are related. That's why one of the jury

instructions that I'm going to revise is the one where the defendant is charged in each Count, and you must consider each Count separately. I'll have an additional sentence that explains that there's an exception with respect to Count Two and then Count Eight.

With respect to -- so Ms. Berry raises the other argument. There are two independent arguments. I agree with Ms. Rachow. On the sufficiency of the evidence, I'm not going to recap what she said. I think she articulated well a summary of the evidence that's been offered that the jury, viewed in a light most favorable to the government, the jury could find Mr. Spurlock guilty. So I'm not going to address that last argument. I agree with Ms. Rachow.

I also agree with her on the first argument, which is that as charged in Count Two, the government is charging Mr. Spurlock under 18 -- under 21 USC 848(e), as in Elephant, (1)(A) -- in fact, I was looking at that section of the statute in working on the jury instructions. And there, as Ms. Rachow indicated, the government charged under the alternative, which is that a person engaging in an offense punishable under Section 848(b)(1)(A) -- which is what he's charged with here -- who intentionally then kills. So, the government is not charging under the first clause, which is a killing in furtherance of the conspiracy. This is one involving a killing while engaging in the offense. And on

that basis, I deny the motion as to Count Two.

You may realize that that's also going to affect my ruling on the jury instructions, but I'll go over the jury instructions later.

Ms. Rachow, you gave me a cite for a Ninth Circuit case. I don't know if the cite is correct. 971 F.2d 200? This is a 19 -- a 2012, Ninth Circuit case.

MS. RACHOW: Sorry. It's a 1991 case. It's 971 F.2d 200, with the PIN cite being at 212, United States versus LaFleur.

THE COURT: How do you spell the case name again?

MS. RACHOW: L-a-f-l-e-u-r.

THE COURT: All right. Thank you.

Count Three.

MS. BERRY: Thank you, Your Honor.

Just for the record, it's our position that the drug -- a drug conspiracy still requires the "in furtherance of." I would like the opportunity to try to find some additional authorities that I'll supplement to Court before final jury instructions are settled.

THE COURT: Well, it seems like you've done all the work in the jury instructions already. I don't know that I need more authorities on the jury instructions.

What's the Count -- I'm going to hear Count Three.

MS. BERRY: I'll move to Count Three, Your Honor.

Count Three is the murder for hire Count. As Your Honor is aware, first, that Mr. Spurlock used a mechanism of interstate commerce.

Second, that he did so with the intent to murder Will Larsen.

Third, that he promised to pay B.K. money in exchange for B.K. killing Will Larsen.

And fourth, that Will Larsen died as a result of the agreement.

And I -- we have included the possibility of financial gain is not enough to satisfy the quid pro quo requirement for murder for hire, which is pursuant to Ninth Circuit case law.

I'm going to start with, kind of, the argument that is lead based on the testimony that was elicited, is that the government, while I'm sure it intended to elicit testimony of an agreement, it failed to do so. So, if we can please pull up BK's -- part one of B.K.'s transcript, on page 32.

THE COURT: I have two transcripts, which day of the transcript?

MS. BERRY: The first day of the transcript, which, just for the record, is August 26th, 2025.

In testimony, he gave what -- something similar to

what he said in his plea, at the bottom of the page: "I repeatedly disagreed with Cory about the necessity of killing Will, and even that the, the monetary value is worth it."

Next page, please: "And, ultimately, uh, he asked me about, like, the time of year when there would be the most money around. And he said that it was a regular occurrence to see, you know, a million dollars in cash and, you know, when we were working together. And then, ultimately, he offered me, if I participated and helped, to split any of the money 60/40; being 60 percent for me and 40 percent for him and O.O. They justified that because they had already acquired a couple hundred thousand dollars in killing Jered."

This conversation is happening in October, based on the testimony above.

"Question: At any point in October have you agreed with Mr. Spurlock to kill Will Larsen for money?

"No, not at that time. No."

So while there is an offer, according to Mr. Spurlock (sic.), of a murder for hire, he did not enter the agreement. No, agreement is going to be made.

And then the government directs Mr. Spurlock to talk about -- excuse me -- B.K. to talk about --

THE COURT: I know who you're referring to.

MS. BERRY: Sorry, Cory.

The government goes on to direct B.K. about his trip

with Amanda, and they discuss the trip, and they discuss him going on the trip, but then she never ties this up. They never actually establish that an agreement was made at any point, let alone before going to Nevada. And in fact, the testimony indicates that he never made an agreement.

If we can please go to page 37 of the transcript. So in the testimony, between these pages, it's just his trip with Ms. Camacho. Mr. Spurlock allegedly asking him to do things, like get a gun. And then meet him in the Dayton RV park. And then they, you know, commence this surveillance. And the question posed: "Did you know" -- I'm on line 15 -- "-- did you know what his intent was for Will Larsen?

"Yes.

"What was his intent, if he told you, regarding Will Larsen?

"To follow him and kill him.

"Did you know his intent regarding Yesenia Larsen?

"Yes, he --" and then there's an objection.

Go to the next page, please.

"Did Mr. Spurlock ever tell you what his intention for Yesenia Larsen was?

"Yes. He had stated it to me on multiple occasions before, uh, or during October, um, that if it was necessary, because she was there, when they ultimately found Will, he was absolutely willing to kill her."

And then skipping ahead a little bit. Sorry. I want to move to a different page. I was just giving that for context.

Oh, yeah. So he explains that he understood what Mr. Spurlock's intent was. And then on page 56, this is when the surveillance is actually happening and they're at the storage facility, and he says that he had no intent and that he didn't want to do anything.

"He asked me" -- on line 5 -- "if I was ready to do this. And I asked him what he meant. And he said that he was going to take care of Will because he understood that could potentially be difficult for me, having known Will for so long" -- even though this is, allegedly, the conspiracy they were in -- "but that he needed me to kill Yesenia.

"And what did you say?

"I said no."

So, what we have is we have an offer from Mr. Spurlock, according to B.K., to engage in a murder for hire. We have B.K. saying he did not, at that time, agree to it. We have him going to Nevada having never agreed to it. And then we have him in Nevada refusing to do it. And then, according to his testimony, never participating. And so an agreement was never actually formed, which is a requirement by statute and case law, of a murder for hire. So all we have is a conversation about it that he -- and he did not agree to it.

That's the state of the record at this point. I'm sure that was not the intended state of the record, but it is the state of the record.

And without a -- without that agreement, there can be no murder for -- conspiracy to conduct murder for hire. Knowing that someone has a plan, and going, is not an agreement. And B.K. repeatedly states that he said that he wouldn't do it, that he was trying to talk him out of it, and at no time during the testimony admitted that he would do it.

O.O. also, of course, said -- O.O. said in her testimony that there was never an intent to kill.

Moving to the consideration issue, I know that Your Honor is well briefed on the consideration issue. We briefed it in the Motion to Dismiss. We incorporate all of those arguments. We briefed it again in the defense trial brief. So, I think Your Honor is very aware of our position on those issues, so I'll just make it clear. It's in an even stronger position, given the state of the record, where there was this hypothetical discussion about Mr. Larsen potentially having money on him and, if he did, he would receive a cut of it. So, there was no knowledge of whether he had money on him. There was speculation that he might. And, there was no knowledge of that amount. And so it was a -- it's not a sufficiently concrete plan for the consideration element to

be met. If he had money, he would get a cut of it is not a murder for hire. The mere possibility of financial gain is not enough to satisfy the quid pro quo requirement. Financial motive is insufficient. Many, many killings are financially motivated. And so the fact that money was a consideration is not sufficient to establish the murder for hire element.

Finally, their venue is improper in this case. First of all, there was no agreement. And even if the government had established agreement, there is no evidence that an agreement occurred in Nevada, and so no essential element of the offense occurred in the State of Nevada.

So, for all of those reasons we seek dismissal as a matter of law in Count Three.

THE COURT: Ms. Rachow.

MS. RACHOW: Your Honor, B.K. admitted on the stand that he pled guilty, and he pled guilty to conspiring with Cory Spurlock to kill Will Larsen for money. So, he admitted that he entered into the agreement with Mr. Spurlock for the purpose of killing Will Larsen. We stand by our briefing as far as the exchange of consideration. A promise of economic advantage may constitute a thing of pecuniary value. Even if it is not enforceable under contract law, the plain meaning of 1958, unambiguously, encompassed a quid pro quo understanding involving something of economic value as understood by common sense.

MS. BERRY: Your Honor, I would like to respond -- oh, I'm sorry.

Ms. Rachow, are you done? I didn't mean to interrupt you.

MS. RACHOW: I was not.

MS. BERRY: I apologize.

MS. RACHOW: Again, Your Honor, when you look at the entirety of BK's testimony, the statements he made repeatedly on direct and cross-examination, he admitted that he purchased the gun for it. He admitted that he met them in Reno instead of going with Miss Camacho, or getting out of it. He knew it was going to happen. He was involved with the stalking within the State of Nevada to find and locate Will Larsen. With venue, this is clearly a continuing -- a continuing event.

Mr. Spurlock and O.O. came down from Montana to be in the Dayton area. B.K. left from Salt Lake City, knowing what was going to happen, agreeing to do it, whether formally or informally, that his purchase of the gun, and his agreement to meet them in Reno to start following Will Larsen, knowing what the intent was for Will Larsen -- and frankly, for Yesenia Larsen as well -- and that he agreed to do it because Mr. Spurlock agreed to give him 60 percent of whatever money was recovered from William Larsen because they assumed, or Mr. Spurlock assumed that Mr. Larsen would have a lot of cash

Case: 26-689, 10/27/2026, DktEntry: 19.2, Page 163 of 254


on him, anywhere up to a million dollars because of the year. So because it was a continuing crime, there is venue in Nevada.

From the totality of B.K.'s testimony, looked at the light most favorable to the government, and all the other evidence in this case, the government would submit there is more than sufficient evidence to let this Count go to the jury.

THE COURT: Ms. Berry, did you have something you wanted to offer?

MS. BERRY: Yes. Thank you.

The fact that he said that he pled to it is insufficient as a matter of law. That is not a fact. That does not support the fact that there was actually an agreement. It's an out-of-court statement. It's hearsay. Under United States versus Armijo, A-r-m-i-j-o, 5 F.3d 1229, 1232. It's a Ninth Circuit case from 1993 discussing the fact that a plea is -- I mean it's an out of court -- it's an out-of-Court statement, and so it cannot be considered as part of the evidence in this case in support of there actually having been an agreement.

THE COURT: I think that the cases that the parties cited to for venue also contains one of those cases involved a similar proposition, that the Court shouldn't rely on the plea agreement itself, which is, as you said,

an out-of-court statement in support. But -- do you have anything further?

MS. BERRY: No, Your Honor.

THE COURT: All right. But this here, I don't think that the government is pointing solely to B.K.'s plea. On the -- so this is Count Three. First of all, on the issue of B.K.'s acceptance of the agreement, I think that viewing the evidence in the light most favorable to the government, the jury could find that he accepted -- despite his apparent protests during trial, he accepted, based on his conduct -- which can be -- so his acceptance can be inferred.

As Ms. Rachow pointed out, he purchased a firearm in Salt Lake City, as he testified he was instructed to do. He left his trip to head to Reno to meet up with Mr. Spurlock and O.O. And then he was involved in, essentially, following the Larsens around Reno, in going to Wal-Mart to purchase items with Mr. Spurlock -- with O.O. And then, continuing to follow them around as they leave Reno for Bridgeport. And knowing that, as he testified to, knowing that Mr. Spurlock's intent was to follow Will Larsen and to kill him. And so given that testimony, I think jurors can infer that his acceptance of the agreement was implicit in his conduct.

As for consideration, my ruling on the Motion to Dismiss I'm going to incorporate. And I agree there's evidence offered here as to discussion about consideration

about Mr. Spurlock allegedly telling B.K. that he could get the greater share of the money. And then ultimately, that when B.K. met up with Mr. Spurlock at the RV, he essentially did not get that money, but he got, I guess, reimbursement for purchasing the firearm. So, I agree with Ms. Rachow.

On the venue question, I think that Count Three, in fact all the Counts in this case fall within the continuing offense section, continuing offense statute under 18 USC Section 3237, which applies to events that began in one district and got completed in another. And under that section, the government just needs to prove that there were acts that occurred where the offense began, continued or completed in Nevada. So under that standard, I think, even though the ultimate killing occurred outside of Nevada, there were -- and the agreement may have been formed outside of Nevada, there were activities conducted in Nevada to prepare for -- to follow Mr. Larsen and prepare for that killing, such that venue is proper in Nevada for Count Three, under 18 USC Section 3237.

MS. BERRY: Moving to Count -- oh.

THE COURT: There's also use of interstate commerce. I think there were communications that B.K. had made with Mr. Spurlock while Mr. Spurlock was in Nevada. There was testimony both from O.O. and the -- from Exhibit 72, that Agent Harris testified to about Mr. Spurlock and O.O.

being in Nevada several days before. And so there were communications via a call, and perhaps text messages with B.K. while Mr. Spurlock was in Nevada and B.K. was in Utah. That further allows for jurisdiction -- for venue to be in Nevada.

THE COURT: Count Four.

MS. BERRY: Ready for Count Four?

Count Four is the witness killing Count. The government must prove, first, that Mr. Spurlock killed Will Larsen. And second, Mr. Spurlock did so to prevent Mr. Larsen from discussing the commission or possible commission of a federal crime with a federal law enforcement officer.

The government must prove there was a reasonable likelihood that Mr. Larsen would have communicated with a federal law enforcement officer. Using our simple definition from the jury instruction, reasonable likelihood is a showing that requires more than a possibility and less than a beyond a reasonable doubt.

First, there is no evidence that Mr. Spurlock killed Mr. Larsen to prevent him from discussing from a federal crime, which is a predicate. Here, as we've argued, and we incorporate our arguments related to Count Two, it is improperly charged as there was no act in furtherance of the drug conspiracy, so a federal crime was not committed, and

Case: 26-689, 10/27/2026, DktEntry: 19.2, Page 167 of 254


thus there can be no evidence that the silencing was to prevent communication of a federal crime. And regarding the second element, there is no reasonable likelihood that a -- this would have been communicated to a federal law enforcement officer.

As I mentioned earlier when we were discussing reasonable likelihood, it is a pretty undefined standard in the case law. There is a circuit split, and the Ninth Circuit has not resolved this split, and so I think it may make sense just to go through some of the various tests that exist. And just assuming any of these tests applied, it still would be insufficient.

So, one consideration that some courts have had is whether there was a federal investigation. The government has been explicit throughout this case that no federal investigation began during this time; that the Feds were -- any role the federal government played was just assistance and that they were not investigating at this point. There is no testimony in this case that there was a federal investigation prior to Mr. Larsen's killing. There is also no testified that Mr. Larsen would have spoken to a federal law enforcement officer. There is testimony that Mr. Spurlock -- or excuse me, Mr. Larsen spoke with Tom Green who was a private investigator. There was testimony that -- Mr. Green specifically testified that it's easier for him to get

information because people will talk to him, even though they wouldn't talk a federal agent or law enforcement.

There is evidence that he spoke, once, to an officer who was a state officer who was involved in investigating the case, and that he basically ghosted that person. He refused to answer follow-up phone calls and never, never responded again. He did not want to have communication with law enforcement.

Regarding the question of whether there's any evidence that this could have been a fed -- reasonable likelihood that this would have been -- there would have been -- there would have been communication with a federal law enforcement officer, the only discussion, at all, of federal law enforcement that I found in the records related to this is from Ms. Sharpe's testimony. The government -- if we could pull up Ms. Sharpe's testimony -- on page 38, at the bottom of the page, she is describing, in October of 2020, speaking -- going to speak with Detective Hatley. And the question:

"And did Detective Hatley have you speak to anybody else?

"Yes.

"Who did he have you speak to?

"An FBI agent.

"And what, generally, did you talk about?

"I told her the whole story about Jered being

missing.

"This seems like a silly question, but who -- was it in, like, an official capacity, like an interview?

"I don't think it was official.

"When you met with Sam Hatley?

"Right."

So the only evidence I found of federal law enforcement, at all, was this one conversation with Ms. Sharpe. It was not as part of an investigation. And the testimony, as it stands, is that it was not in an official capacity.

And so there is no evidence of a federal investigation. There is no evidence that Mr. Larsen was reasonably likely to talk to a federal law enforcement officer. And there is no evidence that there was any knowledge or any basis for knowledge that this could or would be a federal investigation.

So and as we've briefed in the prior motion to dismiss, and I believe it's in the trial brief as well, the fact that there was -- the fact that a crime may have -- could have been charged that was federal is insufficient as well, even if -- I assume the government will argue, obviously, that it was a federal crime. And so that is also, as a matter of law, insufficient.

So as a matter of law, pursuant to the standard of

Rule 29, there is no basis for finding anything more than a possibility. There's nothing in evidence that supports this charge. We ask for its dismissal.

MS. RACHOW: Thank you, Your Honor.

Again, under the light most favorable to the government and under the case law set forth in Fowler v. United States, the government would argue that in this particular case, especially with the timeline, Ms. Sharpe was not going to stop looking for Jered Stefansky. So in October of '20, when she came back to Carson City, she did meet with a Carson City detective and she met with an FBI agent. And she didn't think it was formal, but it was at the Carson City Sheriff's Office, and she told the agent the entirety of what happened with Jered going missing.

Sam Hatley also testified that he had an FBI agent meet him at the Carson City Sheriff's Office to speak with Sheila about what happened to Jered.

Now, keep in mind this is in October of 2020, and Will Larsen is murdered on November 8th of 2020.

In addition, why this timeline all seems to become accelerated, was the YouTube video that Ms. Sharpe participated in, where she laid out the facts and the evidence that she had supporting that Cory Spurlock was responsible for her son's disappearance.

You have testimony from both B.K. and you have

testimony from O.O. that Mr. Spurlock was adamant that Will had to go. He had to be shut up. B.K. testified that Mr. Spurlock specifically said Will is a rat and he can't abide, and so he has to be killed.

When you look at that, and the timing, and the fact that Ms. Sharpe was in Carson City talking to an FBI agent, she was still sending flyers to Mr. Spurlock's family. She was not going to let this go. And meeting with an FBI agent, and having an FBI agent take notes, which I believe was testified too, is likely to have evolved into the FBI opening a case into this.

As we previously discussed, this would have been a federal crime because you have a multi-state drug organization moving quite a large weight of marijuana. And in connection to that, you have one of the people involved in this marijuana conspiracy disappear. And, of course, he's later found dead.

So when you look at the entirety of the circumstances, and you look at the case law under Fowler v. United States, and what the Supreme Court set forth in that case, under the light most favorable to the government, the government believes this Count should go to the jury.

MS. BERRY: Your Honor, may -- unless you have a question, I just wanted to respond.

THE COURT: I have a question for Ms. Rachow. I have a couple questions for Ms. Rachow though.

So, do you agree with Ms. Berry's argument that there still has to be some evidence of -- some knowledge on the part of Mr. Spurlock that there is a reasonable likelihood of communications with a federal law enforcement officer?

MS. RACHOW: I don't necessarily agree with the way that she phrased it because when you look at the language in Fowler, which, I have here --

THE COURT: And you're assuming Fowler is clear?

MS. RACHOW: I am. But, I mean, when you look at Fowler, what the circumstances of Fowler are --

THE COURT: You may remain seated.

MS. RACHOW: -- is that you have a couple men in a cemetery getting ready to plan a bank robber, and a local cop comes up upon them. And because the cop recognized one of them, then Fowler shoots and kills the cop. And when you go through the reasoning with that, and with the Supreme Court saying, basically, that in cases of witness tampering, because of what it's like, it says right here: "Witness tampering may prove more serious and more effective when the crime takes place before the victim has engaged in any communications at all with law enforcement officers, at a time when the precise communication and the nature of the officer who may receive it are not yet known."

And so they found that the statute covers a defendant who kills with the intent to prevent communication

with law enforcement officers generally; i.e., with any and all law enforcement officers.

And of course with the standard that they set forth, I think if you go through the reasoning of Fowler, and the reasoning that with witness tampering, it is going to be more feasible to actually kill somebody before they can testify, and you look at that in conjunction with Ms. Sharpe finally reaching out and getting ahold of the FBI, I that the nature offenses -- or whatever occurred -- is the FBI would have then reached out to Mr. Larsen and attempted to talk to Mr. Larsen.

Yes, Mr. Larsen hadn't communicated with a law enforcement officer yet, but he had talked to Tom Green multiple times, and Mr. Spurlock certainly had the fear that Mr. Larsen was going to continue to talk. Because if he thought that Mr. Larsen wasn't going to continue to talk, then why kill him? That's the thing, Will Larsen had to be shut up because there was this concern that Will Larsen was going to continue to talk, and law enforcement would have continued to investigate.

Even if the Larsens hadn't been murdered on November 8th, Jered still would have been found on March 15th of 2021 in Pershing County, which would have reopened this and started the investigation again.

You also heard from Dan Harris that the FBI gets

involved all the time in locating missing people.

So, I think under the totality of the circumstances and how low the burden is to prove -- certainly not beyond a reasonable doubt. It's more than mere speculation -- I think under the facts of this case and this particular timing, and the fact that Mr. Spurlock was so adamant that Mr. Larsen had to be shut up, I think that there is sufficient evidence, in a light most favorable to the government, for this to go to the jury.

THE COURT: So I want to make sure I'm clear as to what there's been no evidence of -- sorry. My computer is locking up.

So there's been no evidence that at the time of the killing that there was a federal investigation. You agree with that?

MS. RACHOW: I would agree that there is no evidence the FBI opened the investigation at that time, but I would submit that there is evidence that Ms. Sharpe was speaking to the FBI, which would have led to a case being opened.

THE COURT: Well, but no investigation was opened at the time? No federal investigation was opened at the time?

MS. RACHOW: Based on this record, that's correct.

THE COURT: And there's no evidence that Mr. Spurlock even knew that Ms. Sharpe had spoken with an FBI agent.

MS. RACHOW: That is correct.

THE COURT: So the evidence that the government is relying on to draw these inferences relates to Mr. Spurlock knowing about the podcast?

MS. RACHOW: Yes.

THE COURT: And that Ms. Sharpe, on the podcast, is making certain accusations?

MS. RACHOW: Yes.

THE COURT: And mentioned him on the postcast?

MS. RACHOW: Yes.

THE COURT: And then -- so that's one evidence. The other evidence is his alleged statement -- well, B.K.'s testimony about his alleged statement, and O.O. testimony about the kid?

MS. RACHOW: Yes. And she also testified that Mr. Spurlock said that they needed to go find Will because he had to be shut up.

THE COURT: All right.

Ms. Berry.

MS. BERRY: Just to be very clear, I don't think that the fact that Ms. Sharpe mentioned Mr. Spurlock on the podcast is in evidence. So, Ms. Sharpe testified that she

shared her information about the investigation, to date, on the podcast. But because of the objection about Mr. Larsen saying Cory's name, she did not testify that Cory was mentioned on the podcast. I believe the only discussion about the content of the podcast came from B.K., who stated, I think that Mr. Larsen was a witness on the podcast, and that Mr. Larsen said that he thought Cory might be involved. I think that's the testimony. Just to clear that up.

All of the evidence the government points to supports the proposition that this is a witness killing. None of the evidence the government points to supports the conclusion that the federal element has been met in this case. There is no evidence that supports the federal element. It was not originally charged properly by the government with the federal element, and I would submit it's because they don't have any evidence that supports that claim, and they presented none at trial.

So, as the record stands, if this case were pre-Fowler, and there was no federal element, maybe it could have survived. But post-Fowler, there is not a single shred of evidence in this record that it was -- that the federal element has been met.

THE COURT: All right.

I'm going to defer my ruling on Count Four. I want to read Fowler again and consider some of these arguments.

In the event that I agree to dismiss Count Four, I would assume that the government -- I would assume that Mr. Spurlock's counsel would argue that joinder was improper.

In anticipation of that argument, I reviewed the issues relating to the joinder again, and I can tell you that given what I've heard in terms of the testimony -- so, initially, I granted the motion to sever because the only argument the government had made to connect the two separate Counts, the two separate incidents, was that Count Two involved allegations of murder for hire while engaging in a drug conspiracy, and that the other Counts related to murders of people involved in the drug conspiracy. That, to me, was just too tenuous. But given the testimony I've heard, I don't think the Counts are improperly joined, even absent Count Four, primarily, because without the allegations in the sense of relating to Mr. Stefansky, I don't think that there's enough context for the other Counts. And I do think that both separate incidents relate to the broader involvement and the relationship in the drug conspiracy, so they are properly joined, and any prejudice if I were to dismiss Count Four, I think that could be addressed through the instructions for the jury.

So to ensure sure that I don't have to go through this process again, I'm giving you a ruling that even if I dismiss Count Four, I don't think the Counts are improperly

joined.

All right. Let's talk about the next Count, but I'm going to defer ruling on Count Four.

MS. BERRY: I understand Your Honor's ruling. Just for the record, I just want to make one argument, which is that the decision about joinder must be based on the face of the charging document, the Indictment. And without Count Four, the charging document is insufficient for joinder, and so joinder was improper and the case should be severed, and we would move for a mistrial.

THE COURT: I haven't granted the motion as to Count Four.

MS. BERRY: I know. We would move --

THE COURT: I also don't find that joinder was improper. But I don't want to jump ahead of myself either. I hope to have a decision on Count Four when we start next week.

All right. Counts Five and Six.

MS. BERRY: Yes, I'll address Counts Five and Six together.

These are the stalking resulting in death Counts. The government's required to prove that:

Mr. Spurlock traveled in interstate commerce, from Montana to Nevada to California -- or traveled in interstate commerce;

That Mr. Spurlock traveled with the intent to kill,

injure, harass, intimidate, or place under surveillance with the intent to kill, injure, harass, or intimidate another person; to wit, Will Larsen in Count Five, and Yesenia Larsen in Count Six;

Third, that as a result of the travel, Mr. Spurlock engaged in a course of conduct that placed Will Larsen and Yesenia Larsen in reasonable fear of death; and

Fourth, that Will Larsen and Yesenia Larsen died as a result of the conduct.

I will focus -- and we include "a defendant does not commit the crime of stalking resulting in death if the victim's reasonable fear of death or serious bodily injury is contemporaneous with, and incidental to the victim's death."

I'll focus, for the purposes of the rule, we move for dismissal on all elements. But for the purposes of argument today, I'll focus on Counts -- or, excuse me, on elements 3 and 4. In regard to 3, there has to be evidence that the conduct -- excuse me -- actually placed Mr. Larsen and Ms. Larsen in reasonable fear of death or serious bodily injury.

So the fear element, and evidence of fear, is a required element of this Count, and there has been no evidence of that fear. Certainly the killings in this case were brutal. There were multiple gunshots, and there was significant stabbing. To the extent that that evidence supports the

conclusion that they may -- the forensic pathologist was not able to determine which of these injuries was the cause of death, and so it's unknown whether the death was more instantaneous or longer. Assuming that there is enough evidence in the record that it may not have been instantaneous for both of them, to the extend there's an implication through that that there was fear, that fear is not sufficient to meet this requirement because that was not the product of the stalking, that was the product of the murdering. And so under the case law that we cited in support of our jury instruction and in the defense trial brief, that any fear that can be inferred their deaths is insufficient to meet the element required in Count Three. And there's been no evidence, whatsoever, of fear. I'd simply make that argument in case that that's a consideration that the Court has.

THE COURT: You said Count Three. I think you meant Element 3.

MR. FREY: Oh. Excuse me. Element 3. Thank you, Your Honor.

Regarding Element 4, the government has to prove that Will Larsen and Yesenia died as a result of the stalking, so there is a nexus here. And so, here, under the light most favorable to the government, there could be evidence of stalking, and there's evidence of a death -- of death, but there is not evidence of the stalking is what caused the

deaths. This is not a case in which, for example, you know, somebody is following a car and the person realizes that they're being followed, feels afraid, and gets into a fatal car accident, where the stalking resulted in the fear and the deaths of these individuals.

I'll note that the record is crystal clear that at no moment is there any evidence that Mr. Larsen and Ms. Larsen were aware that they were being surveyed, and so there is nothing from the following that suggests that all of the testimony is that they were attempting not to be seen. There -- many witnesses made testimony that they were not -- there's no evidence that the Larsens realized they were being followed, that they saw somebody behind them, and so there can be no argument that the fear existed in any moment prior to their deaths.

And so with that, we move to dismiss Counts Five and Six.

THE COURT: That seems -- it's the same argument that you just offered with respect to the third element.

MS. BERRY: Yeah, that's correct, Your Honor. I just realized that I hadn't actually explicitly argued that there was no fear up until that moment, so I just wanted to put that in the record.

Thank you.

MS. RACHOW: Your Honor, we have a very

different view of what the law is on this. We did not find anything that supported the defendant's contention that the fear must not be contemporaneous with and incidental to the victim's death. And what you have here to support that both of the Larsens were afraid prior to death is you have O.O.'s testimony that she saw Mr. Spurlock contact Mr. Larsen, and she saw Mr. Larsen be surprised. And then, of course, you have Mr. Larsen being shot in the back and having multiple gunshot wounds. He also had what would be considered a defensive wound, under certain circumstances, from Dr. Knight's testimony, on one of his hands.

You also had BK's testimony that Mr. Spurlock said to him that when he got out of the car and confronted Will Larsen, he shot him, but he had a misfire, and so he made, like, some aggressive move towards Will Larsen to throw him off.

As far as Yesenia Larsen, you have O.O.'s testimony that she saw the passenger door open. And then you have the testimony -- there were multiple gunshot wounds, and you have the testimony from Dr. Knight that she had multiple defensive wounds on her hand, both hands.

With that, that is certainly enough that both the Larsens where in fear of serious bodily harm or death prior to them being killed. I'm not sure I completely follow Ms. Berry's argument about how the stalking doesn't relate to

the murders because had they not stalked them, had they not flashed the lights, had the Larsens not pulled over, and had Mr. Spurlock not killed them -- I mean that's the case. They purposely went to find the Larsens with the intent to kill them, and they stalked them through two states until they were able to get them to pull over, and then they were killed.

THE COURT: So I've also, of course, reviewed the disputed jury instruction on this issue, and I can tell you that I'm resolving them in favor of the government. I just need some time to write the ruling because I've reviewed all the cases cited, the supplemental briefing, and the response to the supplemental briefing with respect to Counts Five and Six. But even if I were to agree that there has to be -- as to the third element -- there has to be some amount of fear and realization that they were being stalked, I agree with Ms. Rachow that there's sufficient evidence for the jury to find that the Larsens both realized they had been followed before the death occurred, so it was not instantaneous.

And I realized this was going to be an issue, so I took a lot of notes, actually, on this issue during the trial. Ms. Rachow testified -- not testified -- she offered some of those notes. But in terms of the evidence that the jury can draw on to find that both the Larsens experienced fear, realized they were being stalked before death, B.K. testified that they had followed the Larsens from Carson City,

to past Bridgeport. They would not have been able to commit the homicide but for the stalking, finding out that the Larsens were going, first of all, to Reno, because of Yesenia's social media post about the yoga retreat in Reno, following them around Reno, and then committing the killing.

And according to B.K., he talked to Mr. Spurlock when he got back to the RV, and Mr. Spurlock recounted how he shot Mr. Larsen in his head with a .22 caliber, but that had not put him down. He tried again, but the gun jammed, and then he had to use a knife to stab him. It's, similarly, took a few attempts to kill Yesenia Larsen. The jury could infer from this evidence that they did not immediately die, and could infer fear from the realization that Mr. Spurlock must have followed them to where they were on their way home, on a remote stretch of 395, flashed his headlights to -- as a pretext to stop them, to get them to stop their vehicle. And the inference of fear could also be drawn from the fact that Mr. Spurlock and Will Larsen had a falling out about violence before that in June. How else would Mr. Spurlock have appeared there, but for the fact he would have been following them to that area?

B.K. also testified that when he pulled up, he saw Mr. Spurlock appear to be stabbing at something next to the jeep. And Mr. Spurlock later told him, according to B.K., that he was curious to know what it would be like to stab

through breast implants, and now he knew. That was from the trial transcript, Day 7, page 81.

Dr. Knight's testimony, as Ms. Rachow points out, also supports and could allow the jury to infer that death was not instan -- oh, and O.O. also, her testimony also supports that at least Will Larsen seemed to have recognized Mr. Spurlock, and had a nervous laugh before -- before she, apparently, blacked out and didn't remember what happened. So that's also evidence that the jury could draw on to support -- to draw an inference that Mr. Larsen realized he had been followed before he died.

Dr. Knight went through a series of photos of Mr. Larsen and his injury, which seems supportive of B.K.'s testimony as to what Mr. Spurlock told him when they got back to the RV; that Mr. Larsen's injury -- this is on Exhibit 31g -- the injury appears to be from the gunshot wound exit to the head. There was sharp injury created by implementation of a knife. Exhibit 31g also, labels 3 and 4, are gunshot wounds that seem to support B.K.'s testimony.

The same goes for Yesenia Larsen's wounds as evidenced in Exhibit 33e and 33h; and, the testimony that there were wounds on Yesenia Larsen's hands, suggesting defensive wounds were being inflicted on her.

So, I think that all that evidence allows the jury to reasonably infer that the Larsens did not die immediately;

that they -- before they died, they realized that they must have been followed, for Mr. Spurlock to appear on that part of the highway; and that there were -- they died of multiple gunshots and sharp force injuries, as indicated -- as supported by Dr. Knight's testimony.

That's the third element. The fourth element, I agree, but for the stalking, they wouldn't have been killed. So, I don't know -- I understand that argument. But, I find the causation is met as well. The jury could infer that. So, I deny the motion as to Counts Five and Six.

MS. BERRY: Your Honor, I'll address Counts Seven and Eight together as well. Count Seven is the Hobbs Act robbery, and Count Eight is the 924(c) Count. Obviously, the Count Seven is the predicate for Count Eight.

In terms of Count Seven, the Hobbs Act robbery, I'll reply, primarily, on our trial brief for this question that, basically, the intention to steal must precede or be coterminous with the use of actual or threatened use of force or violence. And, here, there is insufficient evidence that that intention to steal preceded and wasn't just an afterthought. I understand this Court's ruling related to Count Three, but I incorporate it in making that argument -- my arguments in making this argument.

And then, second, in regards to the effect on interstate commerce, there hasn't been any evidence introduced

in this case that what was taken from the wallet was drug proceeds, which is a required element in order -- or they have to establish the interstate commerce element. I suspect that that's how the government intends to do so, and there is no evidence that the money and the wallet was drug proceeds. And the thought that it was drug proceeds is undermined by the fact that there was a bag, a significant bag of money in the trunk of the car -- in the back of the car that had not been found -- or that had not been taken. Excuse me. And in regards -- even if the government could establish the fact that the money was drug proceeds -- which is not based on any fact in evidence -- the government does need to establish that the effects were felt in Nevada, pursuant to the venue argument.

In terms of Count Eight, it's predicated on Count Seven. And so without Count Eight -- or excuse me. Without Count Seven, Count Eight cannot go forward either.

THE COURT: Ms. Rachow.

MS. RACHOW: Thank you, Your Honor.

The evidence has been somewhat overwhelming in this case that B.K. agreed with Mr. Spurlock to kill Mr. Larsen for drug proceeds. Under the case law, stealing of proceeds, of drug proceeds, meets the interstate commerce element for Hobbs Act robbery. So, the intent to steal the money, actually, was generated in Montana. B.K. agreed. And came,

when he left from Utah, to meet in Reno, Nevada.

And as far as the argument that the money in the wallet was not drug proceeds, first of all, there has been no testimony in this case that Mr. Larsen ever had a legitimate job. Since he got out of the Marine Corps, what he did was he trafficked in marijuana. So, with that, there is certainly a very strong inference that any money he had were the proceeds of a drug sale or whatnot.

Additionally, in this case, the reason that they came to this area -- and from the testimony from O.O. -- is that they were trying to follow Will Larsen to find his new drug stash warehouse or whatnot. You had testimony from B.K. and from O.O. that they saw this transaction in the parking lot of the Staybridge Motel, while Mr. Spurlock was off placing the tracker under the jeep; that Mr. Larsen came out, met individuals in the parking lot just briefly; and B.K. said that he saw boxes being transferred, and those boxes were consistent with how he and Mr. Larsen had previously been moving the marijuana when he was arrested back in Kansas, when he had driven marijuana across the country for Mr. Larsen.

Again, the evidence is very clear in this Count that Mr. Larsen never had legitimate income; so, any money on him can be inferred to be drug proceeds.

And the evidence also supports that he was killed

with a firearm. While the cause of death is both because you can't tell which wound comes first, Dr. Knight did testify that the gunshot wounds would have been fatal, independent of any of the stab wounds.

THE COURT: Ms. Berry, do you have anything more to add before I rule?

MS. BERRY: I don't, Your Honor.

THE COURT: So, I agree with Ms. Rachow. And my discussion and my explanation for my rulings as to the other Counts apply equally to the arguments that counsel -- that defense counsel has made with respect to Count Seven. And first of all, I agree, if the jury acquitted, and if I dismiss Count Seven that affects Count Eight.

But, I agree that there's evidence that the intent to kill was formed in discussions they had in Montana, and so it preceded the killing. And, in fact, B.K.'s testimony that I referred to earlier about knowing Mr. Spurlock intending to come to Nevada to kill Mr. Larsen, and then -- and B.K.'s continued involvement, supports the inference of the intent to kill preceded the killing and started in Montana. So, I think that certainly the interstate commerce element has been met with respect to the parties' traveling from Montana to Nevada and then to California.

But also, with respect to the drug proceeds, I agree -- and I was thinking when Ms. Berry made that argument about

the money, there's been no testimony -- all the testimony has been Mr. Larsen's past history engaging in drug trafficking, and he had no other profession, so, of course, the money in his wallet would be drug proceeds. And both B.K. and O.O. testified that they saw Mr. Larsen conduct a drug transaction on the day that they were surveying him from the hotel. So, I agree with Ms. Rachow. And on that basis I deny the motion to dismiss Count Seven.

If you are still energetic, I can move on to the jury instructions. But if you think you need a break for the day --

MS. RACHOW: I do, Your Honor, but I -- we made the arguments as to Count Eight too, but I think Your Honor only went through Count Seven and not Count Eight.

THE COURT: Well, Count Eight depends on Count Seven. So if I deny the motion as to Count Seven, I deny it with respect to Count Eight.

MS. BERRY: Your Honor, based -- understood about the ruling.

In regards to jury instructions, I think Your Honor has given us some feedback about what your thinking is related to jury instructions. I think -- it would be my preference to absorb that thinking and kind of be better prepared to address any questions you have and do it on Monday. That would be my preference.

THE COURT: You want to do that today?
MS. BERRY: No, Monday.
THE COURT: Oh. I was ready to move into the jury instructions.
MS. BERRY: I think Ms. Rachow and I may agree on --
MS. RACHOW: This is maybe the first thing we've agreed on all day. But, yes, we both agree on that.
THE COURT: You want to defer this until Monday?
MS. RACHOW: Yes, please.
MS. BERRY: Going Count by Count we agreed with as well.
THE COURT: We'll recess for today. And then -- so, Monday I will give you my ruling. You already know where I stand, essentially, on some of the major disputes on the jury instructions. The one that I haven't fully thought through is how to address the reasonable likelihood part of the instruction.
All right. So we'll take our recess for today -- oh. Let's talk about the schedule.
So, counsel, you understand I don't want to have days where we have a couple witnesses and then we take a break because, of course, I'm thinking about scheduling for next week.
Where do you think you are in terms of the defense?

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE MIRANDA M. DU, DISTRICT JUDGE
---o0o---

UNITED STATES OF AMERICA, Plaintiff, -vs- CORY SPURLOCK, Defendant.

No. 3:23-cr-022-MMD-CLB

August 28, 2025

United States District Court
400 S. Virginia Street
Reno, Nevada 89501

**JURY TRIAL DAY 11**

**TRANSCRIPT OF TRIAL PROCEEDINGS**

A P P E A R A N C E S:

FOR THE GOVERNMENT: MEGAN RACHOW
PENELOPE BRADY
Assist. United States Attorneys
Reno, Nevada

FOR THE DEFENDANT: CHRISTOPHER FREY
KATE BERRY
ALLIE WILSON
Assist. Federal Public Defenders
Reno, Nevada

Proceedings recorded by mechanical stenography produced by computer-aided transcript

Reported by: KATHRYN M. FRENCH, RPR, CCR
NEVADA LICENSE NO. 392
CALIFORNIA LICENSE NO. 8536

So for what it's worth, Your Honor, I renew the request that the Court somehow accommodate a laptop. I know that you don't have full authority over the Washoe County Jail. But to the extent you have any authority in this respect, I would ask that you exercise it in favor of allowing him more access to the jail.

I can confer with the jail again. Go through the marshals again. I can exhaust efforts on my end. But, Mr. Spurlock wanted this issue addressed with the Court.

THE COURT: All right. That request was made, I think, on the second or third day of trial. I directed the marshal services to look into allowing for Mr. Spurlock to have access to his laptop, purely on the basis that the representation is that there is significant electronic evidence in this case that would help him to review. I had indicated that whatever electronic evidence that's placed on the iPad would be solely evidence that would be public in this case, such as no concern about disclosure of attorney-client communication, or disclosure of documents that we need to have -- would need some kind of protection, such as a cooperator agreement. I was told that the jail's policy is not to allow for the laptop out of security concerns. I was told they give those in custody a tablet, and they were going to try to see if they could load information on the tablet. They were still concerned about having information about the

case on the tablet.

Ultimately, I indicated that I don't have control over the jail, but I have some discretion to politely ask the marshal services to accommodate, and that ask was for them to transport him later each day to allow him to have access to some electronic documents. I granted that request.

I don't have authority, one, to grant the request that he be given a laptop while he's in custody. Two, I don't see the need for that in this case, given that he is represented, and it is counsels' job to represent him. If you need more time to confer with him, I'll ask them to transport him earlier to court. You can also go visit him at the jail. There's no limitation on counsels' visit and counsels' meeting with Mr. Spurlock at the jail. As long as you're there, they allow you to go over evidence with him, so that would not affect his right to representation and to effectively confer with counsel. But anything additional, I, one, don't have authority to do; two, I don't see a basis to do so in this case.

Now, I do recall one case, a criminal case, where a criminal defendant represented himself. He had standby counsel in that case. I ordered for access to be given to he and his standby counsel to meet each day at a time, and access to a conference room so they can go over evidence together. But, I think the evidence in that case was all

paper and not electronic, so it didn't have the added security concern about them worrying about having to have custody over a laptop.

So, in sum, the request is denied. But as I said, I don't think there's any limitation on counsels' visits with Mr. Spurlock while he's in custody.

All right. Anything else?

MS. RACHOW: Not from the government.

THE COURT: Mr. Frey?

MR. FREY: I need a moment with Mr. Spurlock, please.

Counsel and defendant confer.

MR. FREY: Your Honor, our information is that the jail has represented that if there is a court order, making no distinction between state court judge and federal court judge, then access to a laptop is possible; meaning, a laptop can be placed in his unit and he can have access to it. I think how that access is regulated is left up to the jail, but nevertheless a laptop on-site at the jail is something that can be accommodated. The only requirement is that it be ordered by the Court, otherwise the jail won't do it.

So I would ask that the Court make that order. I can investigate precedent where a court has made such an order, and I can go ahead and bring those to the Court's attention. But, it sounds as if the jail is saying it can be accommodated

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE MIRANDA M. DU, DISTRICT JUDGE
---o0o---

UNITED STATES OF AMERICA, Plaintiff, -vs- CORY SPURLOCK, Defendant.

No. 3:23-cr-022-MMD-CLB

August 26, 2025

United States District Court
400 S. Virginia Street
Reno, Nevada 89501

**JURY TRIAL DAY 9**

**TRANSCRIPT OF TRIAL PROCEEDINGS**

A P P E A R A N C E S:

FOR THE GOVERNMENT: MEGAN RACHOW
PENELOPE BRADY
Assist. United States Attorneys
Reno, Nevada

FOR THE DEFENDANT: CHRISTOPHER FREY
KATE BERRY
ALLIE WILSON
Assist. Federal Public Defenders
Reno, Nevada

Proceedings recorded by mechanical stenography produced by computer-aided transcript

Reported by: KATHRYN M. FRENCH, RPR, CCR
NEVADA LICENSE NO. 392
CALIFORNIA LICENSE NO. 8536

at this time. During the morning recess, please remember my instruction to not discuss this case with anyone or each other. And please do not do any independent research on your own.

I ask that you continue to keep an open mind until the case is submitted to you.

All right. So we'll take a brief recess.

(Out of the presence of the Jury.)

THE COURT: All right. Everyone please be seated.

There's two issues that I wanted to briefly reference. First, is towards the end of Ms. Rachow's examination of Devin Newell, juror number 15 gave the Court a note, and I had taken a picture of that and forwarded it to counsel. And the note contains this question: "Can OnStar show where a vehicle may have stopped or delayed on the route traveled?" And I know that question was incorporated by counsel in the examination.

The second issue that I wanted to note for the record is, I believe it was on the second day of trial last week, when Mr. Frey had asked if the Court could direct for Mr. Spurlock to have access to his electronic -- the electronic discovery that counsel would place on a laptop for Mr. Spurlock. I asked the marshal services to look into allowing for that. The jail, unfortunately, has strict

requirements for security, and so it's been challenging for the marshal services. But, ultimately, what I asked them to do is try to accommodate Mr. Spurlock. And my understanding is because trial -- because I recess trial at 3:30 everyday, that the marshal services can delay taking Mr. Spurlock back to the jail.

So, from the time I recess trial, until about 4:30, Mr. Spurlock will be given access to a laptop that his counsel will provide for him in the cell block at the courthouse jail until about 4:30, after which time they have to take him back to the jail. So, that's going to be accommodated on a daily basis. I just wanted to note that for the record. But for Mr. -- as to counsel's request for Mr. Spurlock to have his own laptop at the jail, that cannot be accommodated. The jail had a lot of security concerns about giving access to a laptop, and then having custody over the laptop. I think at one point they were trying to see if they could download or somehow transfer the electronic exhibits to a, I guess an iPad or some similar device that the jail has for inmates there. But, there was some concerns about doing that as well.

Ultimately, I appreciate the marshal services trying to accommodate Mr. Spurlock because I cannot interfere with the security at the jail and the restrictions there. But, I certainly can ask for an accommodation while Mr. Spurlock is held here in the courthouse.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

CORY SPURLOCK,

Defendant.

Case No. 3:23-CR-00022-MMD-CLB

**ORDER DENYING MOTION TO MODIFY PROTECTIVE ORDERS**

[ECF No. 534]

Pending before the Court is Defendant Cory Spurlock's ("Spurlock") motion to modify protective orders. (ECF No. 534.) On July 31, 2025, the Government filed their response to Spurlock's motion. (ECF No. 563.) On August 7, 2025, Spurlock filed his reply. (ECF No. 594.) Spurlock seeks to dissolve the protective orders previously entered at ECF Nos. 81, 82, 106, and 314. (ECF No. 534 at 2.) For the reasons stated below, Spurlock's motion, (ECF No. 534), is denied.

The protective orders at ECF Nos. 81 and 82, entered on October 27, 2023 pursuant to a joint stipulation between the parties, restrict Spurlock from possessing discovery materials that include personal identifying information ("PII") and only permit him to review the materials with the presence of defense counsel. (ECF No. 81 at 9-10.) Spurlock acknowledges that at least some of the material has been accessible following redactions and all other material can still be viewed while in the presence of defense counsel. (ECF No. 534 at 2.) Spurlock argues that much of the materials cannot be meaningfully redacted, such as video discovery, or otherwise due to the voluminous nature of paper discovery. (*Id.*)

The protective order at ECF No. 106 was entered on March 15, 2024 and protective order at ECF No. 314 was entered on March 28, 2025. Each of these protective orders were also entered pursuant to joint stipulations of the parties. These protective orders limit Spurlock's access to materials relating to cooperating witnesses by "prohibit[ing] Mr. Spurlock from retaining relevant court filings from the cooperating

Case: 26-689, 10/27/2026, DktEntry: 19.2, (200 of 254)

witnesses' cases as well as their proffer statements." (*Id.* at 3.) Spurlock asserts that he is aware of all the cooperators and redacting the information within such documents regarding redactions of the documents will "address any concerns for safety." (*Id.*) Nonetheless, the orders permit Spurlock to view the information within the presence of defense counsel. (*See* ECF Nos. 106, 314.)

"Spurlock seeks to have unrestricted access to the protected information encompassed in each order to enable him to meaningfully assist in his own defense, ensure his Fifth Amendment right to a fair trial, Sixth Amendment right to effective assistance, and access to his attorneys and the court process." (ECF No. 534 at 2, 3.) Spurlock asserts that limiting access to such material "has the sole consequence of preventing Mr. Spurlock to meaningfully assist in his own defense." (*Id.*)

With regarded to the protective orders at ECF Nos. 81 and 82, the Government "has no objection to modifying the protective orders covering . . . PII . . . to allow the defendant to retain the materials or review them outside of the presence of counsel" as long as the PII information within is redacted and at the conclusion of trial, the material is returned to defense counsel. (ECF No. 563 at 2.) Regarding the protective orders at ECF Nos. 106 and 314, the Government argues that "[g]iven the voluminous discovery in this case and the threat to the cooperating witnesses' safety, the restrictions on the materials related to the cooperating witnesses, a small portion of that discovery, are not overly burdensome for the defense in their preparation for trial." (*Id.* at 3.)

Other than the bare assertion by Spurlock that he has not been able to meaningfully assist in his defense, Spurlock has not shown what aspects of his defense he has not been able to prepare for due to the restrictions placed by the protective orders, nor has he provided any other reason for the Court to be concerned with his readiness for trial. This is underscored by the fact at the time of Spurlock's reply was filed, and before this Court could even rule on the motion at issue (which was not filed on an emergency basis), trial began with the voir dire of the prospective jury panel and no assertion has been made that Spurlock is not prepared for trial. (*See* ECF Nos. 588, 591.)

Moreover, Spurlock's motion and reply do not cite any caselaw or any legal authority to support his claims that the limitations placed on Spurlock's possession of certain information raises any constitutional concerns in that these types of protective orders would impact a criminal defendant's ability to adequately prepare for trial. It is clear from the motion and reply that Spurlock has access to these materials, albeit in the presence of counsel, and therefore these materials are not inaccessible to him or his defense counsel. Thus, the Court finds that Defendant has not provided a basis to modify the protective orders, which the parties stipulated to, at this time.

Accordingly, the Court **DENIES** Spurlock's motion, (ECF No. 534).

**IT IS SO ORDERED.**

**DATED**: August 8, 2025

**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. CORY SPURLOCK, Defendant. | Case No. 3:23-cr-00022-MMD-CLB-1 ORDER |

## I. SUMMARY

Defendant Cory Spurlock was indicted for murder-for-hire conspiracy and conspiracy to distribute marijuana. (ECF No. 1.) The third superseding indictment expanded the scope of the case to charge eight counts involving three deaths (victims J.S., W.L. And Y.L.).[1] Trial was scheduled for April 22, 2025, but was recently continued to June 3, 2025. (ECF No. 381.) This order addresses the dispositive motions that were fully briefed before the latest continuance of trial: motions to dismiss counts 2, 3, 4, 7 and 8, and motion to dismiss this action for pre-indictment and post-indictment delays. (ECF Nos. 243, 253 (sealed)[2], 255, 256, 259 (sealed), 263.)[3] Also before the Court is Defendant's renewed motion to sever. (ECF No. 244.) For the reasons discussed below,

[1]The third superseding indictment was returned on September 12, 2024. (ECF No. 160.) After Defendant filed the motion to dismiss count 4, the government sought a fourth superseding indictment, filed on April 3, 2025, to correct legal deficiencies as to that count. ECF No. 342.) On April 10, 2025, the grand jury return a fifth superseding indictment, charging the same eight counts but including allegations under 18 U.S.C. §§ 3591 and 3592 to support its notice of intent to seek the death penalty. (ECF Nos. 363, 365.) This order does not address this latest indictment or notice.

[2]The Court granted requests to seal and where appropriate in this order, the Court has redacted information that should be sealed for compelling reasons. The Court will issue a separate unredacted version of this order under seal.

[3]Defendant requested oral argument on these motions, but the Court determined that only the motion to dismiss for government delays warranted a hearing, which was held on April 9, 2025 ("Hearing"). (ECF Nos. 326, 362 (hearing minutes).)

the Court denies each of the five motions to dismiss and further denies the motion to sever.

## II. RELEVANT BACKGROUND

On May 11, 2023, the grand jury returned the original indictment charging Defendant with murder-for-hire conspiracy relating to the killing of W.L. (count 1) and conspiracy to distribute marijuana (count 2). (ECF No. 1.) At the initial appearance held on the same day, the government moved for detention, which the Magistrate Judge granted. (ECF No. 6.) The Court later denied Defendant's motion to review the detention order. (ECF No. 174.) Thus, Defendant has been in pretrial detention as part of this case since May 11, 2023.

Since the initial indictment, the case has expanded in scope to include charges related to three deaths. (ECF Nos. 84, 127, 160.) The third superseding indictment, returned on September 12, 2024, charges Defendant with eight counts: (1) conspiracy to possess with intent to distribute and to distribute marijuana between November 2019 and June 2020; (2) murder while engaged in narcotics trafficking relating to the killing of J.S. between November 2019 and June 2020; (3) murder for hire relating to the killing of W.L. between October 2020 and March 2021; (4) tampering with a witness by killing of W.L. on or about November 2020; (5) stalking resulting in death relating to W.L. between October and November 2020; (6) stalking resulting in death relating to the killing of Y.L between October and November 2020; (7) interference with commerce by robbery in November 2020; and (8) causing death through use of a firearm during and in relation to a crime of violence in November 2020. (ECF No. 160.) In response to Defendant's motion to dismiss count 4, the government obtained the fourth superseding indictment, returned on April 3, 2025, which charges the same eight counts but with modifications to count 4. (ECF No. 342.)

Because Defendant faced death eligible charges, the case went through the Department of Justice's capital case review process. (ECF No. 93 at 6.) The government

did not submit an expedited no-seek decision for Defendant's death eligible charges.[4] (*Id.*) At a January 9, 2024, status conference, after conferring with counsel as to the schedule for completion of the capital case review, the Court set a deadline for the government to make a decision on whether to seek the death penalty by August 16, 2024, and continued trial to November 5, 2024, assuming a no-seek decision.[5] (ECF No. 132 at 5-21.) On July 31, 2024, the government filed a notice of intent not to seek the death penalty (ECF No. 138), and on August 19, the Court further continued trial to April 22, 2025. (ECF No. 150).

On February 5, 2025, about two months before the April trial date, the defense team was informed that the Department of Justice was reconsidering its no-seek decision. (ECF No. 253 at 17.) At the government's invitation, the defense team presented mitigation evidence to the Capital Review Committee on March 10, 2025. (*Id.*) On April 10, 2025—after Defendant's motions to dismiss were filed and the Hearing—the government filed a fifth superseding indictment adding allegations under 18 U.S.C. §§ 3591 and 3592 (ECF No. 363) and a notice of its intent to seek the death penalty (ECF No. 365).

Trial was initially set for July 25, 2023. (ECF No. 6.) In total, the Court has continued trial four times, first to February 6, 2024 (ECF No. 47), then to November 5, 2024 (ECF No. 95), then to April 22, 2025 (ECF No. 150), and finally to the current trial date of June 3, 2025 (ECF No. 381). Defendant objected to every continuance, primarily because of his pretrial detention, while his attorneys acknowledged that they needed more time to prepare to effectively represent Defendant.[6] (ECF Nos. 47, 97, 150, 381.)

---

[4]The government asserts that Defendant did not qualify for the expedited process. (ECF No. 139 at 14.)

[5]The government did not object to the deadline. (ECF No. 132 at 6, 15-16.)

[6]The Court found that the final continuance to June 3, 2025, was predicated solely on the government's notice of intent to seek the death penalty. (ECF No. 381.) While the government indicated that they would need at least a 90-day continuance to prepare to prosecute the case as a capital case, the Court considered the time needed to resolve *(fn. cont…)*

As relevant to Defendant's argument regarding pre-indictment delays, Defendant, along with two individuals, B.K. and O.O., were charged with the murders of W.L. and Y.L. in a three-count criminal complaint filed in the Mono County Superior Court in April 2021. (ECF Nos. 93 at 3, 355 at 2 n. 4.) In April 2021, Defendant was taken into custody and remained in state custody until his transfer to federal custody in connection with this case.[7] (*Id.* at 4.)

In the summer of 2022, the U.S. Attorney's Office for this district started to work with Mono County Sherriff's Office, Mono County District Attorney's Office, and other federal law enforcement agencies on "an investigation into a multi-state marijuana drug trafficking organization involving several individuals and three related homicides" (the same three deaths ultimately charged in this case). (139 at 12.) [redacted]

## III. DISCUSSION

On March 12, 2024, addressing the then-operative third superseding indictment, Defendant filed five motions to dismiss, requesting dismissal of the case for pre- and post-indictment delay (ECF Nos. 253 (sealed), 263), and dismissal of five individual counts (ECF Nos. 243, 255, 256, 259 (sealed) (addressing counts 2, 3, 4, 7, and 8).) Defendant

---

the motion to strike the notice to seek and to issue jury summons in determining the length of the continuance. (*Id.*; ECF No. 384 at 22-23.)

[7]Defendant represented that he was arrested in connection with the Mono County case in Montana on March 25, 2021. (ECF No. 142 at 3 n. 3.)

also filed a renewed motion to sever counts 1 and 2 from counts 3 through 8. (ECF No. 244.) The Court considers each motion in turn.

### A. Motion to Dismiss Indictment for Government Delays (ECF Nos. 253 (sealed), 263)

Defendant seeks dismissal based on the government's delay in indicting him and its further delay prosecuting the action post-indictment. (ECF Nos. 253 (sealed), 263.[8]) The Court addresses these pre- and post-indictment delay grounds below.

#### 1. Pre-Indictment Delay

Defendant argues that pre-indictment delay warrants dismissal because approximately two years passed between his arrest and charge in connection with the Mono County case in 2021 and his indictment in this federal case in May 2023. (ECF No. 263.) But in affirming the Magistrate Judge's pre-trial detention order, the Court accepted the government's explanation that its investigation into this case started in May 2022, finding a lack of evidence that the government "improperly delayed conducting its own investigation" before seeking an indictment in this case. (ECF No. 174 at 4.) Thus, as an initial matter, the Court considers the pre-indictment delay to amount to roughly one year, between from May 2022 to May 2023.

While delay between the commission of a crime and an indictment is generally limited only by the applicable statute of limitations, the Fifth Amendment also guarantees a defendant the right not to be denied due process by extensive pre-indictment delay. *See U.S. v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007). To "succeed on his claim that he was denied due process because of pre-indictment delay[,]" a defendant must "satisfy both prongs of a two-part test[.]" *Id.* "First, he must prove 'actual, non-speculative prejudice from the delay.'" *Id.* (citation omitted). "Second, the length of the delay is weighed against the reasons for the delay, and [the defendant] must show that

[8]The government responded (ECF No. 320 (sealed)) and Defendant replied (ECF No. 352).

the delay offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* (citations and internal quotation marks omitted).

The Court only proceeds to the second prong of the pre-indictment delay analysis if the first is satisfied, and the first, 'actual prejudice' requirement is a "'heavy burden' that is rarely met." *Id. See also U.S. v. Marion*, 404 U.S. 307, 322, 324-325 (1971) (concluding defendants had not shown actual prejudice); *U.S. v. Talbot*, 51 F.3d 183, 185 (9th Cir. 1995) (same); *U.S. v. Doe*, 149 F.3d 945, 948 (9th Cir. 1998) (same). To illustrate the weight of this burden, it is telling that no court in any of the cases Defendant cites dealing specifically with pre-indictment delay actually granted a motion for pre-indictment delay like the one here. (ECF No. 253 at 23 (relying on *Marion*, 404 U.S. at 322, 324; *Talbot*, 51 F.3d at 185; *Doe*, 149 F.3d at 948); *U.S. v. Pallan*, 571 F.2d 497, 500 (9th Cir. 1978); *U.S. v. Sherlock*, 962 F.2d 1349, 1353-54 (9th Cir. 1989)).) The courts in each of these cited cases concluded that defendants had not shown actual prejudice. *See Marion*, 404 U.S. at 325; *Talbot*, 51 F.3d at 185-86; *Doe*, 149 F.3d at 947-49; *Pallan*, 571 F.2d at 499-501; *Sherlock*, 962 at F.2d at 1354-55.

Here, on the first prong, Defendant relies on the length of incarceration in the state case and lost evidence to show prejudice. (ECF No. 253 at 23-24. As to the former, Defendant contends that "the primary source of prejudice here is the lengthy prior incarceration in a state case that mostly sat stagnant while the government took advantage of the lengthy period of pretrial incarceration that separated Mr. Spurlock and his wife and made overt—and ultimately successful—attempts to pit one spouse against the other." (*Id.* at 24.) The records here, as the Court found, do not support Defendant's claim that the government is responsible for the time he spent in state custody. (ECF No. 174 at 5-6.) [redacted]

As for lost evidence, the Court agrees with the government that Defendant has not shown "'actual, non-speculative prejudice from the [pre-indictment] delay," *Corona-Verbera*, 509 F.3d at 1112, because Defendant's claim of prejudice is again too speculative. Defendant first argues that Brandon Stelzreide shared in his interview with the government that W.L. asked him if he would kill for $20,000. (ECF No. 253 at 23.) Defendant would have elicited this statement at trial, he asserts, but Stelzreide passed away in July 2023. But Stelzreid's unfortunate passing occurred two months after Defendant was indicted, so the loss of that potential evidence was not a result of the government's delay. Moreover, as the government points out, Stelzreide was appointed counsel because of his alleged involvement in the marijuana conspiracy, and his testimony would have inculpated Defendant. (ECF No. 320 at 20.) Similarly, Defendant suggests a cooperating witness "became subject to a federal drug investigation into his own illegal activities while Mr. Spurlock sat in jail" and because this witness is now represented by counsel, he "is likely unavailable to the defense." (ECF No. 253 at 24.) The government responds that this witness has been in custody since November 2022—before Defendant's indictment in this case—and the government does not plan to call him as a witness. (ECF No. 320 at 12, 20.) Regardless, Defendant may call this witness and may contact him through his counsel, and to the extent this witness now declines to be accessible to defense counsel because he is represented, the Court cannot attribute such refusal to the government's delay in indicting him.

The Court therefore finds that any prejudice Defendant has suffered through the loss of evidence is too speculative to weigh in favor of granting the motion. *See Corona-Verbera*, 509 F.3d at 1112 (explaining that the defendant failed to satisfy the first prong, and that the Court need not move past the first prong if it is not satisfied); *Pallan*, 571 F.2d at 501 ("While this testimony may have been of some benefit to [the defendant], he has not made a non-speculative demonstration that its loss has actually impaired his ability meaningfully to defend himself.").

Alternatively, even if Defendant had shown the requisite prejudice under the first prong, the Court finds the delay in this case does not offend its conception of justice under the second prong after weighing the length of the delay against the government's proffered reasons for the delay. *See Corona-Verbera*, 509 F.3d at 1112 (explaining second prong). The government took about a year—from May 2022 to May 2023—to indict Defendant on federal charges. But this is not an unduly long delay in the context of cases on which Defendant relies. *See, e.g.*, *Pallan*, 571 F.2d 497 (finding no due process violation where there was a five year delay before indictment); *Doe*, 149 F.3d 945 (no violation resulting from four year delay). Moreover, as to the reasons for the delay, the government explains the need to conduct its own investigation given the broader scope of this case. (ECF No. 174 at 4.) This explanation does not evidence the kind of government culpability normally required for a defendant to establish a due process violation. *See U.S. v. Moran*, 759 F.2d 777, 783 (9th Cir. 1985) (finding no due process violation and noting "our cases clearly require some showing of governmental culpability to prove a deprivation of due process."); *Pallan*, 571 F.2d 497 (finding no due process violation even where the federal prosecutor waited for a state prosecution to conclude before indicting, evidencing a tactical reason for the delay which suggested a level of government culpability not present here). Thus, the Court alternatively finds Defendant's motion fails to persuade at the second prong.

**2. Post-Indictment Delay**

Defendant next argues that dismissal for post-indictment delay is appropriate because the government's action or inaction affected Defendant's preparedness for trial, resulting in three continuances of trial, each time over Defendant's objection.[9] (ECF No. 253 at 26.) Defendant's counsel acknowledged the need for these continuances. (ECF No. 173 at 3 (citing ECF Nos. 47, 97, 150).) And in granting the three continuances, the Court carefully weighed the justifications for continuing trial with Defendant's right to a

[9]The Court does not address the fourth continuance to June 3, 2025, which post-dates the dismissal motion, in its analysis of the delay.

speedy trial in excluding the length of the continuances under the Speedy Trial Act, 18 U.S.C. § 3161. (ECF Nos. 47, 97, 150.)

For context, the Court will briefly summarize the reasons for the continuances from July 25, 2023 (ECF No. 6) to February 6, 2024 (ECF No. 47), then to November 5, 2024 (ECF No. 95), and finally to April 22, 2025 (ECF No. 150). The first continuance was necessary because of the need for the Court to resolve a motion for appointment of conflict counsel, and in resolving that motion following an evidentiary hearing, the Court rejected any suggestion that the government had no basis to bring the motion. (ECF No. 174 at 5 n. 6.) Moreover, even before resolution of that motion, at the July 23, 2023, status conference, it was obvious that defense counsel would need a continuance to effectively represent Defendant, given that not much had occurred in the case in terms of discovery, but also in terms of defense team's trial preparation, at that time. While the Court continued trial to February 6, 2024, it was clear that the trial date was a placeholder and was not a firm trial setting given the status of the case and the death eligible count. The second continuance to November 5, 2024, was necessitated by the need to complete the DOJ's capital case review process, which defense counsel argued should not commence until they had the final death eligible charges.[10] (ECF No. 132 at 10.) The Court essentially adopted defense's proposed schedule, with modifications as to the trial date and a shortened deadline for completion of the capital case review, setting a deadline for the government to complete the capital case review process by August 16, 2024, and for trial

---

[10]In the December 18, 2023 status report, defense counsel explained the need for continuance and explained that setting a "firm" trial date may be premature:

> If this Court concludes that its own case management practices and/or the Speedy Trial Act require the setting of a new trial date at this time, since clearly the February 2024 trial date is not constitutionally viable, Mr. Spurlock's counsel and counsel for the United States agree that it should not be a "firm" trial date and that it is, therefore, premature for the Court to set deadlines for the filing of pre-trial motions or for pre-trial disclosures.

(ECF No. 93 at 11.)

Case: 26-689, 10/27/2026, DktEntry: 19.2, (211 of 254)

to proceed in that event. (*Id.* at 10-21.) The government issued the notice of intent not to seek death ahead of that deadline, on July 31, 2024. (ECF No. 138.) At a status conference held on August 19, 2024, while the parties had some disagreements—including about the reason the government did not seek a second superseding indictment to add additional death eligible charges until July—it was clear a further continuance of trial was needed. At the status conference, the Court heard from the parties as to the state of discovery, which defense counsel described as "complex and technical" and government counsel described as "almost unprecedented"[11], and further heard the parties' positions on "the timing of the discovery relative to the trial date" and the anticipated pretrial litigation.[12] (ECF No. 183 at 5-11, 13-20.) The Court reluctantly agreed with the parties about the need for the continuance and continued trial to April 22, 2025. (*Id.* at 27-29, 31-32.) The Court emphasized that the April setting was firm. (*Id.* at 22.)

As opposed to the simple arithmetic of adding up non-excludable days to determine a Speedy Trial Act violation, courts analyzing a Sixth Amendment Speedy Trial violation conduct a four-factor balancing test, considering: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972). "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *United States v. Lam*, 251 F.3d 852, 855-56 (9th Cir. 2001) (quoting *Barker,* 407 U.S. at 533; *United States v. Gregory,* 322 F.3d 1157, 1161 (9th Cir. 2003)). Weighing these factors, while the Court notes concerns about the manner in which this case has

---

[11]Government counsel expounded on the complexity of electronic discovery, including the number of phones involved and the fact that messages were exchanged on mobile applications (i.e., Signal and WhatsApp) that are not easily extracted and translated to a Cellbrite report, as well as the "overwhelming" physical evidence. (ECF No. 183 at 17-18.)

[12]Defense counsel also noted the government's delay in superseding in July instead of March, as they represented at the prior status conference. (ECF No. 183 at 5.) Government counsel represented that they intended to seek a third superseding indictment in light of the Court's order granting severance. (*Id.* at 14.)

proceeded, the Court finds that the post-indictment delay contemplated in the motion and at the Hearing has not violated Spurlock's Sixth Amendment rights.

First, as to the length of the delay, the Court considers "whether the time from indictment to trial crossed the line dividing ordinary from 'presumptively prejudicial,'" which is normally considered to be approximately a year. *See United States v. King,* 483 F.3d 969, 976 (9th Cir. 2007) (quoting *Doggett v. United States,* 505 U.S. 647, 652 (1992)) (finding delay of about two years in a case involving charges of bank fraud and conspiracy was "not excessive," though defendant was not in pretrial custody). The delay here—of about two years—while substantial, is not excessive given that this is not an ordinary case. (ECF No. 93 at 11 (defense status report asserting that "[t]his is a complex case with voluminous and highly technical discovery requiring forensic analyses").) *See Barker*, 407 U.S. at 530-31 (noting the length-of-delay inquiry depends on the "peculiar circumstances of the case"). Defendant faces death eligible charges, necessitating the DOJ's capital case review protocols. The nature of the charge—involving three alleged murders in two states in the context of an alleged conspiracy to traffic in marijuana—and attenuated voluminous and technical discovery (as discussed further below) separates this case from the ordinary case and is important context for the length of the delay. The government also points to examples of cases involving murder charges from this district, including a death eligible case over which this Court presided which took 2.5 years to go to trial, to show that a two-year delay is on the shorter end of delays in comparatively complex cases. (ECF No. 320 at 11.) *See United States v. Burciaga,* 3:20-cr-60-MMD-CLB, ECF No. 68 (notice of intent not to seek death penalty).) Given the nature of the case, the length of delay factor weighs against a finding of a Sixth Amendment violation.

The second factor, reason for the delay, also weighs slightly against a finding of a Sixth Amendment violation. There is no dispute the offenses charged are serious, the case is complex and evolving, and the discovery has been extensive and technical. Reviewing this context as a whole, the Court does not find the government bears primary responsibility for the delay leading up to the April 22, 2025, trial date because of its action

or inaction, or that it "misrepresented the source of those delays" as Defendant contends.[13] (ECF No. 253 at 27 (arguing the government misrepresented the reasons for superseding).) Defendant offers primarily the number of superseding indictments and the timing of discovery, including delayed discovery disclosure weeks before trial that "impaired" the defense's ability to prepare for trial.[14] (*Id.* at 28.)

The Court begins with the number of superseding indictments. The government provided valid reasons for its decision to superseding three times (by the time of its response), including the year it took to supersede to add charges relating to J.S.'s death. At the Hearing, government counsel represented that the delay in adding charges relating to J.S. occurred because the government was waiting for O.O. to plead guilty; while the government may have had probable cause to seek an indictment, they wanted to ensure they had evidence beyond a reasonable doubt. "A prosecutor may have wide latitude to decide when to seek an indictment, especially when a case [such as this one] involves more than one person." *Sherlock,* 962 F.2d at 1355. In light of this discretion—and given the government's proffered reason for the timing of the superseding indictments—the Court cannot find the government engaged in intentional delay.

As for the timing and pace of discovery, there is no dispute that the discovery in this case is voluminous, technical and complex. (ECF No. 183 at 5-11, 13-20.) Defendant

---

[13]The Court does not consider Defendant's argument in their briefs relating to the anticipated notice to seek death penalty even though DOJ's re-examination of the prior no-seek decision disrupted defense team's time preparing for trial, because as of the filing of the motion, that issue has not resulted in delay of trial. The Court notes, however, that the notice has subsequently resulted in a roughly six-week continuance of trial to allow for the adjudication of Defendant's motion to strike. (ECF No. 381.) It bears emphasis that the Court's finding that the reason-for-delay factor weighs towards the government here does not reach the issue of the government's actions during the capital case review process or the timing of the notice to seek death, particularly to the extent those issues are raised in the pending motion to strike (ECF No. 374).

[14]At the Hearing, defense counsel acknowledges they primarily take issue with the year it took the government to supersede to add counts relating to J.S.'s death when the government had sufficient information all along. Defense counsel concedes there are not many meaningful differences between the third and fourth superseding indictment, the purpose of which was to address legal deficiencies pointed out in Defendant's motion to dismiss count 4. The Court further discusses the propriety of a fourth superseding indictment in addressing the motion to dismiss count 4 below.

argues the government held on to materials in its possession for a lengthy period, as much as a year, before producing the majority of materials between January and March, and that materials produced contained a significant number of duplicates, which require the defense team to essentially waste time sifting through repeated documents. Regarding the timing of production, defense counsel represents that a total of four terabytes of discovery has been produced to date, with three of those terabytes produced in since January of this year. In response, the government acknowledges that duplicative materials were produced but maintains that the materials recently produced were voluminous due primarily to supporting documentation for expert reports.[15] The government represents that they made at least one discovery production every month since February 2024, including eight productions in January 2025 which contained extractions or attempted extractions from 18 devices. (ECF No. 320 at 14-15.) They reiterated steps they have taken to prioritize production of discovery materials, including changing staffing to dedicate a legal assistant assigned to work on this case and procuring additional equipment to process discovery for production. (*Id.* at 17.)

The Court agrees with Defendant that the chaotic disclosure of significant discovery close to trial is concerning, particularly to the extent it puts Spurlock in a Catch 22 position: defense counsel may effectively face a choice between advocating for Defendant's speedy trial rights and being prepared for trial, while in the meantime the government is positioned to disclaim responsibility. In addition, the Court does not give undue deference to the government's assurances that it has simply been trying its best to provide discovery—and to "produce discovery when it is ready to be produced." Although a relatively "neutral reason [for delay] such as overcrowded courts should be weighted less heavily" than a deliberate attempt to delay trial, it "nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the

---

[15]Government counsel also contends these materials are exculpatory, so there was no need for defense counsel to have more time to do a further "deep dive." Defense counsel of course disagreed, contending they need time to further investigate exculpatory evidence.

government rather than the defendant." *Barker*, 407 U.S. at 531. Ultimately, however, the Court does not find that the government's handling of the discovery process has been the reason for the continuances of the trial dates up to April 22, 2025, discussed in the instant motion.

As for the third factor, Defendant has asserted his right to speedy trial. While the Court gives "strong evidentiary weight" to Spurlock's assertions of his rights to a speedy trial, his assertions must also "be viewed in the light of [his] other conduct." *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). *See also Barker*, 407 U.S. at 534 (finding the fact that the defendant "did not want a speedy trial" to be the most important factor counterbalancing the 5-year delay). Spurlock objected to every continuance, including the first continuance of the July 2023 date, even when it was clear his attorneys could not effectively represent him given the status and posture of the case. As to each continuance, Spurlock's counsel emphasized Spurlock's objection to delaying trial and his understandable frustrations with the delay given his pretrial detention. But they also vocalized that the defense team was not ready for trial. (ECF Nos. 47 (first continuance of trial over Defendant's objection); 132 at 13 (Spurlock's counsel acknowledging the need to continue the February 2024 trial date to the end of the year knowing "Mr. Spurlock will not be happy, personally with us proposing" a continuance "but we think the Sixth Amendment requires us to have enough tie to provide the government with reasons why the Attorney General should decide not to seek the death penalty"); 183 at 6 (Spurlock's counsel representing his objection to a continuance but stating that counsel believes a continuance of the November 2024 trial date is needed "especially in light of the discovery that we have and still have not yet reviewed.").) This led the Court to continue trial, excluding the time under the Speedy Trial Act. (ECF Nos. 47, 97, 150.) But given Spurlock's consistent and persistent assertions of his rights, the Court finds this factor to weigh slightly in Defendant's favor.

Finally, as to the fourth factor, the harm from delay can take the form of "oppressive pretrial incarceration" and the prolongation of the "anxiety and concern" of the accused in

addition to "the possibility that the defense will be impaired." *Barker*, 407 U.S. at 531. Here, prejudice to Defendant stems primarily from his pretrial detention and the "anxiety and concern" he faced during that period, as well as during the period of pretrial incarceration in the state case. (ECF No. 253 at 27-28.) That Defendant suffers prejudice is obvious given that he has been held in pretrial custody and charged with offenses involving three killings, including death-eligible offenses.[16] So, this factor favors Defendant.

Carefully weighing the four factors in the difficult and sensitive post-indictment delay analysis, the Court ultimately finds they do not support the "severe" remedy of dismissal of the case in its entirety. *See Barker*, 407 U.S. at 523 n. 16 (quoting United States v. Ewell, 383 U.S. 116, 121 86 (1966)) (noting that "overzealous application of this remedy" could infringe on the societal interest). While Defendant has suffered prejudice as a result of being held in pretrial detention during the two-year period from the time of indictment to the present, and has objected to every continuance of trial, the Court finds that the length of the delay and the reasons for the delay do not warrant dismissal, given the drastic nature of the remedy.

**B. Motion to Dismiss Count 4 (ECF No. 243)**

Defendant moves to dismiss count 4, which charges him with tampering with a witness by killing in violation of 18 U.S.C. § 1512(a)(1)(C) (ECF No. 160 at 4). (ECF No. 243.[17]) Defendant also requests grand jury records related to count 4. (*Id.*) The government added count 4 as an attempt to properly join claims when it filed the third superseding indictment in September 2024, after the Court issued its order severing the set of counts related to the alleged killing of J.S. while engaged in marijuana trafficking

---

[16]The Court reiterates that for purposes of addressing this motion, it does not consider Defendant's argument about prejudice relating to the government's decision to reexamine the no-seek decision because that process did not result in the continuances of trial to April 22, 2025, the delay raised in the motion.

[17]The government responded (ECF No. 303 (sealed)) and Defendant replied (ECF No. 329 (sealed)).

from the set of counts involving the alleged killing of W.L. and Y.L. (ECF Nos. 127, 146 (severing counts), 160.) As charged in the third superseding indictment, count 4 alleges that Defendant killed W.L. to prevent him from communicating information to law enforcement about the killing of J.S. (ECF No. 160.)

In his motion to dismiss count 4, filed on March 12, 2025, Defendant argues that the government fails to allege an essential element of 18 U.S.C. § 1512(a)(1)(C) in the then-operative third superseding indictment because the statute requires a killing "motivated by the intent to prevent communication with *federal* law enforcement" and no allegations suggest that Defendant sought to prevent W.L. from contacting federal rather than local officials. (ECF No. 243 at 2-3.) Defendant further argues that the government cannot cure the deficiencies in the third superseding indictment and should not be permitted to attempt to supersede again. (*Id.* at 12.) The government responded on March 27, 2025, declining to "concede that it failed to allege an essential element of the crime by omitting one word, 'federal,' from the indictment" but nevertheless indicating that it would seek permission from the grand jury to supersede an additional time.[18] (ECF No. 303 at 1-2.) Defendant replied on April 2, 2025, and again objected to the government's stated plan to supersede. (ECF No. 329.) The following day, the government filed the fourth superseding indictment, which is identical to the third superseding indictment except for the one-word addition that count 4 pertains to a "federal" law enforcement officer. (ECF No. 342 at 4.)

Given that the government's fourth superseding indictment moots some of Defendant's arguments, to the extent it is appropriately filed, the Court will begin its analysis by considering whether the government properly superseded, and if so, whether count 4 is now legally sufficient as charged. The Court will assume, without deciding, that 18 U.S.C. § 1512(a)(1)(C) indeed requires the government to prove intent to prevent

---

[redacted]

Case: 26-689, 10/27/2026, DktEntry: 19.2, Page 218 of 254

communication with a *federal* law enforcement officer, and that the third superseding indictment was legally deficient because it omitted the word "federal." *See United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (requiring dismissal where an indictment fails to recite an essential element of a charged offense); *Fowler v. United States*, 563 U.S. 668, 675-78 (2011) (addressing the plain language of 18 U.S.C. § 1512(a)(1)(C) and holding that "where the defendant kills a person with an intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with *federal* law enforcement officers only if it is reasonably likely . . . at least one of the relevant communications would have been made to a federal officer") (emphasis in original).

Defendant argues (1) the government cannot cure the deficiency in the third superseding indictment because there is no factual predicate for count 4, so no reasonable grand juror could find probable cause even where the language of the indictment has been amended to include the word "federal"; and (2) even if the government has a factual basis for seeking to correct the third amended indictment, it should be precluded from doing so. (ECF No. 243 at 11-12.) The Court finds both arguments unpersuasive.

As for his first argument, Defendant focuses on a purported lack of factual evidence produced to the defense going to Defendant's alleged involvement in the death of W.L. with the intent of silencing him, as well as a lack of evidence suggesting with "reasonable likelihood" that W.L. would have spoken to federal law enforcement. (*Id.*) But "[i]t has been repeatedly stated and well established that an indictment cannot be attacked on the ground that evidence before the grand jury was incompetent or inadequate." *Reyes v. United States*, 417 F.2d 916, 919 (9th Cir. 1969) (finding a defendant's argument that a grand jury had insufficient evidence to indict without relying on an improper presumption to be without merit); *Costello v. United States*, 350 U.S. 359, 363 (1955) ("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for a trial on the merits . . . ."). *See also United States*

*v. Wright*, 667 F.2d 793, 796 (9th Cir. 1982) (addressing erroneous grand jury instructions). Defendant may, of course, challenge the sufficiency of the evidence in a Rule 29 motion—and indeed, Defendant cites to cases addressing the sufficiency of the evidence at that stage[19]—but such an argument is premature here. The grand jury—not the Court—is tasked with the initial evaluation of the strength of evidence. *See United States v. Navarro-Vargas*, 408 F.3d 1184, 1201 (9th Cir. 2005) (finding grand jury decision unreviewable). And Defendant effectively acknowledges that there is at least *some* evidence going to the nexus between Defendant, J.S., and W.L., as relevant to count 4, even as Defendant maintains that this evidence is weak.[20] (*See* ECF No. 243 at 11-12 (describing as the "sole piece of evidence relevant to this count" an interview between W.L. and a private investigator hired by J.S.'s mother, in which W.L. indicated that he thought Defendant could be involved in J.S.'s death).) Defendant's arguments as to the inadmissibility of hearsay evidence are inapposite. *See e.g.*, *Costello*, 350 U.S. at 363 (finding no ground to challenge grand jury proceedings on the basis that evidence presented was largely hearsay). The Court thus finds no basis to conclude that the indictment could not be cured as to count 4 because of deficiencies in factual support.[21]

---

[19]*See, e.g.*, *United States v. Johnson*, 874 F.3d 1078 (9th Cir. 2017) (addressing the "reasonable likelihood" standard under *Fowler* on a Rule 29 motion for judgment of acquittal).

[redacted]

[redacted]

(fn. cont…)

As for his second argument, Defendant asserts that the Court should decline to permit the government to proceed on a fourth superseding indictment regardless of any determination on probable cause and grand jury instructions because the government "has yet to present a properly joined indictment" and the government "cannot now, on the eve of trial, attempt a fifth indictment hoping it can finally properly join counts that simply belong in two cases." (ECF Nos. 243 at 12, 329 at 3.) Here, Defendant relies primarily on the Sixth Amendment speedy trial right, as it has been applied in the context of superseding indictments. *See, e.g.*, *United States v. Cutting*, Case No. 14-CR-00139-SI-1, 2017 WL 66837, at *6 (N.D. Cal. Jan. 6, 2017) (citing *Barker*, 407 U.S. at 530 (providing the previously-discussed six-factor test for post-indictment delay)). As a general matter, the government's discretion to supersede before trial is broad. *See U.S. v. Goodwin*, 457 U.S. 368, 382 ("A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct."). And while Defendant points to the Court's countervailing inherent supervisory power to protect against prosecutorial misconduct (ECF No. 329 at 2-3), the Court is unpersuaded that the government overstepped its broad discretion in superseding to properly charge count 4 at the time it did such that the Court's intervention is appropriate.[22] *See United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir. 1977).

Importantly, while the one-word addition to the Fourth Superseding Indictment may have significant implications and for the issue of severance, the change at issue is ultimately corrective; superseding does not "significantly expand[] the scope of the case." *Cutting*, 2017 WL 66837, at *9 (granting a motion to dismiss a superseding indictment

---

[redacted]

[22]The Court does not address the government's discretion to submit a fifth superseding indictment, as that question is beyond the scope of this motion.

which *widely expanded* the scope of the allegations and added charges after significant delay). The issue of this charge and its impact on other counts and severance has been generally known and contested by the parties. Repeated indictments which attempt to join claims and cure deficiencies cause delay, which the Court takes seriously and weighs in evaluating Defendant's delay-related arguments (*see* ECF No. 263 (motion to dismiss for government delay)). Nevertheless, because the Court declines to encroach on the government's discretion under the circumstances, the Court denies Defendant's motion to dismiss count 4.

The Court further denies Defendant's additional request for grand jury transcripts pertaining to count 4. (ECF No. 243 at 14-15.) A defendant seeking disclosure of a grand jury record must demonstrate a "particularized need" for that record by satisfying a three-part standard: (1) the material sought is "needed to avoid a possible injustice in another judicial proceeding," (2) "the need for disclosure is greater than the need for continued secrecy," and (3) the "request is structured to cover only materials so needed." *Douglas Oil Co. of Cal. v. Petrol Stops of Northwest*, 441 U.S. 211, 222-3 (1979). *See also United States v. Plummer*, 941 F.2d 799, 806 (9th Cir. 1991) (applying this three-part standard); *United States v. John Doe, Inc. I*, 481 U.S. 102, 112 (1987) (noting standard is "a highly flexible one, adaptable to different circumstances"). Under Fed. R. Crim. P. 6(e)(3)(E), "[t]he court may authorize disclosure . . . of a grand jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." But "[m]ere unsubstantiated, speculative assertions of improprieties in the proceedings do not supply the particular need required to outweigh the policy of grand jury secrecy." *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) (internal citations omitted). *See also Wright*, 667 F.2d at 796 (finding "erroneous grand jury instructions" insufficient for dismissal where there was no deception by the prosecuting attorney).

Here, Defendant speculates that the grand jury indicted with less than probable cause, necessitating the grand jury record to support a possible ground for dismissal

under Fed. R. Crim. P. 6(e)(3)(E). But given that the government has now superseded the third amended indictment, transcripts of related grand jury proceedings are not relevant. To the extent Defendant intends for the request to apply to transcripts related to the fourth superseding indictment, there is no particularized reason to suspect that disclosure could provide grounds for dismissal or meet the other requirements for disclosure.[23] *See Douglas Oil Co.*, 441 U.S. at 222-23. *See also Ferreboeuf*, 632 F.2d at 835 (speculative assertions of improprieties are not enough). Defendant also argues that "instructional errors before the grand jury, intentional or unintentional, warrant dismissal." But the cases Spurlock cites for support generally involve prosecutorial misconduct, or circumstances strongly suggesting that the jury was misled in a significant way causing actual prejudice. *See, e.g., United States v. Peralta*, 763 F. Supp. 14, 18-19 (S.D.N.Y. 1991) (finding constructive possession instruction given to the grand jury "seriously misstated the applicable law" after testimony from primary witness in front of grand jury was inconsistent with his own later testimony at trial, when government relied on constructive possession theory throughout trial); *United States v. Stevens*, 771 F. Supp. 2d 556, 568 (D. Md. 2011) (dismissing indictment without prejudice where grand jury was improperly instructed on an affirmative defense which also "went to the heart of the intent required to indict" causing actual prejudice). In the instant case, by contrast, the Court cannot conclude that the government precipitated a "deliberate introduction of perjured testimony" or "other prosecutorial behavior, even if unintentional, [which] can also cause improper influence and usurpation of the grand jury's role." *United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979) (dismissing an indictment based on serious prosecutorial misconduct in presenting irrelevant prejudicial material to a grand jury, and expressly distinguishing this circumstance from challenges based on the sufficiency of the evidence).

---

[redacted]

In sum, the Court denies the motion to dismiss count 4 and the request for jury transcripts as to this count.

**C. Motion to Dismiss Counts 7-8 (ECF No. 255)**

The Court next addresses Defendant's motion to dismiss counts 7 and 8 for lack of probable cause and lack of federal jurisdiction. (ECF No. 255.[24]) Defendant also argues, in the alternative, that the Court should require disclosure of the grand jury record related to count 7. (*Id.* at 2.)

Count 7—which serves as a predicate offense for count 8—charges Spurlock with interference with commerce by robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. (ECF No. 160.) The indictment alleges that on or around November 8, 2020, Defendant "did unlawfully obstruct, delay and affect commerce" by "unlawfully tak[ing] and obtain[ing] currency from the person and in the presence of W.L., a marijuana trafficker, against the will of W.L. and by means of actual and threatened force, physical violence, and fear of injury . . . to the person of W.L." (*Id.* at 5-6.) Count 8 charges Defendant with causing death through use of a firearm in relation to a crime of violence (the crime alleged in count 7), in violation of 18 U.S.C. §§ 924(c) and 924(j)(1). (*Id.* at 6).

Defendant argues that dismissal of count 7 is appropriate because "no admissible evidence has been produced to the defense to support either the factual 'unlawful taking' or the jurisdictional interstate commerce element of [the Hobbs Act charge]," also making count 8 deficient as charged. (ECF No. 255 at 2.) Spurlock acknowledges that a claim of insufficient evidence to support probable cause in grand jury proceedings is not grounds for dismissal, *see Navarro-Vargas*, 408 F. 3d at 1200. He maintains, however, that the context here is unique because the alleged theft of currency needed to support a Hobbs Act robbery charge is also necessary to meet the requirement that the robbery "affected commerce," *see* 18 U.S.C. § 1951(a). (ECF No. 255 at 2.) The government argues that despite his contentions to the contrary, Defendant's challenge to count 7 is largely a

[24]The government responded (ECF No. 299) and Defendant replied (ECF No. 335).

dispute regarding sufficiency of the evidence, and dismissal at this stage would encroach on the role of the grand jury. (ECF No. 299.) The Court agrees with the government. Defendant essentially asks the Court to inappropriately parse through grand jury evidence, considering its validity and questioning the reasonableness of any inferences made by the jurors.[25] *See Reyes*, 417 F.2d at 919.

Moreover, even if the Court considers the substance of Spurlock's argument regarding factual infirmities, Defendant's focus on the lack of *admissible* evidence is once again misplaced. *See e.g.*, *Costello*, 350 U.S. at 363 (addressing hearsay in grand jury proceedings). And it is certainly not clear at this stage that "no evidence" supports the unlawful taking or jurisdictional elements – particularly in light of the *de minimis* threshold applicable to the interstate commerce element of a Hobbs Act charge and the discovery evidence in this case related to marijuana distribution. *See United States v. Rodriguez*, 360 F.3d 949, 955 (9th Cir. 2004) ("It is well-established that the government need only show a *de minimis* effect on interstate commerce [to support a Hobbs Act charge]."). *See also Taylor v. United States*, 579 U.S. 301, 308 (2016) ("[I]f the Government proves beyond a reasonable doubt that a robber targeted a marijuana dealer's drugs or illegal proceeds, the Government has proved beyond a reasonable doubt that commerce over which the United States has jurisdiction was affected.").

Defendant further argues that at minimum, the government should be required to disclose all grand jury transcripts and exhibits pertaining to count 7, especially because of its outsized influence on count 8. With respect to the first disclosure factor set out in *Douglas Oil Co.*, 441 U.S. at 222-23, he again emphasizes that instructional errors in grand jury proceedings, even if unintentional, may warrant dismissal, pointing to the

[25] In his reply, Defendant argues the government's statement that "Defendant . . . stated that W.L. did not have any large amounts of money and that Defendant had taken $1,000 from W.L.'s wallet and gave $700 of it to B.K" is not supported by discovery. (ECF No. 335 at 2.) Defendant further argues that the government's "incorrect description of the allegation also calls into question whether the government inaccurately presented this evidence to the grand jury." (*Id.*) But again, the Court will not investigate the specific evidence presented to the grand jury, or the source/strength of that evidence, based on speculation about possible shortcomings.

"inaccurate characterization of the government's evidence on the supposed theft." (ECF Nos. 255 at 3, 335 at 3). But as the Court has already noted, dismissal is a remedy which is generally only appropriate in cases involving significant and non-speculative prejudice; here, the possible introduction of inadmissible evidence – or the characterization of that evidence when compared to discovery – does not rise to this level. *See, e.g.*, *Peralta*, 763 F. Supp. at 18-19; *Stevens*, 771 F. Supp. 2d at 568; *Samango*, 607 F.2d at 882. The Court thus finds that Spurlock fails to demonstrate a particularized need for disclosure of the remaining grand jury record as to count 7, when also bearing in mind the second and third *Douglas Oil Co.* factors (the continuing interest in secrecy and the scope of the request).

Accordingly, the Court denies the motion to dismiss counts 7 and 8 and further denies the request for the grand jury record as to count 7.

**D. Motion to Dismiss Count 2 (ECF No. 256)**

Defendant next moves to dismiss count 2, which charges him with the murder of J.S. while engaged in narcotics trafficking, in violation of 21 U.S.C. § 848(e)(1)(A) (ECF No. 160 at 2-3).[26] (ECF No. 256.[27]) He argues that dismissal is appropriate because (1) count 2 alleges a violation of a penalty section that enhances the possible penalty of count 1, not a standalone offence, and (2) that the count lacks sufficient particularity to put Spurlock on notice of the allegations against him. (*Id.*) In the alternative, Spurlock seeks "a bill of particulars that adequately informs him of the allegation against him and the factual basis for the government's theory of the case." (*Id.*)

The Court is not persuaded by Defendant's first argument—that 21 U.S.C. § 848 is a sentencing enhancement section applicable to offenses involving a continuing

---

[26]Count 2 specifically alleges that Spurlock and others, while engaged in an offense punishable under Section 841(b)(1)(A) (conspiracy to possess with the intent to distribute 1000 kilograms or more of a substance containing a detectible amount of marijuana as charged in count 1), aided and abetted one another to "knowingly and intentionally kill and counsel, commend, procure and cause the intentional killing of J.S." on or about June 19, 2020. (*Id.*)

[27]The government responded (ECF No. 302) and Defendant replied (ECF No. 336).

criminal enterprise or drug trafficking crime (here, a violation of 21 U.S.C. § 841(b)(1)(A)(vii) as charged in count 1), and that as a result, a violation of Section 848 cannot be charged as a standalone offense. (*Id.* at 2-3.) Here, Spurlock asserts that he "should not be separately charged and risk a sentence of ten years to life on Count 1 and a sentence of twenty years to life, and with the possibility of a death sentence, on Count 2" and that he "should not face the prejudice of going to trial on an indictment that appears to allege more offenses than it does, creating the impression of a larger criminal enterprise." (*Id.* at 3.) But Defendant provides limited support for this interpretation of the statute. As the parties both acknowledge, the Ninth Circuit has never directly addressed the question of whether Section 848(e) creates a standalone offense. (ECF No. 336 at 3.) Spurlock primarily points to the heading of the section (titled "Death Penalty") to suggest it authorizes only an additional penalty for a drug trafficking crime. (*Id.* at 3-4.) *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998). As the government notes, however, courts in this circuit and others have frequently—if implicitly—treated Section 848(e) as creating an independent offense in light of the statute's text in context. *See United States v. LaFleur*, 971 F.2d 200, 212 (9th Cir. 1991) (comparing murder charged under 21 U.S.C. § 848(e) to murder under 18 U.S.C. § 1111(b) and finding that Section 848(e) covers "persons who have various roles in a murder," covering a broad range of culpability and making sentencing discretion appropriate). *See also United States v. Villarreal*, 963 F.2d 725, 728 (5th Cir. 1992) (finding that an offense could be charged under Section 848(e)(1)(B) because the statute created a substantive violation); *United States v. NJB*, 104 F.3d 630, 634 (4th Cir. 1997). The Court thus declines to dismiss Count 2 as an improperly charged offense under a penalty statute.[28]

The Court is also unconvinced by Defendant's second argument—that count 2 lacks the particularity necessary to allow him to effectively prepare his defense. (ECF No.

---

[28]The Court does not consider, in addressing the dismissal motion at issue, whether the conspiracy charged in count 1 is a lesser included offense of the violation charged in count 2. *See Rutledge v. United States*, 517 U.S. 292 (1996); *Garrett v. United States*, 471 U.S. 773 (1985).

256 at 3-4.) Defendant asserts that "many, alternative forms of conduct alleged in the indictment render the charging document impermissibly vague, violating Mr. Spurlock's due process rights." (*Id.* at 3.) *See* Fed. R. Crim. P. 7(c)(1) (requiring a "plain, concise, and definite written statement of the essential facts constituting the offense charged"); *United States v. Huping Zhou*, 678 F.3d 1110, 1113 (9th Cir. 2012) (requiring an indictment to meet due process requirements as well as the requirements of Rule 7). In general, a charging instrument must "(1) contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against him which he must defend and (2) enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Forrester*, 616 F.3d 929, 940 (9th Cir. 2010). The charging instrument must do more than merely replicate statutory language – it must articulate facts regarding the conduct at issue. *See Hamling v. United States*, 418 U.S. 87, 117-18 (1974). The Court finds that as charged, count 2 meets these requirements. The count adequately alleges that (1) while engaging in a conspiracy to possess with the intent to distribute and to distribute 1000 kilograms or more of a substance containing marijuana as charged in count 1 (naming W.L., J.S., and O.O.), (2) Defendant and others aided and abetted one another to (3) knowingly and intentionally cause the killing of J.S. on June 19, 2020. (ECF No. 160 at 2-3.)

Relatedly, the Court declines Defendant's request for a bill of particulars. *See United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983), *citing United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir.), *cert. denied*, 444 U.S. 979 (1979) ("In determining if a bill of particulars should be ordered in a specific case, a court should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government.") Of course, the government may not use a vague indictment as a cover for impermissibly changing theories partway through the case. *See id.* But the Court agrees with the government that, considering the indictment and the discovery provided—as well as the relevant facts laid out in other disclosures and the response to the dismissal motion regarding the death of J.S.—Defendant has

adequate information to be on notice about the charges against him and to prepare a defense. While Defendant argues that a bill of particulars is necessary because the government could proceed under multiple vague and circumstantial theories, including about the person who actually killed J.S., the government has stated it "is not alleging, nor does the discovery provided to Spurlock support, that another person aided Spurlock in the actual killing of J.S., that Spurlock ordered another person to kill J.S., or that another person ordered Spurlock to kill J.S." (ECF No. 302 at 6.)

The Court thus denies Defendant's motion to dismiss count 2 and the request for a bill of particulars.

**E. Motion to Dismiss Count 3 (ECF No. 259 (sealed))**

Defendant also moves to dismiss count 3, which charges him with murder-for-hire conspiracy in violation of 18 U.S.C. § 1958(a) (ECF No. 160 at 3-4). (ECF No. 259 (sealed)[29].) Count 3 alleges that between October 2020 and March 2021, "[Defendant], promised B.K. payment for assistance in killing W.L. and [Defendant] and B.K. conspired and agreed to kill W.L.," resulting in W.L.'s death in November 2020. (ECF No. 160 at 3-4.) Spurlock argues that count 3 is insufficiently pled and must be dismissed in light of legal requirements under 18 U.S.C. § 1958(a) because the government (1) fails to allege a clear meeting of the minds as to what consideration was exchanged for the murder and (2) fails to allege more than speculative and hypothetical consideration. (ECF No. 259 at 6.) Relatedly, Defendant argues that the existing factual evidence is legally insufficient to provide the requisite particularity for the charge. (*Id.*)

In general, 18 U.S.C. § 1958(a) "proscribes a very limited category of behavior" and, as Defendant notes, requires the government to prove a legally-adequate mutual agreement and exchange of consideration. *See United States v. Frampton*, 382 F.3d 213, 217-18 (2d Cir. 2004) ("[O]nly those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are

[29]The government responded (ECF No. 300 (sealed)) and Defendant replied (ECF No. 337 (sealed)).

punishable under § 1958."); *United States v. Phillips*, 929 F.3d 1120, 1124 (9th Cir. 2019) (requiring "a clear mutual agreement between the solicitor and hitman of payment in exchange for murder"); *United States v. Chong*, 419 F.3d 1076, 1082 (9th Cir. 2005) (noting the mutual exchange must be "clearly understood" to involve "something of pecuniary value"); *United States v. Ritter*, 989 F.2d 318, 321-22 (9th Cir. 1998) (finding inadequate speculative or hypothetical consideration).

Here, the operative indictment adequately addresses the elements of the offense on its face and despite Defendant's arguments to the contrary, the indictment is adequate with regard to the mutual agreement and consideration requirements. Defendant is charged with conspiring with B.K. and another individual to "use and cause another to use a facility of interstate commerce, with intent that a murder be committed . . . as consideration for the receipt of, and as consideration for a promise and agreement to pay a *thing of pecuniary value*." (ECF No. 160 at 3-4 (emphasis added).) The indictment further specifies that Defendant "promised B.K. payment for assistance in killing W.L. and [Defendant] and B.K. conspired and agreed to kill W.L." (*Id.*) The Court finds that this is enough. Defendant argues that the reference to a "thing of pecuniary value" must be further particularized and the same goes for an expectation of proceeds. (ECF No. 259 at 6.) But whether the killing was in fact motivated by the hope for financial gain and whether this pecuniary value was sufficiently meaningful to support a conviction under 18 U.S.C. § 1958(a) are questions which involve factual determinations.

[redacted]



ER_0229

[redacted] Other cases Defendant cites for support here are also both procedurally and factually distinguishable, to the extent they involve deficiencies in evidence when reviewed in the light most favorable to the government at the end of trial or on appeal. *See, e.g.*, *Chong*, 419 F.3d at 1082 (reversing conviction because "[t]he jury did not have sufficient evidence from which to find that the $100 constituted compensation for the murder-for-hire, given the absence of any overt agreement or understanding between [Defendant and co-conspirators]").

Finally, Defendant argues that the Court should require disclosure of the grand jury transcripts related to count 3. (ECF No. 259 at 6-10.) [redacted] But for the same central reasons the Court has already discussed, the Court finds that Defendant does not show a particularized need for the records, given the basis for his request goes to the sufficiency of the evidence, and considering the relevant factors under *Douglas Oil Co.*

The Court thus denies the motion to dismiss count 3 and the request for grand jury transcripts related to this count.

**F. Renewed Motion to Sever (ECF No. 244)**

Defendant asks the Court to reinstate its previous order severing two groups of counts (ECF No. 146) upon dismissal of count 4, which, as the Court has discussed, is an attempt by the government to link the J.S. murder with the murders of W.L. and Y.L.[30]

[30] The Court previously granted Defendant's motion to sever counts 1 and 2 from counts 3 through 7 of the second superseding indictment, finding the groups of counts were improperly joined under Rule 8(a). (ECF No. 146.) As discussed, the government then obtained a third superseding indictment, adding a new charge in count 4 for tampering with a witness by killing of W.L. (ECF No. 160.)

(ECF No. 244.) Defendant originally argued that, assuming the Court will dismiss count 4, the Court should reinstate its severance order. In response, the government indicated it would seek the fourth superseding indictment to correct the legal deficiencies identified in Defendant's motion to dismiss count 4. (ECF No. 301.) In his reply, Defendant argues for the first time that severance is still required even if the Court denies dismissal of count 4. (ECF No. 330 at 3-5.) The Court has now denied dismissal of count 4, and Defendant cannot raise an entirely new severance argument in his reply. Accordingly, the Court denies Defendant's renewed motion to sever.

Even if the Court were to consider Defendant's new severance argument, the Court nevertheless finds that Defendant's assertion of prejudice—the need to avoid a mistrial if the Court were to grant a Rule 29 motion during the trial due to spillover evidence (ECF No. 330 at 3-5)—does not support severance. Rule 14 permits the Court to order separate trials or "provide any other relief that justice requires" if joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). The rule "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). And "Rule 14 sets a high standard for a showing of prejudice." *United States v. Vasquez-Velasco,* 15 F.3d 833, 846 (9th Cir. 1994).

Here, given that the Court has declined to dismiss count 4, the Court agrees with the government that the counts all share a common scheme with overlapping evidence such that severance is unwarranted. Count 4 charges Defendant with tampering with a witness by the killing of W.L., to prevent communication by W.L. to a federal law enforcement officer about the alleged killing of J.S. (ECF No. 342 at 4.) Count 4 thus properly links the two group of offenses—conspiracy to distribute marijuana and the murder of an individual (J.S.) while engaging in narcotics trafficking (counts 1 and 2) with the killings of W.L. and Y.L (counts 3 and 5 through 8). Defendant's prejudice argument is unpersuasive; limiting jury instructions may cure any "spillover" evidence and render such evidence non-prejudicial, even where the case may be complex. *See United States*

*v. Johnson*, 297 F.3d at 856-60 (affirming trial court's decisions to deny severance requests and finding that any "spillover" evidence was sufficiently addressed through limiting jury instructions during the lengthy and complex trials). Here, the jury will be given proper instructions as to the elements of each count to help them consider each charge separately. Indeed, "juries are presumed to follow their instructions." *Zafiro*, 506 U.S. at 540 (quoting *Richardson v. Marsh,* 481 U.S. 200, 211 (1987)).

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendant's motion to dismiss indictment for government delay (ECF Nos. 253 (sealed), 263) is denied.

It is further ordered that Defendant's motion to dismiss count 4 (ECF No. 243) is denied.

It is further ordered that Defendant's motion to dismiss counts 7 and 8 (ECF No. 255) is denied.

It is further ordered that Defendant's motion to dismiss count 2 (ECF No. 256) is denied.

It is further ordered that Defendant's motion to dismiss count 3 (ECF No. 259) is denied.

It is further ordered that Defendant's renewed motion to sever (ECF No. 244) is denied.

DATED THIS 18th Day of April 2025.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

CORY SPURLOCK,

Defendant.

Case No. 3:23-cr-00022-MMD-CLB-1

ORDER

## I. SUMMARY

Defendant Cory Spurlock was indicted for a murder-for-hire conspiracy and conspiracy to distribute marijuana. (ECF No. 1.) The fifth superseding indictment charges eight counts involving three deaths (victims J.S., W.L., and Y.L.).[1] (ECF No. 363.) Before the Court are two motions to suppress evidence, specifically: (1) Spurlock's motion to suppress tower dump data obtained in response to a warrant and the derivative use of that data (ECF No. 254);[2] and (2) Spurlock's motion to suppress evidence collected during a consent search from 27 Red Rock Drive (ECF No. 257).[3] The Court held an evidentiary hearing on the tower dump motion—along with another motion not addressed in this

[1]The fifth superseding indictment, returned on April 10, 2025, charges Spurlock with eight counts: (1) conspiracy to possess with intent to distribute and to distribute marijuana; (2) murder while engaged in narcotics trafficking relating to the killing of J.S.; (3) murder for hire relating to the killing of W.L.; (4) tampering with a witness by killing of W.L.; (5) stalking resulting in death relating to W.L.; (6) stalking resulting in death relating to Y.L; (7) interference with commerce by robbery; and (8) causing death through use of a firearm during and in relation to a crime of violence. (ECF No. 363.) The government also now seeks the death penalty. (*Id.*; *see also* ECF No. 365.) The motions addressed in this order were filed before the government sought the fourth and then fifth superseding indictment.

[2]The government responded (ECF No. 298), and Spurlock replied (ECF No. 338).

[3]The government responded (ECF No. 297) and Spurlock replied (ECF No. 328).

order—on April 9, 2025 (the "Hearing").[4] (ECF No. 362 (hearing minutes).) As to the motion to suppress regarding the tower dump, the Court finds that a tower dump is a search and the warrant law enforcement used to get it is a general warrant forbidden under the Fourth Amendment. That said, because the Court appears to be the first court within the Ninth Circuit to reach this conclusion and the good faith exception otherwise applies, the Court will not order any evidence suppressed. The Court will deny the motion regarding the search of 27 Red Rock Drive because Spurlock had objectively abandoned it before the challenged search occurred.

## II. DISCUSSION

The Court addresses both motions in the order they were filed, below, beginning with the motion to suppress tower dump data.

### A. Motion to Suppress Tower Dump Data

Spurlock moves to suppress all the evidence collected using warrant 20-SW-56, along with all the evidence collected using some 90 additional warrants that referred to 20-SW-56 or evidence collected based on it. (ECF No. 254 at 26-29.) Spurlock argues that the tower dump—further explained below, but basically records from all cell phones that connected to the cell towers closest to two locations specified in the warrant during a specified time period—is a search under the Fourth Amendment, warrant 20-SW-56 is a general warrant categorically forbidden by the Fourth Amendment, the warrant is overbroad and lacking in probable cause, and the good faith exception does not apply. (*Id.* at 11-25.) The government counters with an onion of alternative arguments: there was no Fourth Amendment search; the warrant was supported by probable cause; law enforcement relied on the warrants in good faith; the cell tower data was obtained through independently lawful means; and the relevant evidence obtained in response to the tower dump warrant would have inevitably been discovered in any event. (ECF No. 298 at 1-2.)

---

[4]In a minute order setting the Hearing, the Court specified it would not address the motion regarding the search of 27 Red Rock Drive at the Hearing. (ECF No. 326.) The Court otherwise directed the government to be prepared to present evidence on four enumerated topics at the Hearing. (*Id.*) Broadly speaking, the government's witnesses who testified at the Hearing provided information going to the four specified topics.

The Court agrees with Spurlock that a tower dump is a search and warrant 20-SW-56 is an impermissible general warrant, but finds the good faith exception applies and, alternatively, suppression is unwarranted because the requesting law enforcement officer got a warrant, and the warrant he got was not unconstitutional at the time it issued.

The Court first includes below its pertinent findings of fact and then provides its legal analysis.

**1. Findings of Fact[5]**

On November 13, 2020, Sergeant Magdeleno Hernandez of the Mono County Sheriff's Office applied for a search warrant to the Honorable Mark Magit, Mono County Superior Court Judge.[6] (ECF No. 254-2 at 2, 5, 7.) Judge Magit granted the application that same day, assigning the warrant the identifier 20-SW-56. (*Id.* at 5.) According to his affidavit, Sergeant Hernandez was investigating the suspected homicide of two people found on the side of U.S. Highway 395 north of Bridgeport, California on the morning of November 9, 2020. (*Id.* at 9.) He and unspecified other deputies who went to investigate the bodies, later identified as W.L. and Y.L., found that they had been shot and stabbed. (*Id.* 9-10.) They also found a cell phone near the victims that the investigating officers determined belonged to one of them. (*Id.* at 9.)

Then, on November 10, 2020, a California Highway Patrol ("CHP") officer found an abandoned vehicle on the side of Highway 395, but south of Bridgeport, California. (*Id.* at 10.) A CHP officer contacted the Mono County Sheriff's Office about the car because they found blood on and in the vehicle. (*Id.*) As it was unlocked, a CHP officer also found

---

[5]Fed. R. Crim. P. 12(d) specifies, "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."

[6]They both testified at the Hearing. The two other witnesses who testified at the Hearing were Jason Pelichowski, the investigator from the Mono County Sheriff's Office who analyzed the information returned in response to warrant 20-SW-56, and Kelsey Guay, Spurlock's retained expert on digital forensic evidence (ECF No. 272 (providing notice that Spurlock intended to rely on her expert testimony in this case and detailing her qualifications)), who also examined the warrant return materials and provided opinions about what those records contain. The Court also explains below its finding that Sergeant Hernandez applied for the warrant on November 13, 2020, and Judge Magit granted the application that same day, even though Sergeant Hernandez dated his affidavit November 20, 2020.

a cell phone, wallet, and keys in the vehicle. (*Id.*) Someone from the Mono County Sheriff's Office ran the car through their system and discovered it was registered to the male victim, W.L. (*Id.*) Someone from the Mono County Sheriff's Office then reviewed surveillance video and determined that W.L.'s vehicle drove through Bridgeport at approximately 8:07 p.m. on November 8, 2020. (*Id.*) Someone also involved in the investigation later noted that tire tracks found near the two bodies matched the tires on W.L.'s abandoned vehicle found south of Bridgeport. (*Id.*)

Sergeant Hernandez explained in his affidavit that all this information led him to believe that the person or people who killed W.L. and Y.L. were using cell phones around the time of the suspected crime. (*Id.*) He accordingly requested a warrant to get 'tower dump data' from cell towers around the mile markers where the bodies and the vehicle had been found (as specified by GPS coordinates) between the hours of 5 p.m. and 11 p.m. on the evening of November 8, 2020 (a window of time around the time he thought the killings occurred). (*Id.* at 10-11.) He further explained that the rural location, the time of day, and the fact that most people carry cell phones with them made it more likely that this tower dump data would lead to phone numbers associated with the person or people who killed W.L. and Y.L. (*Id.*)

///

///

///

///

///

///

///

///

///

///

///

The warrant specifically ordered Verizon and AT&T to produce the following information to Sergeant Hernandez:[7]

> a. Tower Dump/Download records from all cell-sites and their related sectors that cover the immediate area of US Highway 395 around mile marker 84.5 and US Highway 395 around mile marker 74.5 (see GPS Coordinates listed above) that would support any and all communications including; voice calls, text messages, any data connections, and any available HLR (Home Local Registry) or VLR (Visitor Local Registry) records showing subscriber equipment that were idle but still connected to the provider's network (on but not placing a call, text, or data connection but were in the same area as referenced above connecting to the network).
>
> b. Records identifying the device (make and model), phone numbers associated with any communications, locations, date, times, duration of all calls, text messages, and data connections identified in response to item "a," above.
>
> c. Records showing the addresses and/or map GPS coordinates of all cell sites identified as having active connections in item "a." above and maps with markings showing the location of each cell site and the theoretical wireless coverage area provided by each site, commonly called an RF footprint and/or propagation map.
>
> d. Any records of equipment failures, maintenance, cell site overloads, or other outages that tend to show whether any of the listed cell sites were not operating normally during the specified time period.

(*Id.* at 3.) The 'target of warrant' was listed as, "[a]ny subjects related to active homicide investigation." (*Id.* at 4.) Other investigating officers subsequently used some evidence received in response to warrant 20-SW-56 to obtain many other warrants ultimately leading to some evidence implicating Spurlock in the crimes he has since been charged with.[8] (ECF Nos. 254 at 7-10, 298 at 5-7.)

Within the Mono County Sheriff's Office, Investigator Pelichowski was the person who analyzed the information the Sheriff's Office got back from Verizon in response to warrant 20-SW-56. He accessed a working copy of the return materials provided in an Excel spreadsheet and manually examined the phone numbers listed in it, eventually connecting several of the phone numbers he found there with people of interest through other detective work. At the time, he did not have access to any software that would have helped him analyze the data. He just manually looked for phone numbers of interest in

---

[7]Only Verizon returned records in response.

[8]The government argues, and Investigator Pelichowski testified, that he and his colleagues were simultaneously pursuing various investigative techniques and lines of inquiry that they also relied on to apply for other warrants they obtained in this investigation. However, the Court does not detail these other investigations within the overall investigation in this order because the Court does not reach the government's independent source and inevitable discovery doctrine arguments.

the Excel sheet and ran those phone numbers through a third-party public records database his department subscribed to.[9] He further testified that he has since gotten more familiar with the type of data they got in response to the warrant, but at the time, this was all new to him. Similarly, Sergeant Hernandez testified this was the first tower dump search warrant application he had written. He consulted with Investigator Pelichowski and others in the Sheriff's Office, along with an investigator from the Mono County District Attorney's office, before drafting the warrant application. The investigator from the Mono County District Attorney's office gave him the idea to write a tower dump warrant application. Said otherwise, this was an unusual type of warrant application that they were not very familiar with at the time.

Judge Magit also testified that this tower dump warrant application was unusual. He estimated that he has granted 350-450 warrants since taking the bench in 2011, but as of 2020, when he granted this warrant application, had only seen four or five tower dump warrant applications. He had no specific recollection of issuing warrant 20-SW-56, but refreshed his recollection about it to prepare for the Hearing and answered the questions posed to him about it that he felt he could. Consistently with Sergeant Hernandez and Investigator Pelichowski, Judge Magit further testified Mono County is very rural, with only approximately 13,000 residents spread over a very large land area—and homicides are rare. Thus, all three witnesses remembered this double homicide. More generally, Judge Magit testified that he would guess he denies 10%-20% of all warrant applications he receives, and of those applications that were subsequently re-

---

[9]The example Investigator Pelichowski offered involved the phone number with the last four digits 1368. He testified that during the investigation leading up to obtaining the tower dump data, he learned that 1368 was registered to Y.L. As he looked through the tower dump data on the Excel spreadsheet around the 20:00 hour time frame, he saw a call from 1368 to 1975, which he then learned was registered to B.K. He had learned about B.K.'s relationship with the Larsens from their family. He then found on the Excel spreadsheet that 1975 had contacted 0475, which he learned was registered to O.O. Because the tower dump data contains phone numbers but not subscriber information, Investigator Pelichowski used his office's separate database available to him at the time to see who may be associated with a particular phone number.

submitted after denial, he denied a few but probably less than 20%. He could not specifically recall if he had ever denied an application for a tower dump warrant.

Spurlock's expert Ms. Guay examined the same records Investigator Pelichowski got in response to warrant 20-SW-56 in preparation for the Hearing and clarified a few important evidentiary points for the Court. First, she demonstrated that, while Investigator Pelichowski does not appear to have done this in his investigation, from the tower dump records, she was able to determine roughly where the various phones listed in the data were and could plot them on a map if she wanted to.[10] Second, she determined that after accounting for de-duplication the tower dump records contained records—again, including rough location information—for 1686 unique phones. Third, she clarified that the wireless company users whose phones showed up in the tower dump data did not opt in to sharing their location with their wireless provider, and indeed, could not opt out from appearing in the type of records received in response to warrant 20-SW-56. She explained this is essentially because wireless network operators need to know roughly where phones are to effectively route the calls their users make. *See also Carpenter v. United States*, 585 U.S. 296, 300 (2018) (providing similar technical background about how smartphones work, and how often they connect to cell towers without any user input).

**2. Legal Analysis**

The Court now addresses below the legal issues raised in Spurlock's motion in the order he presented them.

**a. Fourth Amendment Search**

While Sergeant Hernandez got warrant 20-SW-56 asking Verizon and AT&T for information about the phones that connected to cell towers near two miles markers on US Highway 395 during a six-hour period on November 8, 2020 (ECF No. 254-2 at 3), Spurlock nevertheless leads off in his motion by arguing that this 'tower dump' is a search

---

[10]Said otherwise, while Investigator Pelichowski did not use any location information contained in the warrant return materials he analyzed, Ms. Guay demonstrated that he could have if he had the technical ability and wanted to.

under the Fourth Amendment (ECF No. 254 at 11-14). The government counters it is not. (ECF No. 298 at 8-11.) The Court agrees with Spurlock.

In *Carpenter*, 585 U.S. 296, the Supreme Court held that individuals maintain a legitimate expectation of privacy in records of their physical movements as captured through cell-site location information ("CSLI"), that obtaining seven days of historical CSLI from a wireless provider without a warrant was a search, that accessing 127 days of historical CSLI invaded the defendant's reasonable expectation of privacy, and thus the government must get a warrant supported by probable cause before obtaining CSLI from a wireless carrier. *See generally id*. However, the Supreme Court in *Carpenter* did "not express a view on matters not before us: real-time CSLI or 'tower dumps' (a download of information on all the devices that connected to a particular cell site during a particular interval)." *Id.* at 316.

According to the parties—as confirmed by the Court's own research—neither the Supreme Court nor the United States Court of Appeals for the Ninth Circuit has answered the question left open by *Carpenter* and pertinent here since *Carpenter* was decided.[11] So, is a 'tower dump,' like Sergeant Hernandez requested, a search? In arguing that it is, Spurlock points the Court towards the United States Court of Appeals for the Fifth Circuit's opinion regarding geofence warrants in *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) and a recent decision from a Magistrate Judge in Mississippi extending *Smith* to some applications for tower dump warrants like the warrant at issue here in *In re Four Applications for Search Warrants Seeking Info. Associated with Particular Cellular Towers*, No. 3:25-CR-38-CWR-ASH, 2025 WL 603000 (S.D. Miss. Feb. 21, 2025) ("*Four Applications*"). (ECF No. 254 at 11-13.) In these decisions, the Fifth Circuit found that Google location history data obtained using a geofence warrant constituted a Fourth Amendment search, *see Smith*, 110 F.4th at 836, and as noted, the *Four Applications*

---

[11]The Court again asked counsel for both sides at the Hearing and they both confirmed they are not aware of any binding precedent on the constitutionality of tower dump warrants.

court extended *Smith* to tower dump warrant applications, *see generally* 2025 WL 603000.

The Court finds these two cases persuasive. To start, the government does not even address *Four Applications* in its response to the motion and did not attempt to meaningfully distinguish *Smith*.[12] (ECF No. 298.) And in *Four Applications*, the Magistrate Judge explicitly extended *Smith* from the context of a geofence warrant to applications for tower dump warrants, reasoning that the applicable warrants sought essentially the same type of information at issue in *Smith* and finding that a person has a reasonable expectation of privacy, "as to the record of his location at particular moments in time that a tower dump would reveal[.]" *Four Applications*, 2025 WL 603000, at *5. The *Four Applications* court went on to find that the data revealed from tower dumps was sufficiently intrusive to warrant Fourth Amendment protection even if it involved less data than in *Carpenter*, and rejected application of the third party doctrine because, "tower-dump warrant applications do not implicate the sort of opt-in procedure that split the Fourth and Fifth Circuits in the geofence cases." *Id.* at *6. Thus, *Four Applications* is factually analogous, and both addresses and rejects the primary arguments the government raises in response to the motion.[13] (ECF No. 298 at 8-11.)

The *Four Applications* court's point about the involuntary nature of the location data obtained from a tower dump warrant also highlights why the Court finds *Smith* more persuasive than *United States v. Chatrie*, 107 F.4th 319, 330 (4th Cir. 2024), the Fourth Circuit case referred to in the quotation above. But before the Court elaborates, the Court

---

[12]When asked at the hearing, government counsel made nothing more than the obvious point that neither *Smith* nor *Four Applications* bind the Court.

[13]The government otherwise argued and reiterated at the Hearing that Spurlock lacks standing to challenge the tower dump warrant because many of the records produced in response to it included information about other peoples' phones (ECF No. 298 at 18), but also does not dispute that information about two phones associated with Spurlock were among the records produced in response to warrant 20-SW-56. Indeed, Spurlock confirmed that fact through Ms. Guay at the Hearing. Spurlock has standing to challenge this warrant. *See Smith*, 110 F.4th at 831 n.6 (finding that two of the three appellants had standing to challenge the geofence warrant because their location data was captured by the geofence warrant they challenged).

must note that *Chatrie* is not currently good law because the Fourth Circuit granted rehearing en banc in that case, *see* No. 22-4489, 2024 WL 4648102 (4th Cir. Nov. 1, 2024), but has not yet issued its en banc decision. *Smith* is nonetheless more persuasive than *Chatrie* because in *Smith*, the Fifth Circuit rejected the application of the third party doctrine (distinguishing *Chatrie*) for the commonsense reason that, "electronic opt-in processes are hardly informed and, in many instances, may not even be voluntary." *Smith*, 110 F.4th at 835. The Court agrees—"[a]s anyone with a smartphone can attest[.]" *Id.* And tower dump warrants are moreover distinguishable from a geofence warrant, as the *Four Applications* court observed, because people whose information would be revealed in a tower dump did not opt in to sharing their location with the wireless companies targeted by this type of warrant in the way that the user targeted in *Smith* had arguably opted in to Google location services, *see* 2025 WL 603000 at *6. Defense expert witness Ms. Guay confirmed this at the Hearing, stating in response to questions from the Court and Spurlock's counsel that cell phone users cannot opt out of sharing their location with cell towers (nor can they opt in), both generally so they have service, and specifically whenever they make a call or send a text message. Cell phones are pinging nearby towers whenever they are turned on, regardless of any settings their users select. Thus, even if *Chatrie* was good law, its reliance on Google users' decisions to opt-in to location sharing renders it distinguishable. *See Chatrie*, 107 F.4th at 331 ("Chatrie voluntarily exposed his location information to Google by opting in to Location History[.]").

In addition, the Court also finds persuasive *Smith*'s second reason for distinguishing *Chatrie*: "[w]hile it is true that geofences tend to be limited temporally, the potential intrusiveness of even a snapshot of precise location data should not be understated." *Smith*, 110 F.4th at 833. Like the *Smith* court, the Court will not understate the potential intrusiveness of the location data at issue here. Sergeant Hernandez and Investigator Pelichowski got location data on over 1600 people who neither consented nor were likely even aware that their location was being tracked as they moved through the area specified in the warrant application during the time also specified in it.

For these same reasons, the Court rejects the government's unpersuasive argument that the records obtained using warrant 20-SW-56 do not constitute a Fourth Amendment search because they are less invasive than the records at issue in *Carpenter*. (ECF No. 298 at 8-11.) The Court will instead follow *Smith* as extended to tower dumps in *Four Applications*. And the non-binding cases the government relies on in this section of its response do not convince the Court otherwise. *United States v. Adkinson*, 916 F.3d 605, 610 (7th Cir. 2019) is a private party search exception case. There, someone was robbing some T-Mobile stores in a similar way, so T-Mobile dumped its own towers and then turned the results over to law enforcement. *See id.* at 608. Here, of course, Sergeant Hernandez got a warrant asking Verizon and AT&T for this information. And *United States v. Hammond*, 996 F.3d 374, 387-92 (7th Cir. 2021) dealt with real-time CSLI, not tower dump data like the data at issue here. Moreover, the Court agrees with Spurlock (ECF No. 338 at 3-4) that *Hammond* is against the weight of authority. *See, e.g.*, *United States v. Broderick*, No. 5:22-CR-00251-EJD-1, 2024 WL 295293, at *6 (N.D. Cal. Jan. 25, 2024) ("many courts in this District and across the country have found that [*Carpenter*'s] reasoning applies to real-time CSLI."), *appeal dismissed*, No. 24-1002, 2024 WL 2559466 (9th Cir. Feb. 29, 2024). The Court accordingly rejects as unpersuasive the government's argument that because *Hammond* found real-time CSLI not subject to the Fourth Amendment, tower dump data is not either. Finally, the government cites *Sanchez v. Los Angeles Dep't of Transportation*, 39 F.4th 548, 560 (9th Cir. 2022) (ECF No. 298 at 10), but the pertinent section of that opinion turns on the fact that the plaintiff "knowingly and voluntarily disclosed location data to the e-scooter operators[.]" *Sanchez*, 39 F.4th at 559. Indeed, *Sanchez* specifically distinguished the rental e-scooters at issue there from the cell phones at issue here and in *Carpenter* because a cell phone reveals "location information 'by dint of its operation, without any affirmative act on the part of the user[.]'" *See id.* (citing *Carpenter*).

///

///

In sum, the Court finds that the tower dump performed in response to warrant 20-SW-56 is a Fourth Amendment search. *See Smith*, 110 F.4th at 836 ("law enforcement in this case *did* conduct a search when it sought Location History data from Google").

**b. General Warrant**

As mentioned, Spurlock proceeds to argue that warrant 20-SW-56 is a constitutionally forbidden general warrant or 'writ of assistance' because it, "seeks access to a vast array of private cellular phone data of a potentially unlimited number of people to identify a criminal suspect the police don't yet know about." (ECF No. 254 at 15.) And indeed, *Smith* reached a conclusion consistent with Spurlock's argument, holding that "geofence warrants are general warrants categorically prohibited by the Fourth Amendment." 110 F.4th at 838. The government counters that warrant 20-SW-56 was not a general warrant because Sergeant Hernandez's affidavit established probable cause and the warrant was sufficiently particularized. (ECF No. 298 at 14.)

But *Smith* also arose from an investigation where investigators obtained a warrant, and the Court has similar concerns with warrant 20-SW-56 to those that the *Smith* court expressed about the warrant there. Most notably, geofence warrants "*never* include a specific user to be identified, only a temporal and geographic location where any given user *may* turn up post-search." *Smith*, 110 F.4th at 837 (emphasis in original). Similarly, here, the subject of warrant 20-SW-56 is, "[a]ny subjects related to active homicide investigation[.]" (ECF No. 254-2 at 4.) Moreover, it is uncontested that "the private data of 1,686 users were captured in [the] tower dump warrant." (ECF No. 338 at 5.) And while the government argues that the "requested data was confined in date, time, and location" (ECF No. 298 at 13), "[a] general warrant cannot be saved simply by arguing that, after the search has been performed, the information received was narrowly tailored to the crime being investigated." *Smith*, 110 F.4th at 837.

Taken together, the Court agrees with Spurlock that these characteristics of warrant application 20-SW-56 render it equivalent to a request for "access to an entire haystack because it may contain a needle." *Four Applications*, 2025 WL 603000, at *8.

The Fourth Amendment "seeks to secure 'the privacies of life' against 'arbitrary power[,]'" and aims to "place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305 (citations omitted). A warrant that authorizes the search of anyone who was in a particular area during a particular time range is too permeating police surveillance. In sum, "the tower-dump search warrant[ at issue here is] materially indistinguishable from the geofence search warrant foreclosed by *Smith.*" *Id.* Warrant 20-SW-56 is a "general warrant[] categorically prohibited by the Fourth Amendment." *Smith*, 110 F.4th at 838.[14]

**c. Good Faith Exception**

Having determined that warrant 20-SW-56 is an unconstitutional general warrant, the Court "must address separately the question of whether exclusion is an appropriate remedy." *United States v. Elmore*, 917 F.3d 1068, 1076 (9th Cir. 2019). And while suppression is generally unwarranted where a search warrant exists, "[t]he existence of a search warrant does not automatically preclude application of the exclusionary rule[.]" *Id.* In situations like this one, where Sergeant Hernandez got a warrant, the Court may suppress evidence if: (1) the issuing judge was misled; (2) the issuing judge acted as merely a rubber stamp; (3) the affidavit was so lacking in probable cause that it was unreasonable for the issuing judge to have found it; or (4) the warrant was so facially

[14]Spurlock's counsel allowed at the Hearing that a tower dump warrant could conceivably be constitutional in a situation where the police are investigating serial robberies or acts of vandalism and the police have other evidence that the suspect had a phone at each of the robbery or vandalism locations, so the police could have probable cause for a tower dump warrant that would allow them to see if any of the same phones were present at each of the robbery or vandalism locations at each of the times they happened, and then use that information to focus in on one phone. Said otherwise, a tower dump warrant might be constitutional in the sort of situation addressed in *United States v. Foster*, No. 3:21-CR-00114-SLG, 2023 WL 155442, at *1 (D. Alaska Jan. 11, 2023) (assuming without deciding, however, "that the Government conducted a Fourth Amendment search when it acquired [the defendants] cell site tower data."). However, the context here is different. This is a warrant that resulted in the dump of a single cell tower following some crimes that were committed simultaneously, in the same spot. The Court indeed agrees with Spurlock that warrant 20-SW-56 "is equivalent to […] allowing law enforcement to search the bags of everyone in the radius of a theft." (ECF No. 254 at 15-16.)

deficient that executing officers could not have reasonably presumed it was valid. *See United States v. Leon*, 468 U.S. 897, 918, 923 (1984).

Spurlock argues that Judge Magit acted merely as a rubber stamp and the affidavit was so lacking in probable cause that it was unreasonable for Judge Magit to have found it. (ECF Nos. 254 at 23-25, 298 at 16-17 (summarizing and addressing Spurlock's argument).) The government counters that Judge Magit did not act as a rubber stamp because the date discrepancy is easily explained as a mistake on Sergeant Hernandez's part when dating his affidavit, and there was at least arguable probable cause for issuing the warrant. (*Id*.) The Court agrees with the government.

To start, the Court heard testimony from both Sergeant Hernandez and Judge Magit at the Hearing, and left the Hearing convinced that the date discrepancy was a simple mistake. Judge Magit testified that, while he did not specifically recall this warrant until he was contacted about it by the government in connection with the Hearing, he believed the correct date of the warrant was November 13, 2020 for three reasons: (1) he signed and dated it on November 13, 2020; (2) the clerk of his court also date stamped the order November 13, 2020, consistent with his practice of forwarding an approved warrant to be filed; and (3) in the body of the warrant, it asked for production of the data on November 19, 2020, which would not make sense if the warrant was not issued until November 20, 2020. He otherwise stated that law enforcement may not post-date warrants.[15] The Court finds this testimony credible. Similarly, Sergeant Hernandez testified that he wrote the wrong date by accident when he signed his affidavit. To corroborate that he made a simple mistake, he stated that the clerk of court stamped the warrant November 13, 2020, and he wrote a supplemental narrative explaining his mistake that included the correct date. (*See also* ECF No. 298-1 (the supplemental narrative he referred to).) The Court also found Sergeant Hernandez's testimony that he simply made a mistake credible. The Court accordingly finds that the date of November

---

[15]And the Court rejects any suggestion that Judge Magit authorized the warrant without swearing in Sergeant Hernandez or reviewing his affidavit either in person or remotely. Indeed, Judge Magit confirmed that was not his practice.

20, 2020, next to Sergeant Hernandez's signature in the application was a simple mistake. (ECF No. 254-2 at 12.) The correct date is November 13, 2020. (*Id.* at 2, 5, 7.) And for these reasons, this date discrepancy does not indicate that Judge Magit 'rubber-stamped' the warrant application.

The Court also heard from Judge Magit about the practices he would have followed before granting warrant 20-SW-56 and is convinced he did not rubber-stamp it for the reasons he provided at the Hearing as well.[16] Judge Magit specifically noted the rural location where the two bodies were found and the time of day in retroactively confirming his conclusion that there was probable cause supporting issuance of the warrant. He similarly testified that the warrant was limited both in terms of time and location, which led him to find it was sufficiently particularized. Judge Magit also noted that while issuing tower dump warrants was unusual at the time he granted this application (he believes he had granted less than five at that time), so too was it unusual for local police to find evidence of a double homicide on the side of a rural highway in the county where he sits as a judge, implying that this extraordinary warrant was justified by extraordinary circumstances. More generally, Judge Magit testified that he never signed a warrant without an affidavit, or without first agreeing the requesting officer had established probable cause. And he otherwise testified that he would guess he denies about 20% of the warrant applications that come before him. Indeed, beyond not acting as a rubber stamp, Judge Magit's testimony also goes to the third and fourth reasons for potential application of the good faith exception: the warrant affidavit arguably contained probable cause and was not so facially deficient that no reasonable officer could execute it.

///

---

[16] Spurlock also argued at the Hearing that the fact Judge Magit authorized the inclusion of a request for 'content' in the warrant further indicated he had rubber-stamped it, but Judge Magit otherwise testified he had no specific recollection of granting this warrant application. The Court is accordingly unable to determine why Judge Magit left those references to 'content' in the warrant, much less that he included them out of carelessness. The same goes for Judge Magit's failure to note the error in the date of Sergeant Hernandez's signature. The Court cannot find such failure adequately supports a finding that Judge Magit did not conduct an independent review of the warrant application.

And Judge Magit's testimony is consistent with the government's argument that there was at least arguable probable cause for issuing the warrant in the warrant application itself, so suppression is not warranted. Specifically, the warrant application noted clear indicia that a crime had been committed; dead bodies that had been shot and stabbed, with shell casings nearby. (ECF No. 254-2 at 9.) Moreover, Judge Magit testified that the warrant does limit how much data is collected in scope because, given the time limitation and the remoteness of the area, there would likely be a relatively small amount of data returned in response to it. The fact that the data returned from the warrant turned out to be more voluminous than he apparently expected does not undermine the fact that Judge Magit deliberated and found probable cause before issuing the warrant. Officer Hernandez further noted in the affidavit that the killings appeared to have taken place at night in a rural area, along with the fact that investigators found cell phones near the victims and in their car found on the other side of Bridgeport, which also had blood in it. (*Id.* at 9-11.) He otherwise noted that most people carry cell phones now, linking this to the fact that cell phones were found near the bodies and in the abandoned vehicle using the word "[a]dditionally." (*Id.*; *see also id.* at 11.) He thus (at least arguably) reasonably inferred that whoever killed the deceased victims may have used cell phones, and because of the time and location, finding out who was calling each other in a six hour window around the time and near the location of the suspected killings would help him find who may have done it. (*Id.*) The Court accordingly finds there was at least arguable probable cause such that the good faith exception applies, and suppression is not warranted. And as noted, the Court does not find that Judge Magit merely rubber-stamped the application either.

**d. Whether Suppression is Otherwise Warranted**

The Court otherwise notes a reluctance to suppress evidence when courts declare novel investigative techniques unconstitutional. *See, e.g.*, *Smith*, 110 F.4th at 840 ("[W]e cannot fault law enforcement's actions considering the novelty of the technique and the dearth of court precedent to follow."); *Elmore*, 917 F.3d at 1078 ("This is particularly true

in light of the fact that in 2012, no circuit court had yet held the Fourth Amendment applicable to CSLI data."). And the Court appears to be the first court within the Ninth Circuit to declare tower dump warrants unconstitutional general warrants. Even *Smith*, which does not bind the Court, was not decided until 2024. *See generally* 110 F.4th 817. Moreover, *Smith* is the first circuit decision finding geofence warrants unconstitutional. This being the case, neither Sergeant Hernandez nor Judge Magit can reasonably have been expected to refrain from seeking the warrant, or to refrain from issuing it, back in 2020. For this additional, alternative reason, the Court declines to suppress any evidence obtained in response to warrant 20-SW-56.

And because the Court declines to suppress any evidence returned from warrant 20-SW-56, the Court also declines to suppress any evidence returned from the approximately 90 (according to Spurlock) other warrants that may have relied at least in part on evidence obtained in response to warrant 20-SW-56.[17] In sum, the Court will deny Spurlock's motion to suppress tower dump data.

**B. Motion to Suppress Evidence from 27 Red Rock Drive**

Spurlock also moves to suppress any evidence collected from a warehouse he was renting, which he identifies as 29 Red Rock Drive in his motion (ECF No. 257 at 1), though the government clarifies in response that the correct address is 27 Red Rock Drive (ECF No. 297 at 1 n.1).[18] The Court will refer to it as 27 Red Rock Drive in this order because that is the correct address.

Spurlock's landlords' daughter, H.M., who he corresponded with regarding the lease and other details after moving out, gave law enforcement permission to search the warehouse after she determined Spurlock had moved out. (ECF No. 257 at 3.) Spurlock argues for the suppression of the evidence gathered during this search because he was

---

[17]For purposes of this order, the Court need not—and does not—make this finding. But as Investigator Pelichowksi testified, the tower dump data was a starting point for he and his colleagues to obtain cell data, which they then built upon to obtain more useful information.

[18]Spurlock further confirms in reply that 27 Red Rock Drive is the correct address. (ECF No. 328 at 1 n.1.)

Case: 26-689, 10/27/2026, DktEntry: 19.2, (250 of 254)

living in the warehouse, so it was his residence entitled to Fourth Amendment protection, and H.M. lacked both actual and apparent authority to consent to the search, rendering the search unconstitutional. (*Id.* at 4-5.) The government counters that the evidence shows Spurlock had already moved out, and his lease had been terminated, at the time of the search, and that H.M. had both actual and apparent authority to consent to the search. (ECF No. 297 at 2.) Because the Court agrees with the government that Spurlock lacked a privacy interest in 27 Red Rock Drive at the time of the search—as even he appeared to understand the lease had ended and he had moved out—and as further explained below, the Court will deny the motion to suppress without addressing the actual or apparent authority arguments.

### 3. Findings of Fact

On June 4, 2020, Spurlock signed a one-year lease with Hans and Velveth Marty for about 3000 square feet of warehouse space at 27 Red Rock Road in Mound House, Nevada. (ECF No. 297-1 at 3, 12.) The lease specifies that Spurlock was going to use the warehouse for a furniture restoration business, and not anything else unless he got the Marty's written consent, and the other use was lawful. (*Id.* at 3.) H.M. is the Marty's daughter, and she lived with them in a house right next to the warehouse during the times pertinent to this motion. (ECF No. 257 at 2, 297 at 2-3.) H.M. also corresponded with Spurlock by email regarding the lease, including sending him a signed copy of the lease on June 6, 2020. (ECF No. 297-2 at 2.)

On June 19, 2020, H.M. again corresponded with Spurlock by email to let him know that they (she and her parents) could not let him keep an R.V. outside the warehouse. (*Id.* at 3.)

H.M. also took notes about Spurlock and his associates who used the warehouse. (ECF No. 297-3.) On June 23, she noted a fight between Spurlock, W.L., and others, which concluded in the evening with W.L. apparently moving out. (*Id.* at 3-4.) As part of that fight, she noted, "[w]e agreed to let [Spurlock] break the lease without paying for the remainder of the term." *Id.* at 3. On July 2, movers and later W.L. came back to gather

some more things from the warehouse. (*Id.* at 4.) On July 3, some men arrived in a semi truck from Brand X and removed more things from the warehouse with a forklift. (*Id.*) They left the lights on, and H.M. went into the warehouse that night to turn the lights off, finding a 'mostly empty shop.' (*Id.*) On July 4, H.M. called W.L., and W.L confirmed he was done moving out. (*Id.*)

This prompted H.M. to email Spurlock, telling him that W.L. moved out, but some things had been left behind, and the warehouse sustained some damage she intended to charge him for. (*Id.*; *see also* ECF No. 297-4 at 2-3.) She attached pictures of some of the damage and items left behind to the email she sent Spurlock. (*Id.* at 2-6.) Spurlock wrote back to her on July 5, 2020:

> Have Hans call me as soon as possible. I'm wondering if this series of emails means you were trying to deduct the minor cost of repairs out of the $4950 (July's rent paid in advance/security deposit/last months rent) and then the remainder will be returned to me? That's not what we agreed on upon our last conversation, do I'm confused. I'll speak to him seeing as my contract is with him and his legal spouse.

(*Id.* at 7.)

Spurlock followed up on that email on July 11, 2020, writing:

> Just following up with you. I have not received any response, so I'm wondering if I might need to inform my attorney that this is escalating. If I am mistaken (and I sincerely hope I am), please just send me a signed copy of an AMICABLE lease termination, and we can conclude our interaction. I hope to hear from Hans and/or receive said termination by Monday evening. Thanks for your time.

(*Id.*)

The government otherwise alleges that Spurlock told W.L. over Signal in late June or early July 2020:

> I would go get those tubs full of your shit from the truck if I were you. They're outside and there are a lot of fucking crackheads. Those people have the keys to the shop and you can talk to them about getting all your tools down. I terminated the lease. It's done. Don't ever fucking contact me again.

(ECF No. 302 at 4.)

On July 14, 2020, H.M. sent an email to Carson City Detective Sam Hatley inviting him to come search the warehouse and collect any evidence from it before she and her parents moved forward with leasing it to someone else. (ECF Nos. 297 at 3, 297-5 at 2.)

Case: 26-689, 10/27/2026, DktEntry: 19.2, (252 of 254)

She mentioned in that email that a private investigator had come to visit her the day before about a missing person, that she had noticed strange things happening while Spurlock had leased the warehouse, and concluded the email by offering to assist law enforcement in their investigation. (*Id.*) This is the email that led to the consent search Spurlock objects to in his motion to suppress. (ECF No. 297 at 3.)

**4. Legal Analysis**

"[T]he demonstration of a legitimate expectation of privacy 'is a threshold standing requirement, and analysis cannot proceed further without its establishment.'" *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (quoting *United States v. Cruz-Jimenez*, 894 F.2d 1, 5 (1st Cir. 1990)). "Where a defendant depends on a 'reasonable expectation of privacy,' two elements must be met: (1) that he had 'an actual (subjective) expectation of privacy,' and (2) that his subjective expectation is 'objectively reasonable'—i.e., that it is an expectation 'that society is prepared to recognize as 'reasonable.'" *United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022) (citation omitted). People who voluntarily abandon property lack standing to complain of its search or seizure, and whether they have abandoned property presents a factual question focusing on the person's words, acts, or other objective indications that the person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure. *See id.* at 686.

Spurlock had voluntarily abandoned the warehouse at 27 Red Rock Road by the time H.M. gave police permission to search it. After witnessing an argument between Spurlock and W.L. (and others), H.M had the impression from Spurlock and W.L. that they were moving out, and she and her parents even told Spurlock he could break the lease without penalty. (ECF No. 297-3.) W.L. confirmed to H.M. that he had moved out by July 4, 2020. (*Id.* at 4.) H.M. emailed Spurlock that same day, and he emailed her back on July 5, 2020, objecting that she was going to deduct money from an amount he had paid that he himself characterized as "last months [sic] rent." (ECF No. 297-4 at 7.) Spurlock sent H.M. another email on July 11, 2020, following up on his apparent request

to get his whole security deposit back, requesting an 'amicable' lease termination. (*Id*.) There is no evidence that H.M saw Spurlock on the property after June 23, 2020. And the government otherwise alleges that Spurlock told W.L. on Signal sometime in late June or early July that he had "terminated the lease." (ECF No. 302 at 4.)

Taken together, this evidence establishes that Spurlock both subjectively believed that he had terminated the lease on 27 Red Rock Road sometime before July 14, 2020, and that he had objectively abandoned 27 Red Rock Road as well.[19] Because he had abandoned the property before H.M. even invited law enforcement officers to come search the premises, Spurlock lacks standing to challenge the search that eventually occurred. *See Fisher*, 56 F.4th at 685-88 (affirming denial of motion to suppress because the defendants had voluntarily abandoned some digital devices containing unlawful content in an attic crawl space when they sold the house that the police later discovered the digital devices in after the purchaser of the house gave them permission to search it). The Court will accordingly deny Spurlock's motion to suppress evidence collected from 27 Red Rock Drive.

## III. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

---

[19]Spurlock argues in reply that he had not surrendered his rights under the lease because the lease provided that a surrender would only be effective if the landlords sent him a written acceptance of his surrender, but they never did. (ECF No. 328 at 2-5.) However, the Court finds this argument unpersuasive because it is overly formalistic and presents only one indicium factoring into an objective assessment of whether Spurlock had objectively abandoned the property outweighed by the other indicia described herein leading the Court to conclude that Spurlock had abandoned the property by the time H.M. consented to a search. Indeed, Spurlock relies on *United States v. Sledge*, 650 F.2d 1075, 1080 (9th Cir. 1981) for the proposition that, "[i]f one who has abandoned property from all outward appearances in fact has retained a subjective expectation of privacy, then a search of the property is nevertheless valid if that expectation is intrinsically unreasonable or not otherwise entitled to protection." *Id.* (*See also* ECF No. 328 at 3.) But here, Spurlock had subjectively abandoned the property as well. (ECF No. 302 at 4 ("I terminated the lease.").) *Sledge* is accordingly inapplicable.

It is further ordered that Spurlock's motion to suppress tower dump data (ECF No. 254) is denied.

It is further ordered that Spurlock's motion to suppress evidence from 27 Red Rock Drive (ECF No. 257) is denied.

DATED THIS 11th Day of April 2025.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE